UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

CITY OF WARREN POLICE AND FIRE : Civil Action No. 1:18-cv-01492-AMD-SJB
RETIREMENT SYSTEM, Individually and on :
Behalf of All Others Similarly Situated, : ECF CASE
:
        Plaintiff, : CLASS ACTION
:
    vs. : SECOND AMENDED COMPLAINT
: FOR VIOLATIONS OF THE FEDERAL
FOOT LOCKER, INC., RICHARD A. : SECURITIES LAWS
JOHNSON and LAUREN B. PETERS, :
:
        Defendants. :
:
———————————————————————— x DEMAND FOR JURY TRIAL

Lead Plaintiffs New England Carpenters Guaranteed Annuity and Pension Funds ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Lead Plaintiffs' counsel. That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings made by Foot Locker, Inc. ("Foot Locker" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of the Company, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of Foot Locker common stock between August 19, 2016 and August 17, 2017, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Defendant Foot Locker is a New York City-based retailer of athletically inspired footwear and apparel. During the Class Period, Foot Locker operated over 3,000 brick-and-mortar stores in 23 countries.

3.      As a retailer, Foot Locker purchases the merchandise sold in its stores from vendors, which provide a defined product or brand. Foot Locker's business is heavily dependent on a small number of vendors, with its largest vendor Nike Inc. ("Nike") supplying 68% of the Company's merchandise in fiscal 2016. The willingness of the Company's top vendors to

allocate high-demand merchandise, including limited release sneaker models, is critical to the success of Foot Locker's business model of selling premium, full-priced merchandise to its core constituency of young male sneaker aficionados.

4. During the Class Period, many conventional retailers were struggling, as vendors increasingly sold their merchandise online through third-party websites such as Amazon.com, Inc. ("Amazon"), as well as through their own websites. Defendants, however, led investors to believe that Foot Locker was not being adversely impacted by these market forces.

5. For example, Defendants highlighted Foot Locker's "strong vendor relationships," and stated that Foot Locker was a "lead[ing] partner for [its] world-class vendors," was "partner[ing]" with its "key vendors . . . to deliver trend-right, premium footwear," and had "great partnerships" with its vendors "that continue[d] to fuel sneaker culture" and "bring heat . . . to [the Company's] stores[.]" In truth, the Company's vendors had essentially become competitors, rather than partners. Unbeknownst to investors, Foot Locker's top vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – becoming their own retailers and directly competing with Foot Locker.

6. As a result, Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker. Nonetheless, Defendants falsely represented that "the leading brands continue[d] to be highly motivated to collaborate with [Foot Locker] on . . . exclusive and strong allocations," that Foot Locker was doing "a great job of working with [its] vendor partners to bring in assortments that resonate[d] with [its] consumers," and that

- 2 -

Foot Locker's vendors were "all committed to bringing fresh, new, exclusive product into" the Company's stores. Defendants likewise stated that Foot Locker was "work[ing] close[ly] with [its] vendors on allocations," was doing "really good work . . . on improving [its] allocation[s] to get the right product to the right place, right time," and was "continu[ing] to work with all of [its] vendor partners to increase [its] allocations[.]"

7. Defendants also failed to disclose that Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products. The less desirable merchandise that Foot Locker was required to purchase was more likely to compete with non-premium merchandise that was available on Amazon and other third-party websites, making it even more difficult for Foot Locker to sell this merchandise. Moreover, the Company's vendors only permitted Foot Locker to return a small percentage of unsold inventory. As a result, Foot Locker was forced to mark down the inventory that it could not sell or return to vendors – a practice that undermined the Company's business model of selling full-priced merchandise and strained its profit margins. Nonetheless, Defendants represented that Foot Locker had "careful inventory . . . management," that Foot Locker's "inventory [was] fresh and well-positioned," and that Foot Locker was "keeping control of [] inventory growth."

8. On April 20, 2017, nine days before the end of 1Q17,[1] Foot Locker issued a press release lowering its first quarter and full year guidance "in light of the . . . slow start to the fiscal year in February." However, Defendants falsely attributed the revision to "the delay in the

---

[1] Foot Locker's fiscal quarters are abbreviated by quarter and year. Thus, for example, "1Q17" represents the first quarter of fiscal year 2017. "FY16" and "FY17" refer to the full fiscal years 2016 and 2017, respectively.

issuance of the vast majority of income tax refund checks until after the NBA All-Star Game," and assured investors that "the customer's appetite for [Foot Locker's] exciting product assortments ha[d] not changed" and the Company's "banners remain[ed] at the center of sneaker culture[.]"

9.      Then, on May 19, 2017, Foot Locker announced disappointing results for 1Q17, including a year-over-year increase in comparable-store sales of just 0.5%, below Foot Locker's recently-revised guidance of a low-single digit percentage increase.  Defendants continued to blame delayed income tax refunds for the disappointing results, however, and assured investors that Foot Locker was merely experiencing "a little bit of a lag," "the consumer ha[d]n't gone elsewhere," and the Company's "position in the industry [was] stronger than ever."  During a conference call that day, when an analyst asked whether vendors' direct-to-consumer initiatives had been negatively impacting Foot Locker's business, Defendant Richard A. Johnson ("Johnson") responded that Foot Locker was "push[ing] back against" those initiatives and "continue[d]" to have the "support" of its vendors, and that direct-to-consumer initiatives were not impacting Foot Locker "any more right now . . . than [they had] been" in the past.

10.      Finally, on August 18, 2017, Foot Locker announced its financial results for 2Q17 and reported negative comparable metrics for the first time in ***29 quarters***[2] – including a 6% decline in comparable-store sales and a 4.4% decline in total sales.  In addition, Defendants revealed that they now "expect[ed] comparable[-store] sales to be down three to four percent over the remainder of the year" and expected earnings per share ("EPS") "to decrease between 20% to 30% in the second half of 2017."

---

[2]    All emphasis is added unless otherwise noted.

11.    These announcements finally apprised investors of the fact that – notwithstanding Defendants' previous denials – Foot Locker's business was in fact facing a sustained downturn as its top vendors increasingly sold their products directly to consumers via online channels, and simultaneously allocated less premier inventory to Foot Locker.  Reflecting this understanding, a Morgan Stanley analyst report issued the same day stated that Foot Locker's "much worse than anticipated" 2Q17 financial results "len[t] more credence to the idea that [Foot Locker] [was] being negatively impacted by Adidas.com and Nike.com," and "questioned whether the "lack of availability of products [was] a sign that [Foot Locker] ha[d] fallen off brands' 'most favored retailer' lists[.]"

12.    Defendants also disclosed that Foot Locker's gross margins had deteriorated 340 basis points, which they admitted was "driven by [] higher markdown[s]," and stated that a "very high level of promotional activity" had "affected [Foot Locker] more this quarter than in the past," thereby revealing that the Company was saddled with undesirable inventory.

13.    After investors reacted to these adverse disclosures, Foot Locker common stock closed at $34.38  per share on August 18, 2017 – a decline of more than 56% from the stock's Class Period high of $79.20 per share, reached on December 8, 2016.

14.    Before investors learned the full truth about the adverse trends impacting Foot Locker, Company insiders, including Defendants Johnson and Lauren B. Peters ("Peters"), collectively sold 192,162 shares of their personally held Foot Locker common stock, generating proceeds of more than $13.38 million.

### JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act because Foot Locker can be "found," "is an inhabitant" and "transacts business" in this District within the meaning of Section 27 of the Exchange Act, 15 U.S.C. §78aa.  Foot Locker operates 58 retail shoe stores in this District, including 20 retail stores in Brooklyn alone: "Foot Locker" stores located at 1565 Flatbush Ave. #1567, 1268 Fulton St., 532 5th Ave., 1636 Pitkin Ave., 5266 Kings Plaza, 767 Broadway, 324 Knickerbocker Ave., 408 Fulton St., 5314 5th Ave., 2061 86th St., 1159 Liberty Ave., 8028 Cooper Ave. Ste. 6102; "Kids Foot Locker" stores located at 1258 Fulton St., 5161 Kings Plaza, 5314 5th Ave., 389 Knickerbocker Ave.; "Footaction" stores located at 543 Fulton St. and 5333 Kings Plaza; a "Lady Foot Locker" store located at 5314 5th Ave.; and a "Champs Sports" store located at 5266 Kings Plaza.  While Foot Locker rents most of the retail space it occupies across the U.S., since 2012 Foot Locker has owned the real property its stores are located on at 5310 5th Ave., Brooklyn, NY.

18.    Venue is also proper in this District pursuant to Section 27 of the Exchange Act because this is a district "wherein any act or transaction constituting the violation occurred." 15 U.S.C. §78aa(a).  The conduct at issue in this lawsuit is Defendants' targeting of materially false and misleading statements about the performance of Foot Locker retail stores at actual or potential purchasers of Foot Locker common stock across the entire nation – many of whom likely reside within this District – which induced those investors to purchase Foot Locker common stock.

19.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Lead Plaintiffs New England Carpenters Guaranteed Annuity and Pension Funds purchased Foot Locker common stock during the Class Period, as set forth in the certification previously filed with the Court and incorporated herein by reference, and have been damaged thereby.

21.     Defendant Foot Locker is a global retailer of full-priced, branded athletic footwear and apparel.  The Company's principal executive offices are located at 330 West 34th Street, New York, New York 10001.  Foot Locker's common stock is listed and trades on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "FL."  The Company's fiscal year ends on the Saturday closest to the last day in January – *e.g*., fiscal 2016 ended on January 28, 2017.

22.     Defendant Johnson is, and was at all relevant times, Foot Locker's Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors.

23.     Defendant Peters is, and was at all relevant times, Foot Locker's Chief Financial Officer ("CFO") and Executive Vice President.

24.     Defendants Johnson and Peters are collectively referred to herein as the "Individual Defendants" and, together with Foot Locker, as "Defendants."

25.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Foot Locker, were privy to confidential and proprietary information concerning Foot Locker and its operations, finances, financial condition, and present and future business prospects.  As discussed below, the Individual Defendants had access to material,

adverse, non-public information concerning Foot Locker via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Foot Locker's business.

27.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the

Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Foot Locker's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Foot Locker common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.    Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Foot Locker common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Foot Locker's business and prospects and the intrinsic value of Foot Locker common stock; (ii) enabled the Individual Defendants and certain Foot Locker insiders to collectively sell more than $13.38 million worth of their personally held Foot Locker common stock to the unsuspecting public at artificially inflated prices at times and in amounts that were unusual; and (iii) caused Lead Plaintiffs and other members of the Class (defined below) to purchase Foot Locker common stock at artificially inflated prices.

**CONFIDENTIAL SOURCES**

30.    The allegations made herein are supported by the first-hand knowledge of eight confidential witnesses ("CWs"). These individuals are former Foot Locker employees who each have direct knowledge about Foot Locker's business prior to and during the Class Period and served in positions at Foot Locker that provided them with access to the information they are alleged to possess.

- 9 -

31.    CW1 worked as a Replenishment Analyst for women's footwear at Foot Locker's corporate headquarters through April 2016.  In that position, CW1 was responsible for analyzing sales trends in women's footwear and advising buyers on the desired quantities of inventory to purchase.  In connection with those responsibilities, CW1 prepared daily and weekly reports for buyers that reflected sales trends in women's footwear.

32.    CW2 worked at Foot Locker as a Treasury Analyst from before the Class Period through November 2016, and subsequently as a Financial Analyst, Capital Planning until January 2017.  CW2's responsibilities as a Treasury Analyst included preparing the Company's global cash forecast for its North American operations.  As a Financial Analyst, Capital Planning, CW2's responsibilities included forecasting the return on investment for the Company's planned store openings and remodelings.

33.    CW3 worked at Foot Locker as the Director of Store Optimization for the Company's SIX:02 "banner" from before the Class Period through September 2017.[3]  In that position, CW3 was responsible for preparing reports containing performance results, marketing review and product analysis for the SIX:02 banner, for use in monthly steering meetings for Foot Locker's women's business.  During those meetings, which were attended by Defendants Johnson and Peters, the performance of the SIX:02 and Lady Footlocker banners was discussed.

34.    CW4 worked at Foot Locker as a Retail Planner from before the Class Period through March 2018, and worked in the Company's Footaction banner during the Class Period.[4]

---

[3]    Foot Locker's SIX:02 banner features a curated assortment of athletic-inspired footwear, apparel and accessories for the "modern woman."

[4]    Foot Locker's Footaction banner offers the "freshest" selection of athletic footwear and apparel, and its primary customer is the "style-obsessed" young male.

CW4's responsibilities included managing sales, evaluating inventory levels, and forecasting margins and inventory levels on a daily, monthly, yearly and three-year basis.

35.     CW5 is a former Replenishment Analyst for men's footwear who worked at Foot Locker throughout the Class Period, until September 2017.  CW5's responsibilities included determining how to allocate footwear among the Company's stores.

36.     CW6 worked as Marketing Brand Coordinator for Foot Locker's SIX:02 banner from before the Class Period through September 2017.  In that position, CW6 served as a liaison between the SIX:02 marketing team and other SIX:02 teams, including the buying, merchandising and web teams, and interacted with Foot Locker's vendors including Nike and adidas AG ("Adidas") to increase recognition of the SIX:02 banner.

37.     CW7 worked at Foot Locker as an Associate Buyer for SIX:02 footwear from before the Class Period until September 2017.  CW7's responsibilities included negotiating the purchase of inventory from vendors including Nike and Adidas.

38.     CW8 is a former Vice President who worked at Foot Locker until January 2016.  CW8's responsibilities included budgeting, procurement, financial planning, accounting and project management.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

39.     Founded in 1989, Defendant Foot Locker describes itself as a leading global retailer of athletically inspired shoes and apparel.  As of the end of fiscal 2016, the Company operated 3,363 primarily mall-based brick-and-mortar stores in the United States, Canada, Europe, Australia, and New Zealand under various "banners," including Foot Locker, Kids Foot Locker, Lady Foot Locker, Champs Sports, Footaction, Runners Point, Sidestep, and SIX:02.

- 11 -

40.     The Company operates through two reportable segments: (1) Athletic Stores, which encompasses its brick-and-mortar stores; and (2) Direct-to-Customers, which encompasses its online and catalogue sales.  In fiscal 2016, the Athletic Stores segment generated $1.576 billion in sales, whereas the Direct-to-Customers segment generated just $204 million in sales.

41.     Like most retailers, Foot Locker does not manufacture its own merchandise. Rather, the items Foot Locker sells are purchased from vendors, which provide a defined product or brand.  Foot Locker's business is heavily dependent on a small number of vendors.  In fiscal 2016, the Company purchased 90% of its merchandise from its top five vendors, with its largest vendor Nike supplying 68% of Foot Locker's merchandise.

42.     Foot Locker's most frequent and highest margin sales are to young males aged 12 to 25, many of whom purchase athletic footwear and licensed apparel for both performance and fashion.

43.     The Company's most loyal customers are sneaker aficionados – referred to in the athletic footwear industry as "sneakerheads."  Sneakerheads typically purchase desirable, limited release sneakers, often waiting in long lines at stores for the opportunity to purchase the sneakers.  Although limited edition sneaker releases comprise approximately 5% of total sneaker sales, sneakerheads are highly coveted customers, as their enthusiasm has a halo effect – helping to shape brands' images and driving store traffic to retailers such as Foot Locker.

44.     Foot Locker relies upon having access to exclusive and marquee products from its top vendors.  Therefore, the willingness of the Company's top vendors to allocate high-profile, high-demand merchandise to Foot Locker is critical to the Company's success.

45.    During 2016, many traditional retailers were experiencing declining sales as a result of increased competition from online retailers such as Amazon.  At the same time, many vendors were increasingly attempting to sell their products directly to consumers via online channels, essentially becoming their own retailers.  In 2016, brick-and-mortar retailers such as Macy's and Sears announced hundreds of store closings while others, such as Aeropostale and Sports Authority, went bankrupt.

46.    Foot Locker represented that it had insulated itself from these larger trends by way of its business strategies and competitive advantages.  For example, Defendants represented that Foot Locker's primary customers, young males, preferred to shop in-store for a variety of reasons, including: (i) the fact that they frequently pay with cash; (ii) the fact that, in many instances, their feet are still growing, necessitating trying on shoes; (iii) the social experience of visiting the store with their friends and interacting with store employees; and (iv) the hype generated at Foot Locker stores by limited edition sneaker releases.

47.    Defendants also highlighted Foot Locker's purportedly "strong" relationships with its vendors, which helped the Company to procure the most desirable product allocations. Echoing Defendants' assurances, a November 1, 2016 Webdush Securities analyst report stated that Foot Locker's "strong vendor relationships lead to favorable product allocation," allowing Foot Locker "to gain access to some of the best product in the market with the most generous allocations available."  Similarly, a Telsey Advisory Group analyst report dated February 17, 2017 noted that Foot Locker was "more insulated from the migration to online given its superior allocation of on-trend sneakers and exclusives."

48.    Prior to and during the Class Period, it appeared that Foot Locker's strategy was working.  As of August 19, 2016, the start of the Class Period, the Company had reported

26 consecutive quarters of year-over-year sales and profit growth.  In addition, Foot Locker consistently achieved Defendants' standard guidance of mid-single digit increases in comparable-store sales, and double-digit EPS growth.

### During the Class Period, Foot Locker was Experiencing Adverse Changes to Its Vendor Relationships

49.     Unbeknownst to investors, during the Class Period, Foot Locker was experiencing several adverse changes to its vendor relationships.  In particular, the Company's vendors were increasingly selling their products directly to consumers, allocating smaller quantities of premier products to Foot Locker, and requiring the Company to purchase undesirable merchandise in order to obtain desirable merchandise.

**Foot Locker's Vendors Were Increasingly Competing with the Company by Selling Their Products Directly to Consumers, and Were Allocating Fewer Premier Products to Foot Locker**

50.     Notwithstanding Defendants' assurances that Foot Locker maintained strong partnerships with its vendors, during the Class Period, Nike and other top vendors were in fact ramping up their initiatives to sell their products directly to consumers via online channels.  By doing so, Foot Locker's vendors were essentially bypassing the Company and becoming their own retailers – and placing themselves in direct competition with Foot Locker.

51.     According to CW1, the former Replenishment Analyst for women's footwear, beginning around April 2016, many of Foot Locker's vendors began to keep much of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker.  Similarly, CW1 stated that vendors began to allocate their premier products to boutique stores.  In some instances, Foot Locker would receive premier products later on, only after they had been successful in boutiques.

- 14 -

52.     CW2, the former Treasury Analyst and Financial Analyst, likewise observed that during 2017, major vendors including Nike and Adidas resorted to selling special releases of their footwear directly to consumers through their own websites and apps.  CW2 explained that for certain special releases from Nike and Adidas, it was necessary to purchase the sneakers through the vendors' apps.  At the same time, those vendors restricted the amount of special release inventory that Foot Locker could procure.

53.     By the Fall of 2016, it was apparent to CW2, as a "sneaker enthusiast," that Foot Locker was receiving less special release inventory because it became difficult even for Foot Locker employees to obtain special release sneakers, including Yeezy shoes by Adidas and certain limited release Jordan shoes by Nike.  CW3, the former Director of Store Optimization for SIX:02, confirmed that Nike allocated only limited quantities of its especially popular products to Foot Locker during the Class Period.

54.     CW2 explained that Foot Locker's inability to obtain special release footwear had an outsized impact on the Company's business, since Foot Locker relied upon special releases to drive sales by attracting customers to its stores.

55.     In addition, during 2017, Nike began to target key sneakerhead customers as part of its direct-to-consumer initiatives.  For example, Nike refined its "SNKRS" app, launched in 2015, as a method of connecting sneakerheads with desirable, limited release sneakers.  The SNKRS app – distinct from the Nike.com app – focused exclusively on limited-edition, special release sneakers.  In contrast to Foot Locker's business model of requiring sneakerheads to camp out in long lines at its stores, the new "Stash" feature of Nike's SNKRS app prompted users to visit certain locations during a specific timeframe.  Once the user reached the location, he or she

- 15 -

was prompted to hold up the in-app camera to an image at the designated spot.  After the app recognized the image, it unlocked the particular shoe model for early purchase.

**Foot Locker's Vendors Were Requiring the Company to Purchase Undesirable Merchandise in Order to Obtain Desirable Merchandise**

56.    CW3, CW4, CW5, CW6 and CW7 each described a practice by the Company's vendors during the Class Period, whereby the vendors would require Foot Locker to purchase large quantities of undesirable merchandise in order to obtain desirable merchandise.  CW3, the former Director of Store Optimization for SIX:02, attended product meetings at Nike every six months, along with representatives from Foot Locker's other banners, to discuss acquiring the Nike inventory that would be sold by Foot Locker.  CW3 reported that during these meetings, Nike would condition Foot Locker's ability to obtain the Nike products that Foot Locker wanted on the Company purchasing large quantities of inventory that Foot Locker did not want.

57.    CW4, the former Retail Planner, likewise reported that vendors required Foot Locker to purchase subpar footwear in order to obtain the footwear that the Company wanted to purchase.  CW4 believed that Nike had a "70/30" rule, whereby Foot Locker could only obtain 70% of the sneakers that the Company wanted to purchase.  In addition, Foot Locker had to fill the other 30% of the order amount with sneaker models that the Company knew would be difficult to sell.

58.    CW5, the former Replenishment Analyst for men's footwear, confirmed that Foot Locker's vendors required the Company to purchase less desirable products in order to obtain the best products.  CW6, the former Marketing Brand Coordinator for SIX:02, similarly stated that some of Foot Locker's vendors would only allow the Company's buyers to purchase certain products if they also purchased another type of product.

- 16 -

59.    CW7, the former Associate Buyer for SIX:02, likewise reported that when Foot Locker wanted to purchase a certain "hot" sneaker from a vendor, the vendor would only allow Foot Locker to obtain the sneaker if the Company also purchased other types of sneakers that were expected to sell poorly.  For example, CW7 reported that this issue frequently occurred with Puma.

60.    According to CW7, Foot Locker routinely agreed to purchase thousands of pairs of undesirable sneakers that had difficulty selling in order to obtain the "hot" sneaker models. CW3 confirmed that Foot Locker inevitably had difficulty selling the undesirable merchandise.

61.    CW3 further stated that, with respect to Nike, Foot Locker was only refunded a small percentage of the order price if it elected to return the unsold inventory to Nike.  Similarly, CW7 reported that the portion of unsold inventory that Foot Locker could return to a vendor at the end of the season was only in the single-digits, which did not meaningfully offset the unsold inventory.  CW4 likewise stated Foot Locker's vendors only permitted the Company to cancel or return five-to-six percent of the orders that Foot Locker had placed.

62.    The less desirable merchandise that Foot Locker was required to purchase was more likely to compete with non-premium merchandise that was available on Amazon and other third-party websites such as Zappos.com, making it more difficult for Foot Locker to sell this merchandise.  As a result, Foot Locker was forced to mark down the merchandise that it could not sell or return to vendors – a practice that contradicted the Company's business model of selling full-priced merchandise and strained its profit margins.  CW4 confirmed that vendors' practice of only permitting Foot Locker to return or cancel a small percentage of orders resulted in a glut of inventory that needed to be marked down in order to be sold.

63.     Indeed, at the end of the Class Period, Defendants revealed that Foot Locker's gross margins had deteriorated significantly year-over-year due to "higher markdown[s]," and admitted that a "very high level of promotional activity" had "affected [Foot Locker] more this quarter than in the past."

### Omissions Based on Violations of Items 303 and 503

64.     During the Class Period, Foot Locker filed Forms 10-Q and 10-K with the SEC. Each of these documents was signed by Defendant Peters, and Foot Locker's Form 10-K for FY16 was also signed by Defendant Johnson.  As detailed herein, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

**Item 303**

65.     The SEC created specific rules governing the content of disclosures by public companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

66.     Specifically, Item 7 of Form 10-K and Item 2 of Form 10-Q require that a company's SEC filings furnish the information required under Item 303(a)(3) of Regulation S-K. Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC, among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was

so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

67.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

68.     Defendants violated the affirmative disclosure duties imposed by Item 303(a)(3) of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, in the Company's Forms 10-Q and 10-K filed during the Class Period, the following material information that was known to management: (i) Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and directly competing with Foot Locker; (ii) Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker; and (iii) Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.

69.     The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or

of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations[.]"

**Item 503**

70.     Defendants also violated their affirmative disclosure duties imposed by Item 503(c) of Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K," codified at 17 C.F.R. §229.503(c). Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

71.     Defendants violated the affirmative disclosure duties imposed by Item 503 of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose that: (i) Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and directly competing with Foot Locker; (ii) Foot Locker was no longer receiving sufficient quantities of the premier

products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker; and (iii) Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.

72.    The foregoing concealed facts were "significant factors" that made Foot Locker securities "speculative or risky," and therefore, were required to be disclosed in Foot Locker's SEC filings, but were not.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

**2Q16 Financial Results**

73.    The Class Period begins on August 19, 2016.  On that date, Foot Locker issued a press release announcing its financial results for 2Q16, the period ended July 30, 2016.  The Company reported that, on a year-over-year basis, comparable-store sales had risen 4.7%; gross margins had improved 40 basis points, to 33% of sales; and EPS had increased 12%, to $0.94 per share.  In addition, net income had reached $127 million; and total sales had increased 5%, to $1.78 billion year-to-date.  Commenting on the results, Defendant Johnson stated, in pertinent part:

> As a Company, ***Foot Locker has strong leadership positions in the athletic industry***, with the most important being ***our deep understanding of the core customer*** for each of our banners.  ***We share this understanding with our key vendors, which enables us to partner with them to deliver the trend-right, premium footwear and apparel assortments our customers seek***, which in turn has led to ***consistently outstanding financial results*** such as we announced today.

74.    In addition, Defendant Peters stated that Foot Locker's "***careful inventory*** and expense ***management, have led to our current strong financial position***."

- 21 -

75.     The statements referenced above in ¶¶73-74 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)     Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and directly competing with Foot Locker;

(b)     Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker;

(c)     Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products; and

(d)     as a result of the foregoing adverse trends, the Company's growth and guidance were not sustainable, and Defendants lacked a reasonable basis for their positive statements about the Company and its business and prospects.

76.     Later that day, Defendants held a conference call with analysts and investors, during which the Company highlighted its "26th consecutive quarter" of "meaningful sales and profit gains over the prior-year period," and "the best start to a year in Foot Locker's history." During the call, Defendants Johnson and Peters each commented, in pertinent part:

<u>Defendant Peters</u>:

***The fairly consistent sales results across footwear categories this quarter is yet another excellent example of our ability to navigate the never-ending shifts and style preferences of our customers, who continue to look to our stores and online sites for the most innovative, trend-right sneakers.  They know they can count on us to have what's hot, or should I say, what's cool***.

<u>Defendant Johnson</u>:

***We are leaders in understanding what our customers want, and how and when they want it***.  We spend a tremendous amount of time identifying the key characteristics of the core customers of each of our banners, and what makes them want to engage and transact with us.  ***This work in turn make[s] us a lead[ing] partner for our world-class vendors***, as they create and market their most innovative athletically-inspired products.

***The investments we have made in our store fleet***, both in the physical appearance of the stores, ***and the quality of the merchandise assortments, have led to our stores being destinations for our customers***.  This can be seen in our traffic results, which consistently outpace overall mall or high street traffic.

                    *        *        *

***We believe we're the leading retailer of premium sneakers, period, not just a specific category of sneakers, sneakers.  Full stop***.

                    *        *        *

***Our vendors know that our banners provide the perfect battleground to fight it out to win market share, especially with the young male customers who buy the most sneakers, and who are the style influencers for the rest of their generations***.  And increasingly for the rest of us, since every day, it seems more and more adults are wearing sneakers too.  ***And that's why the leading brands continue to be highly motivated to collaborate with us on these exclusive and strong allocations***.

77.     The statements referenced above in ¶76 were materially false and misleading at the time they were made for the reasons set forth in ¶75.  In particular, the statements that Foot Locker was a "lead[ing] partner for [its] world-class vendors," that the Company's vendors "kn[e]w that [Foot Locker's] banners provide[d] the perfect battleground to fight it out to win market share," and that "leading brands continue[d] to be highly motivated to collaborate with [Foot Locker] on . . . exclusive and strong allocations" were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that: (a) Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and directly competing

with Foot Locker; and (b) Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker.  In addition, because Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products, the "quality of [Foot Locker's] merchandise assortments," was no longer "[leading] to [its] stores being destinations for . . . customers."  As a result of the foregoing, Foot Locker's customers were not "continu[ing] to look to its stores . . . for the most innovative, trend-right sneakers."

78.    During the call, when Barclays Capital analyst Matt McClintock asked for "some color about success you've had in malls" and how "the closing of anchor tenants in malls" was impacting Foot Locker," Defendant Johnson responded, in pertinent part:

> *So we know that our customers, our core consumers want to be in our stores*. So the anchors, certainly there's some lease ramifications when anchors close, but *our focus is more on the connectivity with our consumer*, the engagement we have with our consumer, building exciting places to shop and buy.  They interact with us digitally on their way to the mall.  They, in the mall, will take a photo of the sneaker on their foot, and they'll tweet it out, or they'll send it out to their group of friends, and get the responses back.  The anchors closing is a change, certainly in the make-up of the malls, but *our consumer is still driven to the malls as a place for social interaction with their friends.  So we're confident that regardless of anchor positioning, we should continue to drive traffic into the malls*.

79.    The statements referenced above in ¶78 that Foot Locker's "core consumers want[ed] to be in [its] stores," and were "still driven to the malls as a place for social interaction with their friends" were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that Foot Locker's customers were increasingly purchasing athletic wear directly from vendors via online channels.

- 24 -

80.     Also during the call, in response to JPMorgan analyst Matthew Boss' question about "the increased category and brand diversification that you're seeing," and whether there was "any change in pricing or overall [average selling prices]," Defendants commented, in pertinent part:

Defendant Johnson:

Well, . . . our consumer's not driven by categories, they're driven by cool and sneaker culture.  So **our buyers and our merchants do a great job of working with our vendor partners to bring in assortments that resonate with our consumers**.

\*     \*     \*

**So from an ASP [average selling price] perspective, they do a great job of managing that as well**, and we're not talking about trading $200 signature basketball shoes for $49 shoes.  We're talking about a lot of these casual silhouettes still being elevated, and price points, and **our focus is really on the premium area of sneaker culture, and the consumer is definitely responding to that**.  So I don't – Lauren, you may want to comment on ASP mix, but I don't see any changes in the back half.

Defendant Peters:

No. The trend has been there for quite a while now.  ASPs have been up.  The customer has voted for these shoes, that they feel have really good price to value, and that price has been a bit elevated.

That, coupled with all of the **really good work that we're doing on improving our allocation to get the right product to the right place, right time, and keeping control of the inventory growth. That too has fueled lower markdowns**.  Therefore, that is a bit of the higher ASP as well.  **Our merchants are very thoughtful about the assortment across price points, to make sure that we're bringing compelling product**, and it's not skewed to the point that we're pricing folks out.

81.     During the call, when Cowen and Company analyst John Kernan asked about the Company's "ability to get increased allocations around some of the" new product launches from Adidas, Defendant Johnson responded, in pertinent part:

**Well, we are on a nice run with adidas**, absolutely, John, **and getting the allocations relates to the great relationship that we have with all of our vendor**

- 25 -

*partners*.  And right now in several markets, no matter what retailer you talk to, they would tell you they don't have enough of the best product.  But *that's one of the things that our vendor partners really do, is they control the scarcity model, they pump in the appropriate number of shoes*.

Our merchants would always like more.  They like to feed at the trough when something's hot, but *the vendor partners do a good job of controlling the flow into the marketplace, and keeping that ever-present demand out there, and I think it helps to keep the heat in our industry*.  It helps to keep the consumer excited about getting the next.  By and large, it's a good thing.  *And we continue to work with all of our vendor partners to increase our allocations, and the story telling that we do in the store to connect better with the consumer, and connect them with the product stories*.

82.    In addition, the following exchange occurred during the call when an analyst asked about Foot Locker's "mix of exclusive[]" products from its vendors:

Paul Trussell – Deutsche Bank – Analyst:

. . . I think it's well understood the partnership that you have on the basketball side with Nike, *maybe you can just give us a little bit more color around your mix of exclusives with Nike on non-basketball products and the same with other vendors, such as adidas, Under Armour, Puma, et cetera*.

Defendant Johnson:

. . . *They're all committed to bringing fresh, new, exclusive product into those spaces*.  So I'm not going to get into the amount of exclusives that we've got in each of those, but the commitment that we've made, we signed the lease, we share the build-out costs, *they deliver great product, some of it exclusive, some of it with time leads*, et cetera.  We do the servicing and the story telling in the stores, and *we have great partnerships that continue to fuel sneaker culture.  So they're all working and we're very positive about the vendor partnerships*.

83.    The statements referenced above in ¶¶80-82 concerning Foot Locker's vendor relationships and product allocations were materially false and misleading at the time they were made for the reasons set forth in ¶75.  In addition, Defendants knew, but failed to disclose, that the Company was not "do[ing] a great job of managing" its average selling prices or maintaining its "focus . . . on the premium area of sneaker culture" because Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to

- 26 -

sell poorly in order to obtain desirable products.  That less desirable merchandise was more likely to compete with non-premium merchandise that was available on third-party websites, making it more difficult for Foot Locker to sell this merchandise.  As a result, Foot Locker was forced to mark-down the merchandise that it could not sell or return to vendors – a practice that contradicted the Company's business model of selling full-priced merchandise and strained its profit margins.

84.    On September 7, 2016, Foot Locker filed its quarterly report for 2Q16 with the SEC on Form 10-Q.  The 2Q16 Form 10-Q was signed by Defendant Peters and repeated Foot Locker's financial results for 2Q16.  The 2Q16 Form 10-Q failed to disclose material information that was required to be disclosed pursuant to Items 303(a)(3) and 503 of Regulation S-K, as set forth above in ¶¶64-72.

**3Q16 Financial Results**

85.    On November 18, 2016, Foot Locker issued a press release announcing its financial results for 3Q16, the period ended October 29, 2016.  The Company reported that, on a year-over-year basis, comparable-store sales had again risen 4.7%; gross margins had improved to 33.9% of sales; and non-GAAP EPS[5] had increased 13%, to $1.13 per share.  In addition, net income had reached $157 million; and total sales had increased 5.1%, to $1.886 billion year-to-date.  Defendant Johnson commented on the results, in pertinent part:

---

[5]    Foot Locker sometimes provides financial information that does not comport with the requirements of Generally Accepted Accounting Principles ("GAAP") "because it believes the information assists investors in comparing [the Company's] performance across reporting periods on a consistent basis by excluding items that are not indicative of its core business."  For example, 3Q16 non-GAAP EPS excluded the impact of a $10 million reduction in tax expense and a $6 million pre-tax impairment charge.

> *Our outstanding track record of meaningful sales and profit growth over several years is a strong testament to Foot Locker, Inc.'s solid position at the center of sneaker culture*.  Our associates work hard every day to make our Company *the sneaker lover's preferred destination for the best footwear and apparel assortments across our array of outstanding athletic vendors*.

86.    In addition, Defendant Peters stated that Foot Locker's "*inventory [was] fresh and well-positioned* . . . ."

87.    The statements referenced above in ¶¶85-86 were materially false and misleading at the time they were made for the reasons set forth in ¶75.  In addition, Defendants knew, but failed to disclose, that Foot Locker's inventory was not "fresh and well-positioned" because Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.  As a result of the foregoing, Foot Locker was not in a "solid position at the center of sneaker culture," and was not "the sneaker lover's preferred destination for the best footwear and apparel assortments."

88.    Later that day, Defendants held a conference call with analysts and investors, during which the Company highlighted its "strong third-quarter financial performance" and "the strength of [its] position in the athletic industry[.]"  During the call, Defendant Johnson highlighted Foot Locker's "27th consecutive quarter of meaningful sales [and] non-GAAP profit growth," and commented, in pertinent part:

> As great as our vendors are, and they are all excellent, style preferences of our customers shift between them which is why being a multi-brand retailer is so important.  *Our vendors have certainly come to recognize and support the critical position we have built within the industry in terms of providing that feeling of authenticity to our customer*. . . .
>
> *We work continuously with our vendors to share the insights we gathered during the journey of discovering what our customers find to be the best, coolest sneakers and apparel at any given moment.  Ultimately, it is having available the most innovative products from our outstanding suppliers that keeps our banners top of mind with our most influential customers*.

- 28 -

89.     The statements referenced above in ¶88 concerning Foot Locker's vendor relationships were materially false and misleading at the time they were made for the reasons set forth in ¶75.   As a result of the adverse trends that Foot Locker was experiencing with its vendors, the Company's growth and guidance were not sustainable, and its banners were not "top of mind with [its] most influential customers."

90.     During the call, the following exchange occurred when an analyst asked about the allocations of premium products that Foot Locker was receiving from its vendors:

Mitch Kummetz – B. Riley & Company – Analyst:

 . . . ***Dick, could you talk a little bit about allocations?  I guess you would say you always wish you had more of the best-selling stuff***.

But just anecdotally, it seems like, whenever I go into my local Foot Locker store you guys are a little short on Ultra Boost and NMDs.  I'm wondering if there's been a catch-up taking place there, just given the resurgence of adidas particularly around some of those styles.  ***And moving forward if you might be in a better position in terms of allocations with some of that hottest product***.

Defendant Johnson:

 . . . ***The thing that fuels our business with our consumers is a scarcity model.  So, while we always wish that we had a little bit more of the best product, the likelihood of us ever being able to satisfy the last customer, we certainly don't want that to happen, frankly***.

***It takes the excitement away if everybody can get exactly what they want.  We want to keep your appetite high for that type of product, Mitch.  We work close with the vendors on allocations and distribution***.

Certainly we try to get more, ***we try to get what we think is the appropriate amount for our stores.  But it's an ongoing conversation.  And as significant partners with our suppliers, I think we end up with*** – I don't know if our fair share is the right way to put it but we end up with ***a model that the consumers are driven by because they know they have to get into the stores and get it or they might not have the chance***.

***So, the scarcity piece of the allocation model is important to our success***, as well.

91.    The statements referenced above in ¶90 concerning Foot Locker's product allocations were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that: (a) Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker; and (b) Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.  In addition, Foot Locker's customers did not "have to get into the stores and get [premium products] or they might not have the chance," since Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels.

92.    On December 7, 2016, Foot Locker filed its quarterly report for 3Q16 with the SEC on Form 10-Q.  The 3Q16 Form 10-Q was signed by Defendant Peters and repeated Foot Locker's financial results for 3Q16.  The 3Q16 Form 10-Q failed to disclose material information that was required to be disclosed pursuant to Items 303(a)(3) and 503 of Regulation S-K, as set forth above in ¶¶64-72.

**FY16 Financial Results**

93.    On February 24, 2017, Foot Locker issued a press release announcing its financial results for 4Q16 and FY16, the periods ended January 28, 2017.  For 4Q16, the Company reported that, on a year-over-year basis, comparable-store sales had risen 5%; gross margins had improved to 33.7% of sales; non-GAAP EPS had increased 18%, to $1.37 per share; and net income had reached $189 million.  For FY16, Foot Locker reported that, on a year-over-year basis, total sales had increased 5.3%, to $2.113 billion; sales had increased 4.8%, to $7.766 billion; comparable-store sales had risen 4.3%; net income had increased to $664 million; and

non-GAAP EPS had increased 12%, to $4.82 per share.  In addition, the Company reported that FY16 sales and profits were its "[h]ighest [e]ver."  Defendants Johnson and Peters each commented on the results, in pertinent part:

> Defendant Johnson:
>
> Generating our seventh consecutive year of meaningful sales and profit growth is *a strong testament to Foot Locker, Inc.'s solid position at the center of sneaker culture*. . . . *Due in part to the change in the cadence of income tax refund check distribution, we are facing a challenging retail sales environment as we enter 2017*; however, we believe the strategic initiatives we have in place, *coupled with our strong vendor relationships*, will enable us to deliver another year of record performance.
>
> Defendant Peters:
>
> *We continued to make substantial progress in 2016 towards our long-term goals* . . . .  Although we currently face a softer sales environment than at this time last year, *we are planning for a mid-single digit comparable sales gain and a double-digit earnings per share increase for the full year of 2017*.

94.    Later that day, Defendants held a conference call with analysts and investors, during which the Company highlighted its "strong finish to the year" and its "sixth consecutive year achieving record annual earnings."  During the call, Defendant Johnson stated that the Company was "*firmly positioned* . . . *at the center of sneaker culture*, which . . . established a strong foundation upon which to build and shape our business in the future."

95.    In addition, Defendant Peters commented, in pertinent part:

> . . . *The current delay in the release of tax refunds by the IRS compared to a year ago has led to a slower than usual start in the US, which is likely to result in a challenging first quarter.  It is our belief that our customers' fundamental appetite for the product has not changed; however, the timing of their cash flows and their ability to buy the product has been impacted*.

96.    The statements referenced above in ¶¶93-95 were materially false and misleading at the time they were made for the reasons set forth in ¶75.  As a result of the adverse trends that Foot Locker was experiencing with its vendors, the Company's growth and guidance were not

sustainable, and Foot Locker was not positioned "at the center of sneaker culture." In addition, Foot Locker was not "facing a challenging retail sales environment" due to the "delay in the release of tax refunds." Rather, as Defendants knew, but failed to disclose, the challenging retail sales environment that the Company was facing was due to the adverse trends that Foot Locker was experiencing with its vendors.

97.    During the question and answer portion of the call, Defendant Johnson commented, in pertinent part:

> *So wherever the heat is brought by our tremendous vendor partners, the consumer is going to move there . . . . I have a huge amount of faith in our vendor partners and our merchant teams, to move the dollars where the customer is, and is going to be.*

98.    During the call, the following exchange occurred when an analyst asked about the expected impact of the delay in income tax refunds:

Camilo Lyon – Canaccord Genuity – Analyst:

> *. . . I wanted just to get a little bit more clarity on what your thinking is around these tax refund delays, and if you consider them . . . as lost sales or sales that will be recovered in the later weeks, when those refunds do flow?. . .*

Defendant Johnson:

> . . . So the year has some shifts in it, right? The year or the week shift of the All-Star Game, the week shift of President's Day, the start of Easter being later, some Mardi Gras and Carnival all shifting. And then the PATH Act that required this delay in some of the tax returns. *So certainly, there have been buying opportunities that have passed when our consumer didn't have cash in their hands.*
>
> *But we firmly believe that the consumer still has a huge desire for the products that we have in our store. We have a huge belief that our vendors continue to bring heat in our category to our stores and websites. So we're confident that the sales will start to flow when the tax checks start to flow.*

99.    Also during the call, an analyst asked about Foot Locker's ability to attract consumers to its stores, and Defendant Johnson responded, in pertinent part:

<u>Camilo Lyon – Canaccord Genuity – Analyst</u>:

*. . . **Could you just remind us what it is that you're doing, or what it is that you have relative to even your competitors, that allows you to continue to generate positive traffic growth in the US?***

<u>Defendant Johnson</u>:

. . . We're focused on creating consistent, authentic, and memorable experiences for our consumers.  So that the striper, the person at Footaction, the guy or gal in blue at Champs, they are the resident experts, the style associates we've got in our 602 business.  ***Our consumers want to be there, and they see it [as]a place where there's cool product, they are among their peers, they're among their friends, and there's an environment they are comfortable to shop in***.

Not all of our stores are like 34th Street and Times Square, but ***there's still a level of excitement that's brought by the product and the associates in the door.  The energy level is high, they are just great places***, and a lot of credit goes to the teams that help drive the excitement.  ***But it also goes to our vendor partners who bring great products, they connect those products with great stories and assets, that allow our consumer to really find them relevant and cool***.

<u>Defendant Peters</u>:

So ***our customers know they got to come into our brands to check it out, because we're going to have the coolest stuff, and that shows up in that traffic number***.

100.    The statements referenced above in ¶¶97-99, including the statements that "wherever the heat is brought by our tremendous vendor partners, the consumer is going to move there," that "our vendors continue to bring heat . . . to our stores," and that Foot Locker's "vendor partners" were "bring[ing] great products" to its stores that consumers found "relevant and cool," were materially false and misleading at the time they were made for the reasons set forth in ¶75.   In addition, the statements that "the consumer still has a huge desire for the products that we have in our store," and that "consumers want to be" in Foot Locker stores because "they see it [as] a place where there's cool product" and "know" that Foot Locker is "going to have the coolest stuff" were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that Foot Locker's customers were increasingly

- 33 -

purchasing athletic wear directly from vendors via online channels.  Finally, the statements concerning the impact of delayed tax refunds were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that "buying opportunities" had not "passed" due to the delayed tax refunds; rather, buying opportunities had passed due to the adverse trends that Foot Locker was experiencing with its vendors.

101.    On March 23, 2017, Foot Locker filed its annual report for FY16 with the SEC on Form 10-K.  The FY16 Form 10-K was signed by Defendants Johnson and Peters and repeated Foot Locker's financial results for FY16.  The FY16 Form 10-K failed to disclose material information that was required to be disclosed pursuant to Items 303(a)(3) and 503 of Regulation S-K, as set forth above in ¶¶64-72.

**April 20, 2017 Press Release**

102.    On April 20, 2017, Foot Locker issued a press release updating its guidance for 1Q17, the period ended April 29, 2017, "in light of the previously noted slow start to the fiscal year in February."  According to the press release, the Company now expected 1Q17 EPS to "be equal to or slightly below last year's record earnings, or $1.36 to $1.39 per share."  In addition, comparable-store sales for 1Q17 were "expected to increase at a low-single digit percentage rate."  As a result of "the sluggish first quarter," Foot Locker now expected a "full-year earnings per share percentage increase in the mid-single digits, excluding the 53rd week" of FY17, compared to the Company's previous guidance of a double-digit EPS increase for FY17.  Commenting on the revision, Defendant Johnson stated, in pertinent part:

> ***We believe the delay in the issuance of the vast majority of income tax refund checks until after the NBA All-Star Game significantly affected our February comparable store sales, which were down low-double digits***.  March sales rebounded well, up high-single digits; however, the strength we experienced once income tax refund checks started flowing into our customers' hands did not fully offset the slow start to the quarter.  Encouragingly, we are now having a strong

Easter selling period, with April comparable sales likely up low double digits, *which we see as confirmation that the customer's appetite for our exciting product assortments has not changed*.

Despite our disappointment in the overall sales performance in the first quarter, *we are confident our banners remain at the center of sneaker culture and we believe in our ability to produce the strong performance over the remainder of 2017 that we previously outlined*.

103.    The statements referenced above in ¶102 were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that Foot Locker's revised guidance and "sluggish first quarter" were not due to "the delay in the issuance of the vast majority of income tax refund checks until after the NBA All-Star Game"; rather, they were due to the adverse trends that Foot Locker was experiencing with its vendors.  In addition, as Defendants knew, but failed to disclose, "the customer's appetite for" Foot Locker's "product assortments" had in fact "changed" because Foot Locker's customers were increasingly purchasing athletic wear directly from vendors via online channels.  As a result of the adverse trends that Foot Locker was experiencing with its vendors, Defendants lacked a reasonable basis to express "confiden[ce]" that Foot Locker's "banners remain[ed] at the center of sneaker culture," or to state that the Company would be able to "produce the strong performance over the remainder of 2017."

**1Q17 Financial Results**

104.    On May 19, 2017, Foot Locker issued a press release announcing its financial results for 1Q17.  The Company reported that its total sales growth had plummeted year-over-year, falling to essentially flat.  In addition, comparable-store sales had risen only 0.5% year-over-year, below Foot Locker's recently-revised guidance of a low-single digit percentage increase.  As a result, Foot Locker reported that its 1Q17 net income had fallen to $180 million,

and EPS had fallen to $1.36 per share, compared to net income of $191 million and EPS of $1.39 per share that the Company had reported for 1Q16.

105.    During a conference call with analysts and investors later that day, Defendants disclosed that the Company was now forecasting that 2Q17 comparable-store sales would be up only in the low-single-digits, "with earnings relatively flat" on a year-over-year basis. Defendants further stated that if "recent sales trends continue[d]," the Company would be forced to implement a "Plan B" to cut costs and inventory, in order to achieve its FY17 guidance of a mid-single digit EPS increase.

106.    In the press release, however, Defendant Johnson once again misleadingly attributed the Company's disappointing results to delayed tax refunds, stating that "*[t]he slow start we experienced in February*, which we believe *was largely due to the delay in income tax refunds*, was unfortunately not fully offset by much stronger sales in March and April." Defendant Johnson further assured investors that Foot Locker's "*banners remain[ed] at the center of a vibrant sneaker culture*," that Defendants were "*confident that [Foot Locker's] customers ha[d] not lost their tremendous appetite for athletic footwear and apparel*," and that the Company's "*position in the industry [was] stronger than ever*."

107.    Defendants issued additional reassurances during the conference call.   In particular, the following exchange occurred when an analyst asked whether vendors' direct-to-customer initiatives had been negatively impacting Foot Locker's business:

Robert Scott Drbul – Guggenheim Securities – Analyst:

. . . [W]hen you look at the trends out there, *do you think that the direct-to-consumer efforts of some of the brands are impacting the business at all today?*

Defendant Johnson:

At all?  Sure.  But, I mean, I think that there's some pressure from everybody that sells sneakers.  We're all fighting for consumers.  *I think that our understanding*

*of our consumer base and our connectivity, trying to create consistent, authentic, memorable experiences for our consumer, whether they're in-store or online with us, allow us to push back against that*.  But certainly, people have a lot of shopping choices, whether it's online or places in malls or on the street.  *So I don't know that it's any more right now, Bob, than it's been, but we'll continue to be diligent* across all of the channels *and leverage our inventory* and our experiences with our consumers across all those channels.

Defendant Peters:

And we know these customers well, and we know the differences in those customers across our different brands.  We understand what motivates them, what they get excited about, and that's what we focus on bringing to them.  So with that focus, *they know they've got to come to us to check out what we've got before they make their purchase decision*.

Defendant Johnson:

. . . Just one other quick point.  *The vendors continue to support our initiatives*, right?  We're building House of Hoops.  We're looking at Kicks Lounges, the Fly Zones in Kids Foot Locker, opening the Jordan store in Paris.  *All of those things just speak to the strength of the relationship with our key vendor partners*.

108.   Also during the call, Deutsche Bank analyst Paul Elliott Trussell asked Defendants to "dig a little bit more on how the second quarter is just a blip," and remarked that "you've said that when the consumer has the cash, they shop at Foot Locker.  And historically, your merchants have been very well prepared for changes in style preferences.  So hard to understand why this time is different."  In response, Defendant Johnson stated that "*[t]here's just a little bit of a lag*," and "*the consumer hasn't gone elsewhere*."

109.   The statements referenced above in ¶¶106-08 were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that Foot Locker's disappointing 1Q17 financial results and revised guidance were not "largely due to the delay in income tax refunds"; rather, they were due to the adverse trends that Foot Locker was experiencing with its vendors.  In addition, the statements that Foot Locker was successfully "push[ing] back against" vendors' direct-to-consumer initiatives, and that direct-to-consumer

initiatives were not impacting Foot Locker "any more right now. . . than [they had] been" were materially false and misleading at the time they were made because Defendants knew, but failed to disclose, that: (a) Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and directly competing with Foot Locker; and (b) Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers, rather than selling those products through Foot Locker.  Moreover, Defendants knew, but failed to disclose, that the Company could not "continue . . . leverage [its] inventory" because Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.  Finally, although Foot Locker's "customers ha[d] not lost their tremendous appetite for athletic footwear and apparel," those customers had in fact "gone elsewhere," and no longer had "to come to [Foot Locker] to check out what [it had] before they ma[d]e their purchase decision," since they were increasingly purchasing athletic wear directly from vendors via online channels.  As a result of the adverse trends that Foot Locker was experiencing with its vendors, Defendants lacked a reasonable basis to state that the Company's "banners remain[ed] at the center of a vibrant sneaker culture," or that Foot Locker's "position in the industry [was] stronger than ever."

110.    In response to the press release and conference call, the price of Foot Locker common stock declined 16.65%, from a closing price of $70.45 per share on May 18, 2017, to close at $58.72 per share on May 19, 2017, on unusually heavy trading volume of more than 16 million shares traded – more than eight times the average daily trading volume over the

preceding 30 trading days.  However, Defendants' false and misleading reassurances in the press release and during the conference call prevented a more substantial decline in Foot Locker's share price.

111.    On June 6, 2017, Foot Locker filed its quarterly report for 1Q17 with the SEC on Form 10-Q.  The 1Q17 Form 10-Q was signed by Defendant Peters and repeated Foot Locker's financial results for 1Q17.  The 1Q17 Form 10-Q failed to disclose material information that was required to be disclosed pursuant to Items 303(a)(3) and 503 of Regulation S-K, as set forth above in ¶¶64-72.

**2Q17 Financial Results**

112.    On August 18, 2017, investors discovered that Foot Locker's business was not merely facing a "little bit of a lag" as Defendants had led investors to believe, but was instead experiencing a sustained downturn.  On that date, before the markets opened, Foot Locker issued a press release announcing its financial results for 2Q17, the period ended July 29, 2017, and reporting negative comparable metrics for the first time in *29 quarters*.  Foot Locker reported that its 2Q17 total sales had now *declined* 4.4% year-over-year, falling $79 million, from $1.78 billion in 2Q16 to $1.701 billion in 2Q17.  In addition, comparable-store sales had *fallen* 6% year-over-year, and gross margins had deteriorated 340 basis points, to 29.6% of sales, compared to 33% of sales in 2Q16.  As a result, Foot Locker reported that its 2Q17 net income had fallen to just $51 million, compared to net income of $127 million in 2Q16, and EPS had fallen to $0.39 per share, drastically below both the $0.90 per share that analysts were expecting, and the $0.94 per share that the Company had reported for 2Q16.  Commenting on Foot Locker's disappointing results, Defendant Johnson stated that the Company now "*expect[ed] comparable[-store] sales to be down three to four percent over the remainder of the year*."

- 39 -

113.    In addition, Defendant Peters stated that the Company was considering various initiatives to cut expenses "in light of the current sales challenges," including reductions to Foot Locker's store base, reductions in capital spending, and a "shifting of emphasis from real estate to digital and supply chain[.]"

114.    During a conference call with analysts and investors later that day, Defendants revealed that they "*expect[ed] non-GAAP EPS to decrease between 20% to 30% in the second half of 2017*."  Defendants also admitted that the deterioration in gross margins was "driven by [] higher markdown[s]," and that a "*very high level of promotional activity*" had "affected [Foot Locker] more this quarter than in the past."  Finally, Defendants stated that they were "accelerating" the "process of reviewing [Foot Locker's] store portfolio" and "currently expect[ed] to close at least 135 stores," an increase from the 100 stores Defendants had previously announced they would close.

115.    In response to these disclosures, the price of Foot Locker common stock declined nearly 28%, from a closing price of $47.70 per share on August 17, 2017, to close at $34.38 per share on August 18, 2017, on unusually heavy trading volume of more than 36.2 million shares traded – more than nine times the average daily trading volume over the preceding ten trading days.  The price of Foot Locker common stock continued to decline the following trading day, on heavy trading volume, as the market digested the adverse announcements, closing at $31.82 per share on Monday, August 21, 2017 – a total decline of more than 33%.

116.    These announcements finally apprised investors of the fact that – notwithstanding Defendants' previous denials – Foot Locker's business was in fact facing a sustained downturn as its top vendors increasingly sold their products directly to consumers via online channels, and simultaneously allocated less premier inventory to Foot Locker.  In addition, Defendants'

admissions that Foot Locker had been forced to mark down inventory and was experiencing a "very high level of promotional activity" revealed that the Company was saddled with undesirable inventory.

117.    Following the August 18, 2017 announcements, analysts issued reports the same day reflecting this understanding.  For example:

- A Credit Suisse analyst report noted that "the pace of retailer disintermediation by core vendors looks to be outpacing Foot Locker's digital offset."

- An Evercore ISI analyst report concluded that, "[w]ith [Foot Locker] shares down huge today on a surprisingly large sales [and] earnings miss [and] guide[-]down, it's clear that [Foot Locker] is now on the growing list of retailers caught in the crossfire of digital disintermediation."

- A J.P. Morgan analyst report described the Company's disappointing financial results "and tempered [second half] outlook" as a "game-changer," noting that they "confirm top-line softness is not transitory, but in fact proving more structural than originally expected."

- Citing 2Q17 "performance that was far worse than expected," a Wells Fargo analyst report noted that "[i]nvestors have been significantly concerned about . . . the disruption that e-commerce is causing to sellers of third-party goods, and today's print likely heightens those concerns."  "[G]iven that the . . . headwinds do not appear to be short-term in nature," the report concluded that there was "meaningful risk that 2018 will be another year of negative comps, margin erosion and EPS declines . . . ."

- A Morgan Stanley analyst report opined that Foot Locker's "much worse than anticipated" 2Q17 financial results and guidance "sp[oke] to the lack of visibility in the business and . . . len[t] more credence to the idea that [Foot Locker] [was] being negatively impacted by Adidas.com and Nike.com."  The report also "questioned whether the "lack of availability of products [was] a sign that [Foot Locker] ha[d] fallen off brands' 'most favored retailer' lists[.]"

- Piper Jaffray stated in an analyst report that it was "remain[ing] cautious" on Foot Locker's prospects "given [the] intensifying consumer shift to vendor [direct-to-consumer] platforms . . . ."

- A UBS analyst report predicted that FY18 comparable-store sales would likely "struggle to return to positive growth amid a secular shift away from brick [and] mortar and key brands pushing [Amazon] [and] [direct-to-consumer] growth."  The report further noted that "[a]fter pre-releasing 1Q[17] results to update

expectations, [the] lack of a 2Q[17] pre-release despite numbers well below plan should weigh on confidence in the path forward."

- An article published in *Sneaker News* stated that Foot Locker's disappointing results were "partly due to a decrease in sales of Nike products and specifically [Nike's] premium, higher-end products." The article observed that "part of the decreased sales of Nike products could be due to the brand's own ramping up of direct-to-consumer e-commerce platforms, which means people are buying directly from Nike and not from retail partners."

## ADDITIONAL SCIENTER ALLEGATIONS

118. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Foot Locker, their control over, and/or receipt and/or modification of Foot Locker's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Foot Locker, were active and culpable participants in the fraudulent scheme alleged herein.

119. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

120. The Individual Defendants, because of their positions with Foot Locker, controlled the contents of the Company's public statements during the Class Period. The

Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Foot Locker's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

121.    The fraud alleged herein relates to the core business of Foot Locker, so knowledge of the fraud may be imputed to Defendants. As a retailer, Foot Locker's business is dependent upon the vendors who supply the Company with inventory. Indeed, Foot Locker purchased approximately 90% of its inventory from its top five vendors during the Class Period, with its largest vendor, Nike, supplying 68% of Foot Locker's inventory in fiscal 2016. Accordingly, Defendants would have closely monitored the direct-to-consumer sales of Nike and the Company's other top vendors throughout the Class Period, and would have been aware that those vendors were increasingly bypassing Foot Locker and selling their products directly to consumers via online channels, and were keeping more of their premier products for themselves, to be sold directly to consumers.

122.    Likewise, Defendants would have closely monitored Foot Locker's inventory purchases during the Class Period, and would have known that Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products.

123.     Indeed, at the end of the Class Period, Defendant Peters admitted that Defendants knew, while 2Q17 was still in-progress, that sales were declining "more than expected," and – knowing that Foot Locker's share price was artificially inflated – decided to "temporarily halt[]" the Company's share "repurchase activity."   Despite this knowledge, Defendants did not pre-announce that they expected disappointing financial results for 2Q17, as they had done on April 20, 2017 with respect to 1Q17.

124.     In addition, Foot Locker's internal systems and periodic reports and meetings give rise to a strong inference that Defendants knew, or recklessly disregarded, the adverse changes in Foot Locker's vendor relationships, and the financial impact that those changes were having on the Company.  In particular, CW1, the former Replenishment Analyst for women's footwear, stated that Foot Locker maintained an internal network called Quantum, which tracked sell-through data, sales numbers, products and inventory.  According to CW1, Quantum was updated on a daily basis.  Similarly, according to CW4, the former Retail Planner, Foot Locker employees had access to MicroStrategy software which showed the Company's sales on a daily, weekly and monthly basis for various divisions, as well as Company-wide.  CW7, the former Associate Buyer for SIX:02, reported that members of the SIX:02 buying group received printouts that contained metrics for the SIX:02 banner such as sales, inventory, cost, turnover and margins, as well as projected inventory at year-end.

125.     CW6, the former Marketing Brand Coordinator for SIX:02, stated that Foot Locker held weekly meetings every Monday, which were attended by the Company's top executives, including Defendants Johnson and Peters.  CW8, the former Vice President, confirmed that Foot Locker held weekly meetings, which CW8 attended along with Defendants Johnson and members of the Company's leadership team.  During these weekly meetings, the

leadership team discussed sales, earnings and cost trends.  CW8 also participated in weekly meetings attended by Defendant Peters, during which financial forecasts for each area of Foot Locker's business were discussed.  According to CW8, these weekly meetings included discussions of revenues and mark-downs.

126.    Given Defendants' knowledge of the adverse trends that Foot Locker was experiencing with its vendors, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

127.    Defendants were motivated to engage in this fraudulent course of conduct in order to enable certain Company insiders, including Defendants Johnson and Peters, to collectively sell 192,162 shares of their personally held Foot Locker common stock for gross proceeds in excess of *$13.38 million*, as follows:

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---|---|---|---|---|---|
| **Defendant Johnson** (CEO, President, Chairman) | 8/19/2016 8/19/2016 | $68.00 $68.10 | 30,000 20,000 **50,000** | $2,040,000 $1,362,000 **$3,402,000** | **5.4%** |
| **Defendant Peters** (CFO) | 8/22/2016 3/8/2017 | $68.00 $77.51 | 20,000 25,000 **45,000** | $1,360,000 $1,937,750 **$3,297,750** | **10.9%** |
| **Lewis P. Kimble** (Executive Vice President, CEO International) | 9/7/2016 9/7/2016 | $65.38 $65.46 | 30,667 12,812 **43,479** | $2,005,008 $838,674 **$2,843,682** | **32.5%** |
| **Paulette Alviti** (Senior Vice President, Chief Human Resources Officer) | 12/5/2016 12/5/2016 4/20/2017 | $75.23 $75.37 $74.50 | 3,000 7,000 8,000 **18,000** | $225,690 $527,590 $596,000 **$1,349,280** | **21.4%** |
| **Jarobin Gilbert** (Director) | 12/6/2016 5/24/2017 | $76.23 $59.40 | 1,000 5,600 **6,600** | $76,230 $332,640 **$408,870** | **38.9%** |

| Insider | Date | Price | Shares Sold | Proceeds | % Sold |
|---|---|---|---|---|---|
| **Nicholas P. Dipaolo** (Director) | 10/13/2016 | $68.75 | **5,424** | **$372,900** | **7.3%** |
| **Cheryl N. Turpin** (Director) | 10/12/2016 3/2/2017 | $69.16 $76.17 | 10,000 2,000 | $691,600 $152,340 | |
| | | | **12,000** | **$843,940** | **21.8%** |
| **Matthew M. McKenna** (Director) | 11/29/2016 3/1/2017 | $72.39 $75.92 | 6,659 5,000 | $482,045 $379,600 | |
| | | | **11,659** | **$861,645** | **19.9%** |
| | **Total:** | | **192,162** | **$13,380,067** | |

128.    These insider sales were unusual in timing and amount because during the 363-day period prior to the Class Period, Foot Locker insiders sold just 31,628 shares for proceeds of approximately $2.1 million.

129.    Similarly, during the 363-day period following the Class Period, Foot Locker insiders sold just 73,442 shares for proceeds of approximately $3.6 million.

## LOSS CAUSATION/ECONOMIC LOSS

130.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Foot Locker common stock and operated as a fraud or deceit on Class Period purchasers of Foot Locker common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Foot Locker common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Foot Locker common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

- 46 -

131.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Foot Locker's business and prospects.  Defendants' false and misleading statements and omissions had the intended effect and caused Foot Locker common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.20 per share on December 8, 2016.

132.    The precipitous decline in the price of Foot Locker common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Foot Locker common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Foot Locker common stock and the subsequent significant decline in the value of Foot Locker common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Foot Locker common stock between August 19, 2016 and August 17, 2017, inclusive, who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

134.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Foot Locker common stock was actively traded on the NYSE.  As of November 24, 2017, Foot Locker had more than 121.2 million shares issued and outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Foot Locker or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

135.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

136.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

137.    Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants misrepresented and/or omitted material facts about Foot Locker and its business;

- 48 -

(c)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)     whether the price of Foot Locker common stock was artificially inflated during the Class Period; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE
### AND *AFFILIATED UTE* DOCTRINE

139.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiffs and the other members of the Class purchased Foot Locker common stock between the time Defendants misrepresented or failed to disclose material facts

and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

140.    At all relevant times, the market for Foot Locker common stock was efficient for the following reasons, among others:

(a)    Foot Locker common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Foot Locker filed periodic public reports with the SEC and the NYSE;

(c)    Foot Locker regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Foot Locker was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

141.    As a result of the foregoing, the market for Foot Locker common stock promptly digested current information regarding Foot Locker from all publicly available sources and reflected such information in the prices of Foot Locker's common stock. Under these circumstances, all purchasers of Foot Locker common stock during the Class Period suffered similar injury through their purchase of Foot Locker common stock at artificially inflated prices and a presumption of reliance applies.

142.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Foot Locker's business and prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

143.    Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**NO SAFE HARBOR**

144.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Foot Locker who knew that those statements were false when made.

- 51 -

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

145.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

146.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147.    Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 [17 C.F.R. §240.10b-5], in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

148.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Foot Locker common stock.  Plaintiffs and the Class would not have purchased Foot Locker common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Foot Locker common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

150.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

151.    The Individual Defendants acted as controlling persons of Foot Locker within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Foot Locker, and their ownership of Foot Locker common stock, the Individual Defendants had the power and authority to cause Foot Locker to engage in the wrongful conduct complained of herein.

152.    As set forth above, Foot Locker and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Foot Locker's Section 10(b) and Rule 10b-5 violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Lead Counsel as Class Counsel;

B.       Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  August 24, 2018                        ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                               SAMUEL H. RUDMAN
                                               DAVID A. ROSENFELD
                                               ERIN W. BOARDMAN


                                                     */s/ Samuel H. Rudman*
                                               SAMUEL H. RUDMAN

                                               58 South Service Road, Suite 200
                                               Melville, NY  11747
                                               Telephone:  631/367-7100
                                               631/367-1173 (fax)
                                               srudman@rgrdlaw.com
                                               drosenfeld@rgrdlaw.com
                                               eboardman@rgrdlaw.com

- 54 -
