UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF WARREN POLICE AND FIRE    :
RETIREMENT SYSTEM, Individually and on    :
Behalf of All Others Similarly Situated,    :
    :
                Plaintiff,    :    18-CV-1492-AMD-SJB
            v.    :
    :
FOOT LOCKER, INC., et al.,    :
    :
                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Susan L. Saltzstein
Scott D. Musoff
Michael M. Powell
Four Times Square
New York, New York 10036
Phone: (212) 735-5000
Facsimile: (212) 735-2000

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ..................................................................................4

    A.    The Parties ............................................................................4

    B.    Procedural Background.....................................................................4

    C.    Foot Locker's Relevant Disclosures and Performance ............................................5

    D.    Disruption in the Sneaker Market Causes Foot Locker to Miss Estimates.............7

ARGUMENT ..................................................................................8

I.    PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE STATEMENTS OR OMISSIONS ..................................................................................9

    A.    The Second Amended Complaint Fails to Establish That Any Challenged Affirmative Statements Were Actually False ............................................9

    B.    Many of the Challenged Statements Are Nonactionable Puffery.........................14

    C.    Many of the Challenged Statements Fall Within the Safe Harbor Provision .......15

    D.    Plaintiffs' Challenge to Defendants' Opinions Fails to Satisfy *Omnicare* .............17

    E.    There Was No Duty to Disclose Any Purported Omissions.................................20

II.    PLAINTIFFS FAIL TO ALLEGE ANY PARTICULARIZED FACTS TO CREATE A STRONG INFERENCE DEFENDANTS ACTED WITH SCIENTER ..................................................................................25

    A.    Plaintiffs Do Not Adequately Allege That Defendants Had a Motive to Commit Fraud .....................................................................................26

    B.    Plaintiffs Do Not Adequately Plead That Defendants Engaged in Conscious Misbehavior or Recklessness ................................................29

    C.    Any Inference of Scienter Is Not at Least as Compelling as an Opposing Inference of Good Faith.......................................................................31

III.    PLAINTIFFS DO NOT ADEQUATELY PLEAD LOSS CAUSATION .......................32

    A.    Plaintiffs Do Not and Cannot Identify Any Corrective Disclosures.....................32

B.    Plaintiffs Do Not Sufficiently Allege That the Purportedly Concealed Risks Led to Any Loss ......................................................................................... 34

IV.    PLAINTIFFS' CONTROL PERSON LIABILITY CLAIM FAILS ................................ 34

CONCLUSION .................................................................................................................. 35

**TABLE OF AUTHORITIES**

**CASES**

*Altayyar v. Etsy, Inc.*,
      242 F. Supp. 3d 161 (E.D.N.Y. 2017),
      *aff'd,* 731 F. App'x 35 (2d Cir. 2018) ...................................................................... passim

*In re Apple REITs Litigation*,
      No. 11-CV-2919 (KAM), 2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013), *vacated in
      part on other grounds by Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81 (2d Cir.
      2014) ................................................................................................................................. 16

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
      493 F.3d 87 (2d Cir. 2007) ........................................................................................... 4, 34

*Barrett v. PJT Partners, Inc.*,
      No. 16-CV-2841 (VEC), 2017 U.S. Dist. LEXIS 145781 (S.D.N.Y. Sept. 8, 2017) .. 10, 19

*In re BHP Billiton Ltd. Securities Litigation*,
      276 F. Supp. 3d 65 (S.D.N.Y. 2017) ........................................................................... 23, 25

*Board of Trustees of City of Ft. Lauderdale General Employees Retirement System v.
      Mechel OAO*,
      811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*,
      475 F. App'x 353 (2d Cir. 2012) ....................................................................................... 31

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
      506 F. App'x 32 (2d Cir. 2012) ......................................................................................... 16

*Boguslavsky v. Kaplan*,
      159 F.3d 715 (2d Cir. 1998) .............................................................................................. 35

*City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*,
      752 F.3d 173 (2d Cir. 2014) .............................................................................................. 14

*Cox v. Blackberry Ltd.*,
      660 F. App'x 23 (2d Cir. 2016) ......................................................................................... 31

*Cyan, Inc. v. Beaver County Employees Retirement Fund*,
      138 S. Ct. 1061 (2018) ....................................................................................................... 15

*Dalberth v. Xerox Corp.*,
      766 F.3d 172 (2d Cir. 2014) .............................................................................................. 20

*Delfonce v. Eltman Law, P.C.*,
      No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 16, 2017), *aff'd*,
      712 F. App'x 17 (2d Cir. 2017) ........................................................................................... 4

*In re Eaton Corp. Securities Litigation*,
    No. 16-cv-5894 (JGK), 2017 U.S. Dist. LEXIS 153323 (S.D.N.Y. Sept. 20, 2017) ........27

*ECA, Local 134 IBEW Joint Pension Trustees of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...............................................................................25

*Employees' Retirement System of Government of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 20150 ..............................................................................27

*In re eSpeed, Inc. Securities Litigation*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................29

*In re Fairway Group Holdings Corp. Securities Litigation*,
    No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015).................16

*Fishbaum v. Liz Claiborne, Inc.*,
    189 F.3d 460 (2d Cir. 1999).................................................................................28

*Fogel v. Vega*,
    No. 18-650-cv, 2018 U.S. App. LEXIS 36441 (2d Cir. Dec. 26, 2018)...........................19

*Ford v. Voxx International Corp.*,
    No. 14-CV-4183(JS)(AYS), 2016 WL 3982466 (E.D.N.Y. July 22, 2016).................9, 18

*In re Francesca's Holdings Corp. Securities Litigation*,
    No. 13-cv-6882 (RJS), 2015 U.S. Dist. LEXIS 50726 (S.D.N.Y. Mar. 31, 2015)......33, 34

*In re Gentiva Securities Litigation*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..........................................15, 27, 28, 35

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009).................................................................27

*Glaser v. The9*, Ltd.,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................26, 27, 29

*In re IAC/InterActiveCorp Securities Litigation*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010)..........................................................22, 23

*In re IAC/InterActiveCorp Securities Litigation*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)..................................................................26

*Jackson v. Halyard Health, Inc.*,
    No. 16-CV-05093-LTS, 2018 U.S. Dist. LEXIS 54738 (S.D.N.Y. Mar. 30, 2018).........31

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ........................................................................30

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...........................................................................26

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)......................................................................32, 34

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011)...........................................................................25

*Livingston v. Cablevision Systems Corp.*,
  966 F. Supp. 2d 208 (E.D.N.Y. 2013) ...........................................................15

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018)............................................................12, 17, 19

*Medina v. Tremor Video, Inc.*,
  640 F. App'x 45 (2d Cir. 2016).......................................................................25

*In re NBTY, Inc. Securities Litigation*,
  224 F. Supp. 2d 482 (E.D.N.Y. 2002) ......................................................13, 14

*In re Nokia Corp. Securities Litigation*,
  396 F.3d 161 (2d Cir. 2005)...........................................................................32

*One Communications Corp. v. JP Morgan SBIC LLC*,
  381 F. App'x 75 (2d Cir. 2010)......................................................................14

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
  681 F.3d 114 (2d Cir. 2012)...........................................................................25

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
  *Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...........................................31

*Plumbers and Steamfitters Local 137 Pension Fund v. American Express Co.*,
  No. 15 Civ. 5999 (PGG), 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017),
  *appeal filed*, 17-4142 (2d Cir. Dec. 28, 2017).................................................23

*Pope Investments II, LLC v. Deheng Law Firm*,
  586 F. App'x 1 (2d Cir. 2014).........................................................................25

*In re PXRE Group, Ltd. Securities Litigation*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*,
  357 F. App'x 393 (2d Cir. 2009) ....................................................................30

*In re Radian Securities Litigation*,
  No. 07-3375, 2010 U.S. Dist. LEXIS 42849 (E.D. Pa. Apr. 30, 2010)............27

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne Inc.*,
    189 F.3d 460 (2d. Cir. 1999)......................................................................12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................9, 10

*Rudman v. CHC Group Ltd.*,
    217 F. Supp. 3d 718 (S.D.N.Y. 2016)........................................................15

*S.E.C. v. First Jersey Securities, Inc.*,
    101 F.3d 1450 (2d Cir. 1996).....................................................................35

*Shemian v. Research in Motion Ltd.*,
    No. 11 Civ. 4068 (RJS), 2013 U.S. Dist. LEXIS 49699 (S.D.N.Y. Mar. 28, 2013) .........23

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017).......................................................................24

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)....................................................................9, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................25, 31

*Thesling v. Bioenvision, Inc.*,
    374 F. App'x 141 (2d Cir. 2010) ...............................................................20

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)......................................................................19

*In re UBS Ag Securities Litigation*,
    No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 141449
    (S.D.N.Y. Sept. 28, 2012).........................................................................23

*In re WEBMD Health Corp. Securities Litigation*,
    No. 11 Civ. 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...................28

*In re Weight Watchers International, Inc. Securities Litigation*,
    No. 14-cv-1997 (LAK), 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ............13

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ......................................................26

## STATUTES

15 U.S.C. § 77z-2 .................................................................................................15

15 U.S.C. § 78j(b) ...............................................................................................8

15 U.S.C. § 78t ...................................................................................................34

15 U.S.C. § 78u-4(b) .......................................................................................9, 25

## RULES

Federal Rule of Civil Procedure 9(b) ...............................................................9, 25

## REGULATIONS

17 C.F.R. § 229.10(b) (2018) ............................................................................15

17 C.F.R. § 229.303(a) (2018) .....................................................................23, 24

17 C.F.R. § 229.503(c) (2018) .....................................................................23, 24

17 C.F.R. § 240.10b-5(b) (2018) ......................................................................8

Defendants Foot Locker, Inc. ("Foot Locker" or the "Company"), Richard A. Johnson, and Lauren B. Peters (together with Mr. Johnson, the "Individual Defendants") respectfully move to dismiss the Second Amended Complaint ("SAC").

## PRELIMINARY STATEMENT

After an unprecedented twenty-nine straight quarters of growth, Foot Locker, a leading athletic footwear and apparel retailer, reported second-quarter 2017 financial results that fell below its prior forward-looking projections and guidance.  Plaintiffs seized upon the ensuing stock price decline and have accused Defendants—through the liberal use of impermissible fraud by hindsight pleading—of committing securities fraud by purportedly omitting disclosures concerning Foot Locker's vulnerability to so-called trends in market competition and related vendor supply practices and for allegedly misrepresenting the reasons for an observed slowdown that Foot Locker had disclosed voluntarily in a prior intra-quarter guidance update.  Although the crux of the Second Amended Complaint is Plaintiffs' contention that Defendants falsely portrayed the Company as having "insulated itself from . . . larger [market] trends" (*see* SAC ¶ 46), Plaintiffs do not and cannot point to a single statement from Foot Locker containing any such representation.

Hoping to sidestep the rigorous pleading standards of the Private Securities Litigation Reform Act, which encourages issuers to provide forward-looking projections by offering statutory protection, Plaintiffs work backwards from the first time in many quarters that Foot Locker did not meet its projections to construct a theory of fraud that targets Foot Locker's *explanation* for its projections miss.  What Plaintiffs are left with is a deficient complaint that relies upon a collection of one-off earnings call comments that are often quoted out of context and that convey no concrete facts (let alone facts that are inconsistent with any internal

information supposedly concealed by Defendants).  In the main, these targeted conference call comments have **nothing whatsoever** to do with any supposed insulation from market trends or specific vendor supply practices.

Plaintiffs' theory is even more illogical (and inferentially unsound) when one considers the context.  In the middle of the putative class period, Foot Locker voluntarily issued an intra-quarter update **revising downward** its quarterly guidance.  Foot Locker's action alone fatally undermines Plaintiffs' suggestion that Defendants intentionally sought to conceal performance issues.  Additionally, numerous other defects in the SAC highlight Plaintiffs' failure to plead a viable claim.  The complaint should be dismissed with prejudice for at least the following reasons:

*First*, Plaintiffs fail to allege adequately that any of the alleged misstatements were false or misleading.  Plaintiffs purport to rely on a handful of insufficient attributions to anonymous witnesses (i) noting unremarkably that product from suppliers was not unlimited and (ii) describing the existence of meetings and reports tracking certain data.  (*See, e.g.*, SAC ¶¶ 53, 124-25.)  Plaintiffs ask this Court to infer from those allegations some contradiction with public statements about the Company's vendor relationships and supply practices, but the challenged statements are entirely consistent with the so-called confidential witness allegations.  Further, Plaintiffs target comments that are nothing more than inactionable puffery or protected forward-looking statements.

*Second*, Plaintiffs' SAC relies heavily on Defendants' expressions of opinion.  Under Supreme Court and Second Circuit authority, to challenge statements of opinion Plaintiffs must allege with particularity that the statements were both objectively and subjectively false.  But

here Plaintiffs allege neither—there are no well pled allegations that Defendants did not subjectively believe their opinions when made nor that the statements were objectively false.

*Third*, insofar as Plaintiffs proceed on an omissions-based theory of fraud, Plaintiffs do not and cannot identify any purported omissions that render any of the cited affirmative statements misleading, nor can Plaintiffs point to any duty requiring further disclosure. Plaintiffs' claims that Foot Locker failed to disclose risks concerning vendor competition ignore that such risks were fully disclosed in public filings. Plaintiffs also elide the existence of relevant publicly available information, including disclosures from Foot Locker's vendors that describe their efforts at direct-to-consumer sales—the supposedly concealed "adverse trend."

*Fourth*, Plaintiffs fail to plead scienter with the requisite degree of particularity. Plaintiffs rely on confidential witnesses—mostly junior employees with little to no access to broad vendor relationship discussions—to claim that Defendants were aware of Foot Locker's sales, revenue, and inventory numbers during the class period. But the existence of such generalized types of business information is not contrary to and does not render false any of Foot Locker's disclosures so that scienter may be inferred. And although Plaintiffs cite certain publicly disclosed stock sales, they fail to inform the Court that the Individual Defendants' sales were made pursuant to 10b5-1 plans, and none of the sales are alleged to be unusual or suspicious in timing or amount. Plaintiffs thus fail to plead the existence of scienter.

*Finally*, Plaintiffs' failure to identify a single corrective disclosure of the vendor competition and supply issue they claim caused Foot Locker's underperformance and their inability to link that issue to the purported decline in the Company's share price is fatal to their claim.

# STATEMENT OF FACTS[1]

## A.    The Parties

Lead Plaintiffs New England Carpenters Guaranteed Annuity and Pension Funds ("Plaintiffs") purport to bring a class action suit on behalf of purchasers of Foot Locker common stock between August 19, 2016, and August 17, 2017, inclusive (the "Class Period").

Headquartered in midtown Manhattan, Foot Locker is "a leading global retailer of athletically inspired shoes and apparel," which "operates approximately 3,270 stores in 27 countries in North America, Europe, Asia, Australia, and New Zealand."  (*See* https://www.footlocker-inc.com.)  Foot Locker's common stock is listed on the New York Stock Exchange and trades under the ticker symbol "FL."  Richard A. Johnson has been Foot Locker's President and Chief Executive Officer since December 1, 2014, and Chairman since May 18, 2016.  Lauren B. Peters is the Chief Financial Officer and Executive Vice President of Foot Locker—positions she has held since July 1, 2011.

## B.    Procedural Background

On August 24, 2018, Plaintiffs filed the SAC, asserting, based on the Company's announcement of a projections miss with the disclosure of its second-quarter 2017 results, that Defendants are liable for making misstatements and knew or recklessly disregarded that:

> (a)    Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels;

---

[1]    The facts set forth herein are drawn from the SAC and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman Law, P.C.*, No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 16, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  References to "Ex. [ ]" are to the exhibits listed in the accompanying Declaration of Susan Saltzstein.  All emphases are added unless otherwise noted.

(b)     Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of their premier products for themselves, to be sold directly to consumers;

(c)     Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products; and

(d)     as a result of the foregoing adverse trends, the Company's growth and guidance were not sustainable, and Defendants lacked a reasonable basis for their positive statements about the business and prospects.

(*See* SAC ¶ 75.)

**C.     Foot Locker's Relevant Disclosures and Performance**

Throughout the Class Period, Foot Locker warned investors of numerous risks, including the precise risk of vendor competition and evolving allocation practices that Plaintiffs assert was concealed.  (*See* Ex. 1 at 2-9; Ex. 2 at 2-9.)  Most directly, Foot Locker expressly disclosed:

> *[A]ll of our significant suppliers operate retail stores and distribute products directly through the Internet* and others may follow. Should this continue to occur, and *if our customers decide to purchase directly from our suppliers, it could have a material adverse effect* on our business, financial condition, and results of operations.

(Ex. 1 at 2; Ex. 2 at 2.)  This clear identification of risk was accompanied by numerous other statements of caution by Foot Locker, including that its industry was "highly competitive," and that this competition included "Internet retailers."  (Ex. 1 at 2; Ex. 2 at 2.)  Foot Locker further warned that "a significant shift in customer buying patterns to purchasing athletic footwear, athletic apparel, and sporting goods via the Internet could have a material adverse effect on our business results."  (Ex. 1 at 2; Ex. 2 at 2.)

The Company was also forthcoming about how its relationship with its vendors and those vendors' corresponding supply practices could affect its performance, disclosing that "[a] change in the relationship with any of our key suppliers or the unavailability of key products at

competitive prices could affect our financial health" and explaining that its business was "dependent to a significant degree upon our ability to obtain exclusive product," that "[m]erchandise that is high profile and in high demand is allocated by our suppliers based upon their internal criteria," and that Foot Locker could not "be certain that our suppliers will continue to allocate sufficient amounts of such merchandise to us in the future."  (Ex. 1 at 3; Ex. 2 at 3.)  These risk factors were incorporated by reference into each of its Forms 10-Q.  (*See* Ex. 3 at 24; Ex. 4 at 27; Ex. 5 at 23.)[2]  Further, Foot Locker unequivocally warned investors that suboptimal inventory management could deleteriously impact its performance:

> If we fail to anticipate accurately either the market for the merchandise in our stores or our customers' purchasing habits, we may be forced to rely on markdowns or promotional sales to dispose of excess or slow moving inventory, which could have a material adverse effect on our business, financial condition, and results of operations.  (Ex. 1 at 3; Ex. 2 at 3.)

In addition to this chorus of warnings regarding risks to the Company's business, Foot Locker further explained to its investors that it was grappling with specific challenges throughout the Class Period.  (*See* Ex. 13 at 7; Ex. 9; Ex. 14 at 12.)  First, Defendants told investors in February 2017—months before the Class Period's end and after a successful fourth quarter of

---

[2]    Further, Foot Locker regularly advised investors that its Form 10-K, Forms 10-Q, press releases announcing quarterly and annual results, and earnings calls contained forward-looking statements, accompanied by cautionary language.  Each public filing by the Company cautioned that the predictions reflected therein were "based on many assumptions" including "uncertainties related to the effect of competitive products and pricing, customer acceptance of the Company's merchandise mix and retail locations, [and] the Company's reliance on a few key vendors for a majority of its merchandise purchases (including a significant portion from one key vendor)."  (*See* Ex. 1 at 2-9; Ex. 2 at 2-9; Ex. 3 at 23; Ex. 4 at 26; Ex. 5 at 16.)

Likewise at the beginning of each earnings call, the Company stated:  "This conference call may contain forward-looking statements that reflect management's current views of future events and financial performance. These forward-looking statements are based on many assumptions and factors, including the effects of currency fluctuations, customer preferences, economic and market conditions worldwide, and other risks and uncertainties described in the company's press releases and SEC filings. We refer you to Foot Locker, Inc.'s most recently filed Form 10-K or Form 10-Q for a complete description of these factors. Any changes in such assumptions or factors could produce significantly different results, and actual results may differ materially from those contained in the forward-looking statements."  (*See* Ex. 6 at 2; Ex. 7 at 2; Ex. 8; Ex. 9; Ex. 10; Ex. 11 at 2; Ex. 12 at 2; Ex. 13 at 2; Ex. 14 at 2.)

2016—that it was "likely" to face a "challenging first quarter" going forward.  (*See* Ex. 13 at 7.)

Next, far from concealing negative business developments, Foot Locker in April 2017 ***pre-***

***disclosed*** that it was revising downwards the Company's forward-looking estimates to reflect this

"previously noted slow start," ahead of the release of the Company's first-quarter results.  (Ex. 9.)

Accordingly, Foot Locker adjusted its earnings expectations, correctly anticipating they would

be "equal to or slightly below last year's record earnings."  (*Id.*)  A month later, Defendants

directly cautioned investors that the Company was experiencing competitive pressures:  "I think

that there's some pressure from everybody that sells sneakers.  We're all fighting for

consumers. . . .  [P]eople have a lot of shopping choices, whether it's online or places in malls or

on the street."  (Ex. 14 at 12.)  Defendants also disclosed that, while they "remain[ed]

optimistic," they were "developing a Plan B, so to speak, in case the recent sales trends that—***in***

***case recent sales trends continue.***"  (*Id.* at 3.)

### D. Disruption in the Sneaker Market Causes Foot Locker to Miss Estimates

Following these warnings, in August 2017, Foot Locker "reported that its 2Q17 total

sales had now declined 4.4% year-over-year . . . [and] comparable-store sales had fallen 6%

year-over-year."  (SAC at ¶ 112 (emphasis omitted).)  The Company disclosed that it believed its

performance change was due to "industry dynamics," namely, "a changed retail landscape in

which we are seeing our consumers move faster than ever from one source of inspiration or

influence to another."  (*See* Ex. 15 at 1.)  Defendant Johnson elaborated:

> The disruption taking place today in our industry, and in retail in general, is the
> most significant I've seen in my quarter-century in the athletic business.  The fact
> is that we're seeing mobile technology drive shifts in consumer behavior and
> spending patterns at a faster pace than our industry has been able to keep up
> with.  . . . We, and the leading suppliers in the industry, are working hard to
> significantly shorten the product development cycle, the ordering and
> manufacturing lead times, the extensive supply chain, and the storytelling and
> marketing timeline.

(Ex. 16 at 3.)  Defendant Peters also observed that:

> [O]ur second quarter was *far more challenging than we anticipated* when we last spoke in May.  *We highlighted then* that . . . sales were trending lower than the high single digit gains we achieved in March and April.  As it turned out, the trend weakened further during the period. . . .

(*Id.* at 5.)  Defendant Johnson explicitly disclosed that, despite the slight downturn:

- "[W]e do not believe our vendors selling product directly on Amazon is an imminent threat."

- "We haven't taken down our expectation of those allocations on the hot products."

- "I see we're working very collaboratively [with Foot Locker's suppliers].  I think that our vendor partners have been clear that they have their plans around their [direct-to-consumer] and other channels, but our vendor partners have been very good at their segmentation and distribution strategies."

(*Id.* at 4, 7, 11.)[3]  Disregarding Defendants' explanation that the decline was caused by evolution in the speed with which consumer tastes evolve, which led to hot products "cooling off" faster than before, Plaintiffs, relying entirely on single-line observations in analyst reports, attribute the decline to increasing competition from Foot Locker's vendors and those vendors' corresponding inventory allocation practices.  Plaintiffs' fraud-by-hindsight challenge should be rejected.

## ARGUMENT

### THE SAC SHOULD BE DISMISSED WITH PREJUDICE

The elements that must be alleged adequately to state a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) (2018), promulgated thereunder are well settled.  *See Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 171-72 (E.D.N.Y. 2017) (Donnelly, J.), *aff'd,* 731 F. App'x 35 (2d Cir. 2018).  Specifically, Plaintiffs must allege that Defendants: "'(1) made misstatements or

---

[3]  Notably, Plaintiffs do not allege that these statements were false and misleading, but rather suggest they were part of a disclosure that supposedly revealed the alleged fraud.  (*See* SAC ¶ 116.)

omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" *Id.* at 172 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)). Further, the SAC must meet the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and Section 21D(b) of the Exchange Act, 15 U.S.C. § 78u-4(b) (the "PSLRA"). *See Ford v. Voxx Int'l Corp.*, No. 14-CV-4183(JS)(AYS), 2016 WL 3982466, at *4-5 (E.D.N.Y. July 22, 2016). Under these heightened pleading standards, Plaintiffs "must do more than say that the [Defendants'] statements . . . were false and misleading; [Plaintiffs] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs fail to do so.

## I.   PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE STATEMENTS OR OMISSIONS

### A.   The Second Amended Complaint Fails to Establish That Any Challenged Affirmative Statements Were Actually False

Plaintiffs assert that Defendants made affirmative misleading statements regarding Foot Locker's vulnerability to competition from its vendors and those vendors' merchandise allocation practices but fail to identify a single false statement on that subject. As this Court has recognized, "the falsity of [defendants'] statements depends on whether the statements were 'just that: false; in error; wrong.'" *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 172 (E.D.N.Y. 2016) (citation omitted). However described, Plaintiffs do not meet that standard. Notably, Plaintiffs do not allege that Defendants misrepresented ***any*** concrete fact—not a particular metric, projection, or contractual term, let alone a fact actually relating to Foot Locker's vendor relationships or allocation practices. Instead, Plaintiffs challenge broad, generalized statements and ask the Court to infer the existence of a contradiction that simply does not exist. The PSLRA, however, requires that Plaintiffs "explain why the statements are false and allege 'specific facts' that

9

support [their] claim that the complained of statements were 'false when made.'"  *Barrett v. PJT Partners, Inc.*, No. 16-CV-2841 (VEC), 2017 U.S. Dist. LEXIS 145781, at *11-12 (S.D.N.Y. Sept. 8, 2017) (quoting *Rombach*, 355 F.3d at 172).  Plaintiffs offer no such specific allegations and thus fail to allege falsity.[4]

First, Plaintiffs challenge Defendants' positive statements about Foot Locker's relationships with its vendors, arguing that Defendants improperly highlighted Foot Locker's "strong vendor relationships," and stated that Foot Locker was a "lead[ing] partner for [its] world-class vendors," was "partner[ing]" with its "key vendors . . . to deliver [] trend-right, premium footwear," and had "great partnerships" with its vendors "that continue[d] to fuel sneaker culture" and "bring heat . . . to [the Company's] stores" (SAC ¶¶ 5, 73, 76, 82, 98), which Plaintiffs contend to be false because (they assert) Foot Locker's top vendors were increasingly bypassing the Company and selling products directly to consumers via online channels.  (SAC ¶¶ 5, 75.)  The sparse allegations in the SAC regarding the Company's actual vendor relationships and related allocation practices that supposedly support this assertion are based solely on confidential witnesses.  These include that:

- certain vendors were keeping "premier products for themselves" and also selling directly to consumers (SAC ¶¶ 51, 52, 55);

---

[4]    The SAC often takes liberties with Defendants' statements without regard to their full and proper context.  In particular, Plaintiffs excerpt select phrases from Defendants' statements across a variety of mediums and time periods and attempt to cobble them together into a narrative of fraud.  (*See* SAC ¶¶ 5-12.)  However, when these statements are placed in their full context (and even just in the limited context Plaintiffs provide elsewhere in their SAC), they are not misleading and clearly inactionable.  (*Compare* SAC ¶ 9 ("During a conference call that day, when an analyst asked whether vendors' direct-to-consumer initiatives had been negatively impacting Foot Locker's business, Defendant Richard A. Johnson . . . responded that Foot Locker was 'push[ing] back against' those initiatives . . . .") *with* SAC ¶ 107 (showing the actual response to begin with "At all?  Sure.  But, I mean, I think that there's some pressure from everybody that sells sneakers.  We're all fighting for consumers. . . .").)

- Nike allocated "limited quantities" of some "especially popular" products to Foot Locker and Foot Locker could not return all unsold inventory to Nike (*id.* ¶¶ 53, 61);

- an employee observed that it was more difficult for Foot Locker employees to obtain special release sneakers (*id.* ¶ 53); and

- some vendors purportedly required Foot Locker to purchase additional inventory "in order to obtain desirable merchandise" or imposed a "seventy-thirty" model whereby the Company had to purchase a specific percentage of less desirable merchandise to obtain the more desirable merchandise. (*Id.* ¶¶ 56-60.)

The confidential witnesses also reference the existence of certain sales and inventory information but do not purport to describe it. (*Id.* ¶¶ 57, 124-25.) Notably, none of these allegations is at odds with the challenged generalizations about "strong" vendor relationships. Plaintiffs do not and cannot allege, for example, that the vendors did not sell to Foot Locker, engage in initiatives with Foot Locker to sell product, or view Foot Locker as a desirable partner[5]—but instead, at best, provide details that are entirely consistent with the relationships' supposed misrepresentation as "strong."

Plaintiffs revert to these same confidential witness statements to challenge Defendants' statements regarding the allocation practices of its vendors, pointing to statements that: (i) "the leading brands continue[d] to be highly motivated to collaborate with [Foot Locker] on . . . exclusive and strong allocations"; (ii) Foot Locker was doing "a great job of working with [its] vendor partners to bring in assortments that resonate[d] with [its] consumers"; (iii) Foot Locker's vendors were "all committed to bringing fresh, new, exclusive product into" the Company's stores; and (iv) Foot Locker was "work[ing] close[ly] with [its] vendors on allocations," was

---

[5]   Indeed, public statements during the Class Period from Foot Locker's largest vendor, Nike, contradict Plaintiffs' allegations. (*See, e.g.*, Ex. 25 at 6 (Mark Parker, Nike's President, Chairman, and CEO, referring to Foot Locker as one of Nike's "strategic partners and key accounts").)

doing "really good work . . . on improving [its] allocation[s] to get the right product to the right place, right time," and was "continu[ing] to work with all of [its] vendor partners to increase [its] allocations[.]"  (SAC ¶¶ 6, 76, 80-82, 90.)  Plaintiffs claim that these statements were false because Foot Locker was supposedly not receiving sufficient quantities of premier products as its vendors opted to sell more of that merchandise themselves directly to consumers.  (*Id.* ¶¶ 6, 75.)

Again, however, none of the confidential witnesses' allegations contradicts any of Defendants' actual statements regarding vendor allocations and thus do not establish that those statements were false.  The challenged statements do not, for example, reflect any promise or factual representation that (i) Foot Locker was receiving any specific allocation or specific products, (ii) the Company received an unlimited supply of products or premier products, or (iii) the Company engaged in specific inventory management practices.  Rather, all that Defendants conveyed was that Foot Locker was working with its vendors: working to improve allocations, engaged in motivated collaborations with vendors, and working to increase its allocations. (*See* SAC ¶¶ 6, 76, 80-82, 90.)  Plaintiffs' confidential witnesses do not offer any observations at odds with these statements.  Rather—without sufficient detail or particularity—the witnesses vaguely refer to generic reports tracking inventory.  (*Id.* at 124-25.)  Plaintiffs apparently ask this Court to assume that those reports reflected the alleged inventory allocation issues supposedly concealed but omit ***any*** detail about the reports or their data from which that conclusion may be inferred.[6]  Plaintiffs' second-hand allegations derived from confidential witnesses thus "say[]

---

[6]      No confidential witness even contests that the allocation was ***inappropriate***—suggesting merely Foot Locker had to purchase certain inventory to obtain other inventory that it deemed desirable.  Further, even if certain former employees entertained an opinion that differed from management's view of those allocations (a generous reading of the confidential witnesses' allegations), that difference in opinion does not render Defendants' statements inaccurate or misleading.  *See Martin v. Quartermain*, 732 F. App'x 37, 41 (2d Cir. 2018); *see also Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 53-54 (E.D.N.Y. 1998) (complaint failed to plead that description of inventory levels as "appropriate" was false by offering "general assertions that Claiborne

*(cont'd)*

nothing about the veracity of the statement[s]" challenged and do not suffice to show Defendants misrepresented that the Company was receiving appropriate allocations of desirable product. *See Etsy, Inc.*, 242 F. Supp. 3d at 178; *see also In re NBTY, Inc. Sec. Litig.*, 224 F. Supp. 2d 482, 492-93 (E.D.N.Y. 2002) (dismissing allegations about "adverse trends" as conclusory).

Reliant again on those confidential witness assertions, Plaintiffs similarly challenge statements that the Company engaged in "careful inventory . . . management," that its "inventory [was] fresh and well-positioned," and that it was "keeping control of [] inventory growth"— statements supposedly at odds with the alleged reduction in vendors' allocation of desirable merchandise. (SAC ¶¶ 7, 74, 80, 86.) Yet, the confidential witnesses upon which Plaintiffs rely actually ***support*** the veracity of Defendants' statements. None of the confidential witnesses alleges that Foot Locker's inventory management was careless or out of control. Instead, they simply describe that some vendor allocations had shifted. Even accepting the premise derived from confidential witness allegations that Defendants strategically agreed with vendors to allocations that included "undesirable" merchandise in order to obtain exclusive or desirable products, that allegation actually supports the inference that Defendants engaged in strategic (or "careful") decision-making to obtain "fresh" inventory. This is inconsistent with Plaintiffs' conclusion that Foot Locker falsely portrayed itself as engaged in "careful" inventory management, when Plaintiffs' own allegations show the Company's inventory management was indeed "careful." *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997 (LAK), 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (rejecting allegations that defendants' statements were wrong where confidential witness allegations failed to support conclusions).

_____

*(cont'd from previous page)*

generated monthly and weekly internal reports on the company's performance and held weekly meetings with retail buyers"), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).

And while Plaintiffs dispute Defendants' statements concerning Foot Locker's customers' favorable perception of the Company[7] (mainly by impermissibly quoting statements and simply claiming that the opposite was true),[8] Plaintiffs offer no particularized facts—no customer comments or statements, no customer surveys, nor even any publicly available data from Foot Locker's vendors regarding their direct-to-consumer sales, for example—that contradict these statements.  Instead, Plaintiffs rely on Foot Locker's projections' miss to baldly assert that Foot Locker's customers had "gone elsewhere" because they were "increasingly purchasing athletic wear directly from vendors."  (SAC ¶ 109.)   Plaintiffs' conclusory pleading is insufficient as a matter of law.  *See In re NBTY, Inc.*, 224 F. Supp. 2d at 494 (rejecting conclusory pleading that sales practices were cause of "customer attrition" and revenue diminution where plaintiff failed to offer "specific data from distributors" reflecting either).

### B.  Many of the Challenged Statements Are Nonactionable Puffery

Exacerbating Plaintiffs' failure to plead the existence of any actionable false statement is the fact that nearly all of the statements challenged by Plaintiffs are puffery—statements that are "aspirational and vague," *Etsy, Inc.*, 242 F. Supp. 3d at 173, and thus "'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted).

Plaintiffs repeatedly complain of such non-actionable statements that:

- use generalizations to describe the Company as a "leading retailer" in the industry (*see* SAC ¶¶ 8-9, 73, 76, 85, 88, 93-94, 102, 106);

---

[7]  *See* SAC ¶¶ 73, 76, 78, 107 (describing Foot Locker's "understanding" of its consumers); *see also id.* ¶¶ 76, 78, 80, 99, 107 (explaining how Foot Locker's stores are "destinations" and its products create a "level of excitement" for customers); *id.* ¶¶ 76, 99 (touting the "traffic results" that are tied to the previous two factors); *id.* ¶ 102 (describing the lack of change in the "customer's appetite").

[8]  *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 80 (2d Cir. 2010) (affirming dismissal of Section 10(b) claim where complaint alleged "merely that the representations are false").

- use vague language, such as "strong," "key," and "great," to describe the Company's relationships with its vendors and its customers (*see id.* ¶¶ 5-6, 9, 47, 50, 73, 76, 78, 80-82, 85, 88, 93, 95, 97-99, 107); and

- use commonplace terms, such as "hot," "heat," and "fresh," to describe the Company's stores and products. (*See id.* ¶¶ 5-7, 76, 81-82, 86, 90, 97-98.)[9]

These statements are precisely the type of immaterial expressions that courts time and again have held to be inactionable—aspirational "puffing" that "fall[s] 'into the category of commonplace statements too general to cause reliance by a reasonable investor.'" *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (citation omitted); *see also Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) (statements regarding "'strong' relationships with [company's] customers" were "no more than 'puffery'" (citation omitted)); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) ("[Defendant's] statement that [company] "'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable puffery.").

## C.    Many of the Challenged Statements Fall Within the Safe Harbor Provision

The SAC is further fatally flawed because of its reliance on protected forward-looking statements. The PSLRA "created a 'safe harbor' from federal liability for certain 'forward-looking statements' made by company officials," thus "protecting defendants" by excluding such statements from the reach of the securities laws. *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066, 1072 (2018); *see also* 15 U.S.C. § 77z-2. Part of Congress's purpose in enacting the safe harbor provision was to encourage disclosure of the kind of guidance at issue here. *See, e.g.*, 17 C.F.R. 229.10(b) (2018) (stating that the SEC "encourages the use . . . of management's projections of future economic performance" in required filings).

---

[9] Many such statements also reflect subjective opinions that Plaintiffs do not adequately allege to be false. (*See infra* Section I.D.)

Plaintiffs ignore that the complained-of statements are forward-looking, were identified as such, and were accompanied with meaningful cautionary language:

- "[W]e're confident that *we should continue to drive traffic* …." (SAC ¶ 78);

- "*I don't see any changes in the back half*." (SAC ¶ 80);

- "[H]owever, we believe the strategic initiatives we have in place, coupled with our strong vendor relationships, *will enable us to deliver another year of record performance*." (SAC ¶ 93);

- "*I have a huge amount of faith in our vendor partners and our merchant teams, to move the dollars* where the customer is, and is going to be." (SAC ¶ 97);

- "We're confident that the sales *will start to flow* when the tax checks start to flow." (SAC ¶ 98); and

- ". . . our ability to produce the strong *performance over the remainder of 2017* that we previously outlined." (SAC ¶ 102).[10]

Plaintiffs also allege that the supposed vendor issues ensured that "the Company's growth and guidance were not sustainable, and Defendants lacked a reasonable basis for their positive statements about the Company and its business and *prospects*." (SAC ¶ 75.)  But each of the news releases and earnings calls in which these statements are found identifies them as forward-looking statements (*see supra* Statement of Facts, Section C) and contains meaningful cautionary language so that no liability may lie.  (*See, e.g.*, Ex. 1 at 2-9.)  *See In re Apple REITs Litig.*, No. 11-CV-2919 (KAM), 2013 WL 1386202, at *11 (E.D.N.Y. Apr. 3, 2013) (finding investment objectives were "expressly caution[ed]" to be forward-looking), *vacated in part on other grounds by Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81 (2d Cir. 2014).

---

[10]  Many of these statements additionally reflect subjective judgements—inferable from language such as "we're confident," "I have faith," and "we believe," *see In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357, at *21 (S.D.N.Y. Aug. 19, 2015)—such that they constitute statements of opinion subject to the *Omnicare* standard, for which Plaintiffs fail to plead falsity for the reasons described below.  (*See infra* Section I.D.) These statements moreover contain inactionable puffery.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (affirming dismissal in holding that statement that company could "compete successfully" and was "confident it will be so in the future" was inactionable puffery).

### D.    Plaintiffs' Challenge to Defendants' Opinions Fails to Satisfy *Omnicare*

Furthermore, Plaintiffs challenge numerous subjective statements of belief by Defendants, including the reasons Defendants provided for revised guidance in the first quarter of 2017.  But as the Supreme Court has held, where allegedly false and misleading statements are expressions of opinion or belief, plaintiffs must plead facts sufficient to show either that "(1) 'the speaker d[id] not hold the belief . . . professed'; (2) the 'fact[s] [] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'"  *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (alterations in original) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-28 (2015)).  The Exchange Act "'does not allow investors to second-guess inherently subjective and uncertain assessments.'"  *See Etsy, Inc.*, 242 F. Supp. 3d at 174 (citation omitted). Second-guessing Defendants' beliefs is all Plaintiffs do here.

Take, for example, Plaintiffs' challenge to Foot Locker's 4Q16 earnings call previewing a "challenging" first quarter of 2017, which Defendants supposedly fraudulently attributed to "the change in the cadence of income tax refund tax distribution" while noting "our belief that our customers' fundamental appetite for the product has not changed; however, the timing of their cash flows and their ability to buy the product has been impacted."  (SAC ¶¶ 93, 95.)  Defendant Johnson further commented that "[w]e're confident that the sales will start to flow when the tax checks start to flow."  (*Id.* ¶ 98.)  On the Company 1Q17 earnings call several months later, Defendants Johnson again referenced the "slow start in February, which we believe was largely due to the delay in income tax refunds."  (*Id.* ¶ 106.)  These statements are expressly statements

17

of belief and opinion.  Yet, Plaintiffs' sole challenge to their veracity[11] is the conclusory assertion

that Defendants "knew, but failed to disclose" that "buying opportunities had passed due to the

adverse trends that Foot Locker was experiencing with its vendors" rather than the tax refund

issue.  (*Id.* ¶ 100; *see also id.* ¶ 109.)  This bald assertion does not suffice to establish falsity

under the "three-pronged" standard outlined in *Omnicare*:  Plaintiffs offer no facts from which it

may be inferred that Defendants did not sincerely believe that the slow quarter could be

attributed to the delay in tax refunds; Plaintiffs identify no misrepresented supporting facts

(Plaintiffs do not challenge, for example, that tax refunds *were* late that year); and Plaintiffs fail

to plead the omission of material information relating to the basis for those beliefs.  *See Ford*,

2016 WL 3982466, at *8 (failure to plead falsity of belief statements where complaint "[did] not

contain facts" suggesting defendants knew purportedly contradictory facts).

　　　The rest of the opinion statements challenged by Plaintiffs are similarly inactionable

generalized statements, many of which are described above.  Plaintiffs challenge, for example,

the Company's subjective description of its vendor relationships as "strong" and of "partnering"

with the vendors[12] but the confidential witness allegations upon which they rely (*see supra*

Section I.A) do not undermine Defendants' characterizations that the relationships were strong or

could be characterized as a "partnership" (let alone establish that Defendants did not believe that)

or that Defendants misrepresented any actual facts regarding the issue or omitted material

information going to the basis for those beliefs.  Rather, Plaintiffs simply disagree with

Defendants' beliefs, essentially contending that a supposed evolution in one discrete aspect of

---

[11]　To the extent Plaintiffs rely on confidential witness allegations elsewhere in the SAC, those allegations are addressed above.  (*See supra* Section I.A.)

[12]　*See* SAC ¶¶ 5, 6, 47, 50, 76, 80-82, 88, 90, 93, 107 (describing the relationship as "strong," the Company as a "leading partner" of the vendors, and the work the Company was doing with its vendors as "great").

some of the Company's vendor relationships is incompatible with describing the relationships overall in positive terms and thus—insufficiently—asserting that Defendants "should have drawn different conclusions from those facts."  *Martin*, 732 F. App'x at 41; *see also Barrett*, 2017 U.S. Dist. LEXIS 145781, at *14 (dismissal for failure to plead falsity of statement that company's relationships were "strong" in light of supposed scheme to defraud clients where plaintiff did not explain "how [allegedly concealed] fraud bears on the existence *vel non* of deep and long-standing client relationships").

Likewise, Plaintiffs suggest that Defendants misrepresented their belief that the inventory allocated by the Company's vendors was desirable or "hot"[13] and that the Company engaged in "careful" management of inventory (*see id.* ¶ 74), but ignore that their allegations, far from showing Defendants did not hold these beliefs as the first prong of *Omnicare* requires, actually support that these beliefs were correct.  (*See, e.g.*, *supra* Section I.A; SAC ¶ 60 (explaining how Foot Locker obtained inventory of "'hot' sneaker models" through agreements with vendors).) And Plaintiffs do not offer any concrete facts regarding inventory composition or management that they contend to have been misrepresented.  Finally, even if the confidential witness allegations described above—limited in scope and involving one minor aspect of Foot Locker's inventory operations that were supposedly omitted from the Company's public disclosures— were deemed to cut against these opinions, Plaintiffs ignore that a company's opinion statements are not fraudulent simply because of the existence of a fact that "potentially undermine[s]" that opinion.  *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016); *see also Fogel v. Vega*, No. 18-650-cv, 2018 U.S. App. LEXIS 36441, at *13-14 (2d Cir. Dec. 26, 2018) (affirming dismissal for

---

[13]    *See* SAC ¶¶ 5-7, 47, 73, 76, 80-82, 86, 90 (describing the vendors' allocations and the Company's inventory as "exclusive," "strong," "fresh," "new," and "trend-right").

19

failure to plead falsity under *Omnicare* where purportedly concealed information did not conflict with belief statements). As such, Plaintiffs' claims fail under *Omnicare*.

### E.  There Was No Duty to Disclose Any Purported Omissions

In an attempt to escape their inability to plead the falsity of any affirmative statements, Plaintiffs also suggest Defendants improperly omitted material information about the risks the Company faced from vendor competition and the manifestation of those risks. (*See, e.g.*, SAC ¶¶ 7, 64-73.) However, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citation omitted). Such a duty may arise in the face of "a statute or regulation requiring disclosure, or [] a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure,* 776 F.3d at, 101. Plaintiffs identify no such duty requiring additional disclosure and thus fail to plead any actionable omission.

Because the statements they challenge are consistent with supposedly concealed internal information (*see supra* Section I.A), Plaintiffs fail to identify any statement rendered "inaccurate, incomplete, or misleading" by omission, and moreover disregard the existence of comprehensive and specific risk disclosures. *See Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (affirming dismissal of omissions-based fraud claim where plaintiffs failed to adequately allege contradiction between disclosures on business strategy and purportedly concealed merger negotiations). Although Plaintiffs' theory of fraud is premised on the Company's supposed failure to disclose its exposure to the trend of increasing vendor competition, Defendants regularly disclosed that the Company was vulnerable to risks Plaintiffs contend were concealed.

20

(*See* Ex. 2 at 3 ("In addition, ***all of our significant suppliers*** operate retail stores and ***distribute products directly through the Internet*** and others may follow. ***Should this continue to occur***, and if our customers decide to purchase directly from our suppliers, it could have a material adverse effect on our business, financial condition, and results of operations."); *see also* Ex. 1 at 3.) Notably, Defendants further disclosed that the Company was in fact contending with the materialization of those risks, as Defendant Johnson even cautioned investors that the Company was working "to ***push back against***" its vendors' direct-to-customer initiatives, thereby emphasizing that the Company was ***already*** experiencing some effects of the vendor competition described in its risk disclosures and attempting to counteract the issue. (*See* Ex. 14 at 12; *see also* SAC ¶ 9.) Thus, to the extent the Company's eventual underperformance can be attributed to those risks, their routine disclosure undermines any conclusion that Defendants fraudulently omitted information about its vulnerability to such risks or experience with their manifestation. *See Etsy, Inc.*, 242 F. Supp. 3d at 180 ("The defendants cannot be held liable for failing to disclose something that they disclosed.").

Likewise, Plaintiffs also repeatedly allege (without adequate factual basis) that Defendants failed to disclose that "Foot Locker's vendors were requiring the Company to purchase undesirable merchandise" and allotting increasingly fewer numbers of desirable sneakers to the Company's stores.[14] Not only was the ***risk*** of changing vendor allocations disclosed,[15] however, but the Company also disclosed—at the beginning of the Class Period—

---

[14]    *See* SAC ¶¶ 56-63; *see also* SAC ¶¶ 47, 76, 80-82, 88, 90, 99 (describing Foot Locker's "strong" vendor relationships, and the "great products" that result from the "really good work" Foot Locker does with its vendors regarding its allocations); SAC ¶¶ 6, 7, 49 (alleging that the previous statements are false).

[15]    *See* Ex. 2 at 3 ("***Merchandise that is high profile and in high demand is allocated by our suppliers based upon their internal criteria***. Although we have generally been able to purchase sufficient quantities of this merchandise in the past, we cannot be certain that our suppliers will continue to allocate sufficient amounts of such merchandise to us in the future."); *see also* Ex. 1 at 3.

that it was pursuing more favorable allocations.  (*See* SAC ¶ 80 (commenting on the "good work that we're doing on *improving our allocation*"); *see also* SAC ¶ 80 (stating that "[o]ur merchants would always like more" and "we continue to work with all of our vendor partners to *increase our allocation*").)

Similarly, Plaintiffs allege that Defendants' statements about its customers' buying habits were false or misleading[16] because Defendants supposedly knew but failed to disclose that the Company's stores were "no longer . . . destinations" for its customers (*see* SAC ¶¶ 77, 86, 91), "its banners were not 'top of mind with [its] most influential customers'" (SAC ¶ 89), and its customers "were increasingly purchasing athletic wear directly from vendors via online channels." (*See* SAC ¶¶ 100, 103, 109.)  But once again, Defendants disclosed this risk and its occurrence.  (*See* Ex. 2 at 2 ("[I]f our customers decide to purchase directly from our suppliers, it could have a material adverse effect on our business, financial condition, and results of operations."); *see also* Ex. 1 at 2; Ex. 14 at 12 ("We're all fighting for consumers. . . . ").)  Any assertion that the Company concealed the effects of increased competition from its suppliers, any inventory management practices, or its ongoing battle to retain its customers fails in light of these disclosures.  *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) (failure to identify concealed trends distinct from those disclosed by defendants was fatal to claim of omission).

Second, Defendants' supposed omissions cannot be the basis for Plaintiffs' claim of securities fraud because much of the information supposedly omitted was already publicly known.  (*See* SAC ¶¶ 53, 55.)  Plaintiffs' contention that the Company was experiencing "adverse trends" in its vendor relationships is grounded in those vendors' increasing direct targeting of

---

[16]    *See* SAC ¶¶ 4, 8-9, 46, 73, 76, 78, 80-81, 85, 88, 90, 95, 97-99, 102, 106-08.

consumers, which is, by nature, publicly available information arising out of those companies' ongoing public marketing campaigns and sales practices.   Thus, to the extent Foot Locker's customers were increasingly purchasing directly from the Company's vendors (which Plaintiffs do not adequately plead), omission of this publicly available information cannot be the basis for Plaintiffs' omission claims.  *See IAC*, 695 F. Supp. 2d at 118; *see also Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 U.S. Dist. LEXIS 49699, at *63 (S.D.N.Y. Mar. 28, 2013) (noting that supposedly concealed information that product line was aging was "available to any customer who walked into a . . . store" and thus a "matter[] of general public knowledge" and not an actionable omission (citation omitted)).

Finally, Plaintiffs cannot ground their omission claims in a failure to fulfill any duty to disclose risk factors that is imposed by Item 303, 17 C.F.R. § 229.303(a) (2018), and Item 503, 17 C.F.R. § 229.503(c) (2018),[17] of Regulation S-K.  (SAC ¶¶ 64-72.)  The SAC's alleged omissions—supposed adverse competition trends, related allocation practices, and customer buying habits—were disclosed (s*ee supra* Statement of Facts, Section C), which is fatal to any claim of a violation of the duty to disclose.  *See, e.g.*, *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15 Civ. 5999 (PGG), 2017 WL 4403314, at *18-19 (S.D.N.Y. Sept. 30, 2017) (finding disclosure about "increased competition" to satisfy Item 303's requirements); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 141449, at *98 (S.D.N.Y. Sept. 28, 2012) (no violation of duty under Item 503 where company had disclosed facts underlying purported risk).  Specifically, the Company explicitly identified

---

[17]   Courts in the Second Circuit have noted that there is "scant caselaw on Item 503" and indeed cast doubt on its application to documents other than registration statements and prospectuses.  *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (citation omitted) (finding no Item 503 violation where information was allegedly omitted from Forms 20-F).

vendor competition, issues with allocation of merchandise, and customer preferences as risk factors and incorporated those risk factors into each subsequent quarterly filing.  (*See, e.g.*, Ex. 2 at 2-9.)  These statements adequately alerted investors about the trends that Plaintiffs claim were not disclosed.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (affirming dismissal for failure to plead Item 303 violation based on failure to disclose evolving regulations where public disclosures "included repeated warnings . . . business was generally vulnerable to changing regulations").

Further, both Item 303 and Item 503 require that a supposed trend or risk factor be sufficiently material: Item 303 requires disclosure of trends where a trend is "known" ***and*** "reasonably expect[ed]" to have a "material" impact, and Item 503 requires disclosure of the "most significant" factors that render an offering risky.  *See* 17 C.F.R. § 229.303(a) (2018); 17 C.F.R. § 229.503(c) (2018).  Although Plaintiffs assert that Defendants knew but failed to disclose the existence of supposed "adverse trends" Foot Locker was experiencing due to its vendors' direct-to-consumer efforts, as described above, Plaintiffs do not offer any facts apart from insufficient and narrowly-targeted confidential witness claims to support the existence of a trend (*see supra* Section I.A) and only include the conclusory allegation that the supposedly omitted information was "material."  (*See* SAC ¶ 68.)  Nowhere in the SAC do Plaintiffs offer particularized facts from which materiality or the significance of the "trend" may be inferred, such as any communication from Foot Locker's vendors regarding allocation of premier products or specific inventory data showing any change (let alone a material change) in allocation.  Nor do Plaintiffs offer facts supporting the conclusion that Defendants "reasonably expected" the trend to have a material effect as Item 303 requires, such as internal discussions of the magnitude of the competitive threat.  (*See* SAC ¶ 69.)  Plaintiffs' allegations are thus too speculative to

connect the supposed "adverse trend" with a "material effect" that Defendants expected was "reasonably likely to occur," rendering its reliance on both Item 303[18] and Item 503[19] futile.

## II.   PLAINTIFFS FAIL TO ALLEGE ANY PARTICULARIZED FACTS TO CREATE A STRONG INFERENCE DEFENDANTS ACTED WITH SCIENTER

Pursuant to the heightened pleading requirements of the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., *scienter*]," 15 U.S.C. § 78u-4(b)(2)(A), which is a mental state "embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted); *see also* 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b). This is a high bar:  Plaintiffs must allege facts demonstrating a strong inference of scienter that is "cogent and at least as compelling as any opposing inference" of non-fraudulent intent. *Pope Invs. II, LLC v. Deheng Law Firm*, 586 F. App'x 1, 3 (2d Cir. 2014) (citation omitted).  This requires particularized factual allegations of (1) strong circumstantial evidence of conscious misbehavior or recklessness or (2) both motive and opportunity for the defendant to commit fraud.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Plaintiffs' scienter allegations fail on all counts.

---

[18]   *See Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 49 n.2 (2d Cir. 2016) (affirming dismissal of claim alleging violation of Item 303 and acknowledging that while Item 303 requires disclosure of "'potential future impact'" of trend, plaintiffs had not alleged facts to support a plausible inference that defendants knew that information underlying publicly known trend "indicated anything in particular about its potential future impact on defendants' business") (citing *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011)); *compare to Panther Partners Inc. v. Ikanos Commc'ns., Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (plaintiff plausibly alleged that product defect issue was "a known trend or uncertainty" that company "reasonably expected would have a material unfavorable impact" by alleging that company was receiving increasing complaints about defects from customers comprising 72% of customer base and company was aware it would be unable to determine which products were defective and therefore might have to accept returns of "all" products).

[19]   *See In re BHB Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d at 89 (omission did not constitute Item 503 violation where information was material yet did not "rise to the level of the considerably higher 'most significant factors' standard").  Plaintiffs here fail to plead the allegedly omitted information regarding the vendor competition trend was material and thus likewise fail to meet the "considerably higher" standard under Item 503.

## A.   Plaintiffs Do Not Adequately Allege That Defendants Had a Motive to Commit Fraud

Plaintiffs fail to allege adequately the existence of motive on the part of any Defendant. To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs purport to rely on several alleged trades by individuals associated with the Company during the Class Period but ignore that, although courts in the Second Circuit have found that insider stock sales support an inference of scienter, such allegations fail where plaintiffs do not also show that the trades were "unusual or suspicious." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011). Plaintiffs make no such showing here.

First, although the SAC lists multiple individuals[20] who supposedly traded in Foot Locker stock, the trades by both of the Individual Defendants and the other officers listed (in other words, all individuals except the independent directors) were made pursuant to Rule 10b5-1 trading plans.[21] 10b5-1 trading plans are "periodic divestment plan[s]," *see In re IAC/InteractiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007), that "allow[] corporate insiders to set a schedule by which to sell shares over a twelve to fifteen month period," which sales then take place without further action from the insider. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003). That the trades were

---

[20]   Plaintiffs provide a table of trades in common stock for the Individual Defendants, two other officers of the Company, and several independent directors: Lewis P. Kimble, Executive Vice President, CEO-International; Paulette Alviti, (former) Senior Vice President, Chief Human Resources Officer; Jarobin Gilbert, (retired) Director; Nicholas P. DiPaolo, (retired) Director; Cheryl N. Turpin, Director; and Matthew M. McKenna, Director.  (SAC ¶ 127.)

[21]   Defendant Johnson's trades were conducted under a plan adopted on March 24, 2016.  (*See* Ex. 17.)  Defendant Peters's trades were conducted under plans adopted on January 13, 2016, and December 16, 2016.  (*See* Ex. 18.)  Mr. Kimble's trades were conducted under a plan adopted on July 8, 2016.  (*See* Ex. 19.)  Ms. Alviti's trades were conducted under plans adopted on August 24, 2016, and March 6, 2017.  (*See* Ex. 20.)  Ms. Turpin's (Ex. 21), Mr. Gilbert's (Ex. 22), Mr. McKenna's (Ex. 23), and Mr. DiPaolo's (Ex. 24) trades were not conducted under 10b5-1 plans.

conducted pursuant to Rule 10b5-1 plans, nearly all of which were adopted before the Class Period[22] and none of which are alleged to have been adopted or amended in any suspicious manner, "undermines any allegation that the timing or amounts of the trades was unusual or suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009); *see also Gentiva*, 932 F. Supp. 2d at 380 ("[I]t is well established that trades under 10b-5 plans do not raise a strong inference of scienter . . . .").

Second, Plaintiffs' attempt to establish scienter by turning to trades by ***non-defendant*** individuals also should be rejected.  The SAC contains no additional allegations about these officers and independent directors beyond their names and titles—and notably nothing at all connecting them to the alleged fraud.  Transactions by these non-defendant insiders (most of whom in fact traded pursuant to 10b5-1 plans, as described above) thus shed no light on scienter on the part of Defendants.  *See, e.g.*, *In re Radian Sec. Litig.*, No. 07-3375, 2010 U.S. Dist. LEXIS 42849, at *35 (E.D. Pa. Apr. 30, 2010) (no inference of scienter based on allegations of trades by non-defendants not alleged to have knowledge of alleged fraud).

Plaintiffs offer no other allegations to show that any trades, by Defendants or even non-defendants, were "'unusual' or 'suspicious'" in timing or amount.  *Glaser*, 772. F. Supp. 2d at 587. In determining whether trades meet this standard, courts look to a variety of factors that include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *In re Eaton Corp. Sec. Litig.*, No. 16-cv-5894

---

[22]   *Compare to Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (holding that insider trading pursuant to 10b5-1 plans provides "no defense to scienter allegations" where "executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price").  In *Blanford*, the plaintiffs alleged that the defendants repeatedly made positive statements to drive up share price "immediately before the scheduled sales [under the 10b5-1 plans]," that one of the defendants had never before made a sale in her nine-year tenure, and that the two defendants reaped nearly fifty million dollars from the trades—allegations with no parallel here.  *See id.*

(JGK), 2017 U.S. Dist. LEXIS 153323, at *28 (S.D.N.Y. Sept. 20, 2017).  Plaintiffs assert only

in conclusory fashion that the relevant trades were "unusual in timing and amount" due to the

volume of shares sold, *see* SAC ¶¶ 128-29,[23] but entirely ignore the other factors that bear on this

analysis, apparently because they cut against the inference Plaintiffs urge.  For example,

Plaintiffs make no allegations regarding the profit accruing to any trader (or whether any made a

profit at all).  *See Gentiva*, 932 F. Supp. 2d at 381 ("[A]llegations of reaped 'proceeds' are

insufficient, as the complaint does not identify net profits.").  Plaintiffs likewise make no

allegations regarding the size of Foot Locker's management or board to suggest that a

disproportionate number of insiders engaged in sales.  Nor do Plaintiffs explain how the timing

of the trades is in any way unusual or suspicious, a deficiency that is especially glaring given that

none of the individuals made trades that aligned with each other or with the alleged

misstatements.  (*See* SAC ¶ 127 (reflecting trades spread across the majority of the Class

Period—August 19, 2016, through December 6, 2016 and March 8, 2017, through May 24,

2017).)  *See Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460, 1999 WL 568023, at *4 (2d Cir.

1999) (unpublished table decision) ("[I]nferences of scienter can be undermined when . . . the

timing of the insider sales did not closely coincide with alleged false statements.").

Finally, Plaintiffs ignore that Foot Locker conducted a share repurchase program during

the Class Period (*see* Ex. 11 at 14)—a fact that undermines any claim of scienter.  *See In re*

*WEBMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at *14 (S.D.N.Y.

Jan. 2, 2013) (scienter allegations insufficient where defendants argued that fraudulently

---

[23]    Nor do the volume allegations help Plaintiffs; by comparing the Class Period to the 363-day periods before and after it, Plaintiffs include insiders in those extra time periods who were no longer insiders, making their comparisons on sheer volume meaningless.  (*See* Exs. 17, 18, 19, 20, 21, 22, 23, 24.)

inflating its stock price during a share buy-back "would defy economic reason").  Thus, Plaintiffs

have not adequately pled that any supposed trades support the existence of scienter.

**B.      Plaintiffs Do Not Adequately Plead That Defendants Engaged in Conscious Misbehavior or Recklessness**

In addition to their failure to plead motive, Plaintiffs' contention that Defendants knew or

recklessly disregarded that certain statements were materially false and misleading when made is

deficient in several respects.  First, as described above, Plaintiffs have failed to plead that

Defendants made any false statements at all.  (*See supra* Section I.B.)  The deficiencies that

render their allegations of falsity inadequately pled—*i.e.*, Plaintiffs' inability to show that the

facts purportedly known and not disclosed by Defendants actually contradict their generalized

public statements, or that their omission rendered the public statements misleading—undermine

any inference of scienter here.  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 292

(S.D.N.Y. 2006) (noting that when plaintiffs attempt to plead scienter based on defendants'

knowledge of contradictory facts, "'the falsity and scienter [pleading] requirements are

essentially [combined]'" (citation omitted)).  Likewise, "'in false statement of opinion cases . . .

the falsity and scienter requirements are essentially identical' because 'a material misstatement of

opinion is by its nature a false statement, not about the objective world, but about the defendant's

own belief.'"  *Etsy, Inc.*, 242 F. Supp. 3d at 182 n.4 (alteration in original) (citation omitted).

Plaintiffs' citation to unnamed confidential witnesses does not remedy this defect.

"[C]onfidential source allegations must show that individual defendants actually possessed the

knowledge highlighting the falsity of public statements; conclusory statements that defendants

'were aware' of certain information, and mere allegations that defendants 'would have' or 'should

have' had such knowledge is insufficient."  *Glaser*, 772 F. Supp. 2d at 591.  Plaintiffs instead

conclusorily allege that Defendants engaged in conscious misbehavior or recklessness because

29

they knew "of the adverse trends that Foot Locker was experiencing with its vendors" (SAC ¶ 126), based on confidential witness allegations regarding the existence of: (i) Foot Locker employees' access to software programs reflecting sales, inventory, and revenue data (SAC ¶ 124); (ii) the Individual Defendants' attendance at weekly meetings where "the leadership team discussed sales, earnings, and cost trends" (*id.* ¶ 125); and (iii) Defendant Peters's attendance at separate weekly meetings "during which financial forecasts for each area of Foot Locker's business were discussed." (*Id.*) But tellingly absent from these descriptions is a statement by *any* confidential witness that any such data or report or meeting reflected or featured a discussion of competition from the Company's vendors or changing inventory allocation practices, let alone a suggestion that Defendants participated in that discussion and agreed with that interpretation of the Company's vendor relationships.[24] Plaintiffs otherwise offer nothing to suggest that any of this data would have put Defendants on notice of any changes in its vendor relationships. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (*aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (dismissal for failure to plead scienter where plaintiff failed to allege defendants had access to information that "*specifically informed them*" of supposedly contradictory information) (emphasis in original); *see also Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (no inference of scienter where "none of the confidential witnesses assert direct knowledge that [] view was held by defendants").

---

[24] Even if Plaintiffs could draw a connection between the meetings and reports described by the confidential sources and the Company's perception of vendor-related competition issues, these allegations also bear other indicia that an inference of scienter would be inappropriate. They originate from non-management employees (only three of whom even claim to have been in the same room as Defendants) and employees of a Foot Locker brand, SIX:02, that the Company disclosed was experiencing its own performance issues. (*See* SAC ¶¶ 30-38, 124-25.) Several of the allegations in fact appear to contradict one another. (*Compare id.* ¶ 125 (CW6 alleges weekly meetings with both Individual Defendants), *with id.* (CW8 alleges that only Defendant Johnson attended same meetings).)

Finally, Plaintiffs rely on the oft-rejected strategy of alleging that the Individual Defendants "*would have been aware*" of the alleged adverse trends with vendors because of their positions as officers of the Company.  (SAC ¶¶ 121-22.)  However, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also Jackson v. Halyard Health, Inc.*, No. 16-CV-05093-LTS, 2018 U.S. Dist. LEXIS 54738, at *30-31 (S.D.N.Y. Mar. 30, 2018) (rejecting argument that defendants as "'high-level corporate officers'" "'would have been aware'" of supposedly contradictory information where plaintiff failed to allege access to "specifically identified reports or statements containing [contrary] facts" (citation omitted)).[25] And Plaintiffs' core scienter theory—that because there was a performance downturn, Defendants must have been aware of and concealed the alleged change in vendor relationships purportedly leading to the downturn—runs directly afoul of the Second Circuit's admonition against "fraud by hindsight" pleading.  *See Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016).

### C.    Any Inference of Scienter Is Not at Least as Compelling as an Opposing Inference of Good Faith

Plaintiffs' SAC also fails to allege scienter because it ignores the more compelling inference that Defendants acted in good faith.  An inference of fraudulent intent must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551

---

[25]    Plaintiffs also appear to rely on the "core operations" doctrine by making the conclusory allegation that "[t]he fraud alleged herein relates to the core business of Foot Locker, so knowledge of the fraud may be imputed to Defendants."  (SAC ¶ 121.)  However, the core operations doctrine has been heavily questioned by courts within the Second Circuit.  *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871-73 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (collecting cases calling the doctrine into question).

U.S. at 324.  Plaintiffs ignore the compelling inference here that to the extent Defendants were aware of any performance issues, they held a good faith belief they were attributable to such factors as industry disruption that was "the most significant [Defendant Johnson had] seen in [his] quarter-century in the athletic business," rather than the supposed vendor relationship issues. (*See* Ex. 16 at 3.)  Such a belief is supported by facts Plaintiffs ignore or allege but disregard, such as the fact that Foot Locker's business continued to report record growth throughout the end of 2016 (*see* Exs. 6, 7, 8) and Defendants' early, voluntary disclosure of disappointing results in the first quarter of 2017 (*see* SAC ¶ 102; Ex. 9)—hardly consistent with a protracted scheme to conceal that the Company's results would be disappointing.  *See In re Nokia Corp. Sec. Litig.*, 96 Civ. 3752 (DC), 1998 U.S. Dist. LEXIS 19897, at *15 (S.D.N.Y. Dec. 21, 1998) (noting "voluntary, early disclosure" of negative information undercuts inference of scienter).

## III.    PLAINTIFFS DO NOT ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs' claims must be dismissed for the separate and independent reason that the SAC fails to adequately allege that "'the subject of the fraudulent statement . . . was the cause of the actual loss suffered,' . . . *i.e.*, that the misstatement . . . concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).  A plaintiff must allege either that "the market reacted negatively to a corrective disclosure," or the defendant "misstated or omitted risks that did lead to the loss."  *Id.* at 175.  Plaintiffs do neither, and instead ask this Court to simply accept their conclusory assertion that the Company's underperformance was attributable to vendor relationship issues that Foot Locker purportedly concealed.  This is insufficient.

### A.    Plaintiffs Do Not and Cannot Identify Any Corrective Disclosures

There can be no dispute that Plaintiffs fail to identify a single corrective disclosure relating to the purportedly concealed vendor relationship issues, and for good reason: None

exists.  Plaintiffs contend that Defendants' disclosures on August 18, 2017 "finally apprised

investors" of the alleged "sustained downturn" Foot Locker was facing "as its top vendors

increasingly sold their products directly to consumers via online channels, and simultaneously

allocated less premier inventory to Foot Locker."  (SAC ¶ 116.)  However, Plaintiffs only cite

one-off statements by **analysts** reflecting that belief.  (*Id.*)  From **Defendants**, Plaintiffs cite

statements that relate to Foot Locker's performance and expectations going forward and a "very

high level of promotional activity" that quarter.  (*Id.* ¶¶ 112-15.)  Not a single statement cited

mentions Foot Locker's relationship with vendors or allocations from them, and Plaintiffs thus

offer no basis to support that the market had been "apprised" of the issues purportedly concealed.

Instead, on the Company's August 18, 2017 earnings call, Defendants stated:

- *[W]e do not believe our vendors selling product directly on Amazon is an imminent threat*.  There is no indication that any of our vendors intend to sell premium athletic product, $100-plus [sneakers] that we offer, directly via that sort of distribution channel.  (Ex. 16 at 4.)

- [In response to a question regarding "the allocations of new and innovative products"] "*We haven't taken down our expectation of those allocations on the hot products*." (*Id.* at 7.)

- [In response to a question about Foot Locker's relationship with its vendors] "*I think that our vendor partners have been very clear that they have their plans around their [direct-to-consumer] and other channels, but our vendor partners have been very good at their segmentation and distribution strategies.  And that's allowed us to be successful at the premium end of sneaker culture*, and that's where we will continue to do our business."  (*Id.* at 11.)

When proceeding on a theory of loss causation based upon a corrective disclosure, the

corrective disclosure "requires an **exposure** of some previous misrepresentation or omission."  *In

re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS), 2015 U.S. Dist. LEXIS 50726,

at *54 (S.D.N.Y. Mar. 31, 2015).  Because the supposed corrective disclosures identified by

Plaintiffs did not "expose" that the Company's downturn was attributed to the vendor issues

Plaintiffs purport were concealed, Plaintiffs' claims insofar as they are based on a corrective

disclosure theory must be dismissed for failure to plausibly allege loss causation.  *See In re Francesca's Holdings*, 2015 U.S. Dist. LEXIS 50726, at \*54 (failure to plead loss causation where "nothing in [supposed corrective disclosures] corrected any of the allegedly false statements from the past").

### B. Plaintiffs Do Not Sufficiently Allege That the Purportedly Concealed Risks Led to Any Loss

Having failed to identify any corrective disclosure, Plaintiffs must demonstrate that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173.  Plaintiffs instead merely put forward the same conclusory allegation that Foot Locker's "downturn" could be attributed to the alleged vendor relationship issues.  As described above, Plaintiffs offer no facts apart from insufficient confidential witness allegations regarding a discrete aspect of certain vendors' allocation practices (*see supra* Section I.A) to tie the downturn to the purportedly concealed vendor relationship issues, and a review of the Company's disclosures in fact identifies a completely unrelated explanation for the downturn, namely, that "mobile technology [had driven] shifts in consumer behavior and spending patterns at a faster pace than our industry has been able to keep up with."  (Ex. 16 at 3.)  As such, Plaintiffs fail to plead loss causation and the SAC should be dismissed on that basis.  *See ATSI*, 493 F.3d at 107 (affirming dismissal for failure to plead loss causation for lack of "causal connection" between supposed materialization of concealed risk and loss).

## IV. PLAINTIFFS' CONTROL PERSON LIABILITY CLAIM FAILS

The second claim asserted against the Individual Defendants is based upon so-called "control person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  In order to allege liability under Section 20(a), Plaintiffs must show: "(1) a primary violation by a controlled

person; (2) control of the primary violator by the [alleged controlling person]; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Because Plaintiffs' Section 10(b) claim fails, their secondary Section 20(a) claim fails as well.  *See Gentiva*, 932 F. Supp. 2d at 390.  Additionally, Plaintiffs' 20(a) claims must fail because they have failed to adequately plead culpable participation as described above.  (*See supra* Section II.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the SAC be dismissed with prejudice.

Dated:  New York, New York
        January 7, 2019

Respectfully submitted,

/s/ Susan L. Saltzstein

Susan L. Saltzstein
Scott D. Musoff
Michael M. Powell
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Facsimile: (212) 735-2000
Email: susan.saltzstein@skadden.com
        scott.musoff@skadden.com
        michael.powell@skadden.com

*Attorneys for Defendants*