UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

CITY OF WARREN POLICE AND FIRE       :    Civil Action No. 1:18-cv-01492-AMD-SJB
RETIREMENT SYSTEM, Individually and on :
Behalf of All Others Similarly Situated,   :    CLASS ACTION
                                         :
                        Plaintiff,         :    MEMORANDUM OF LAW IN
                                         :    OPPOSITION TO DEFENDANTS' MOTION
            vs.                           :    TO DISMISS THE SECOND AMENDED
                                         :    COMPLAINT
FOOT LOCKER, INC., RICHARD A.          :
JOHNSON and LAUREN B. PETERS,          :
                                         :
                        Defendants.        :
                                         :
                                         :
———————————————————— x

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    STATEMENT OF FACTS ........................................................................................3

      A.     Defendants Mislead Investors About Foot Locker's Vendor Relationships ..........4

      B.     The Truth Gradually Emerges ........................................................................7

III.   ARGUMENT ............................................................................................................10

      A.     Applicable Legal Standards ..........................................................................10

      B.     The SAC Pleads Actionable Misstatements and Omissions................................10

           1.     The SAC Adequately Alleges Falsity ........................................................10

           2.     The Alleged Misstatements Are Not Puffery...............................................16

           3.     Any Statements of Opinion Are Actionable ...............................................18

           4.     Defendants' Purported Disclosures Were Inadequate ..............................20

           5.     Defendants Fail to Establish a "Truth-on-the-Market" Defense................22

           6.     The Safe Harbor Is Inapplicable .............................................................23

           7.     Items 303 and 503 Created an Independent Duty to Disclose ..................24

      C.     The SAC's Allegations Give Rise to a Strong Inference of Scienter ...................26

           1.     Plaintiffs Adequately Allege Defendants' Recklessness ..........................26

           2.     Suspicious Insider Sales Contribute to an Inference of Scienter ..............30

           3.     Defendants Have Not Set Forth a More Compelling Inference.................33

      D.     The SAC Adequately Alleges Loss Causation .....................................................33

IV.   CONCLUSION........................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## CASES

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ............................................................26, 28

*Altayyar v. Etsy, Inc.*,
   242 F. Supp. 3d 161 (E.D.N.Y. 2016) ...........................................................3, 13, 21

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012).................................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................10

*Barrett v. PJT Partners, Inc.*,
   2017 U.S. Dist. LEXIS 145781
   (S.D.N.Y. Sept. 8, 2017).......................................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................10

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012)..................................................................16

*Christine Asia Co. Ltd. v. Yun Ma*,
   718 F. App'x 20 (2d Cir. 2017) ............................................................................30

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011)..................................................................26

*Cruz v. TD Bank, N.A.*,
   742 F.3d 520 (2d Cir. 2013)..................................................................................35

*Crypto Research, LLC v. Assa Abloy, Inc.*,
   236 F. Supp. 3d 671 (E.D.N.Y. 2017) .................................................................10

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................................................33, 34

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)............................................................................26, 31, 32

*Fogel v. Vega*,
   2018 U.S. App. LEXIS 36441
   (2d Cir. Dec. 26, 2018) .........................................................................................20

**Page**

*Ford v. Voxx Int'l Corp.*,
2016 WL 3982466
(E.D.N.Y. July 22, 2016) ...................................................................................19

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................32

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................... *passim*

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................................................15, 16, 17

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)......................................................................... *passim*

*Gauquie v. Albany Molecular Research, Inc.*,
2016 U.S. Dist. LEXIS 97295
(E.D.N.Y. July 26, 2016) ........................................................................27, 28, 29

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................................22

*Hutchins v. NBTY, Inc.*,
2012 U.S. Dist. LEXIS 45678
(E.D.N.Y. Mar. 30, 2012) ............................................................................31, 32

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................................14

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)...........................................................17, 26

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)...........................................................12, 21

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 U.S. Dist. LEXIS 87991
(S.D.N.Y. May 24, 2018)...................................................................................23

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ........................................................22, 23

**Page**

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)............................................................20, 21, 25

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 5999
   (S.D.N.Y. Jan. 20, 2015)....................................................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009)................................................................22

*In re Francesca's Holdings Corp. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 50726
   (S.D.N.Y. Mar. 31, 2015) ..................................................................................35

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................30

*In re Guilford Mills, Inc. Sec. Litig.*,
   1999 U.S. Dist. LEXIS 21690
   (S.D.N.Y. July 21, 1999) ...................................................................................32

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 U.S. Dist. LEXIS 171110
   (S.D.N.Y. Dec. 2, 2013).....................................................................................29

*In re IAC/InterActiveCorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010)................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)..........................................................33, 35

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017)..........................................................12, 17

*In re MBIA, Inc. Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)..........................................................11, 13

*In re NBTY, Inc. Sec. Litig.*,
   224 F. Supp. 2d 482 (E.D.N.Y. 2002) ...............................................................16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................18

**Page**

*In re Pall Corp*.,
2009 U.S. Dist. LEXIS 88240
(E.D.N.Y. Sept. 21, 2009) ................................................................................29

*In re PXRE Grp., Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) ..............................................................30

*In re Salix Pharms., Ltd*.,
2016 U.S. Dist. LEXIS 54202
(S.D.N.Y. Apr. 22, 2016) ...........................................................................24, 29

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ...............................................................14, 30, 32

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 U.S. Dist. LEXIS 199809
(S.D.N.Y. Nov. 26, 2018) .................................................................17, 18, 29, 35

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) ..............................................................31

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 U.S. Dist. LEXIS 171688
(E.D.N.Y. Dec. 5, 2013) ...................................................................................28

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) .................................................................32

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .........................................................................3, 11

*In re WEBMD Health Corp. Sec. Litig.*,
2013 WL 64511
(S.D.N.Y. Jan. 2, 2013) ....................................................................................32

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
2016 WL 2757760
(S.D.N.Y. May 11, 2016) ..................................................................................16

*Jackson v. Halyard Health, Inc*.,
2018 U.S. Dist. LEXIS 54738
(S.D.N.Y. Mar. 30, 2018) .................................................................................30

**Page**

*Jones v. Perez,*
　550 F. App'x 24 (2d Cir. 2013) ....................................................................30

*Lentell v. Merrill Lynch & Co. Inc.,*
　396 F.3d 161 (2d Cir. 2005)...................................................................33, 34

*Litwin v. Blackstone Grp., L.P.,*
　634 F.3d 706 (2d Cir. 2011)...................................................................24, 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
　797 F.3d 160 (2d Cir. 2015)..............................................................33, 34, 35

*Manavazian v. ATEC Grp., Inc.,*
　160 F. Supp. 2d 468 (E.D.N.Y. 2001) .....................................................23, 24

*Meyer v. JinkoSolar Holdings Co.,*
　761 F.3d 245 (2d Cir. 2014)...................................................................11, 20

*New Orleans Emps.' Ret. Sys. v. Celestica, Inc.,*
　455 F. App'x 10 (2d Cir. 2011) ....................................................................29

*Novak v. Kasaks,*
　216 F.3d 300 (2d Cir. 2000)................................................................ *passim*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
　135 S. Ct. 1318 (2015)...................................................................18, 19, 20

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,*
　595 F.3d 86 (2d Cir. 2010).........................................................................11

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
　*Arbitron Inc.,*
　741 F. Supp. 2d 474 (S.D.N.Y. 2010)........................................................22

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,*
　89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................28

*Rombach v. Chang,*
　355 F.3d 164 (2d Cir. 2004).......................................................................20

*Shemian v. Research in Motion Ltd.,*
　2013 U.S. Dist. LEXIS 49699
　(S.D.N.Y. Mar. 28, 2013) .........................................................................23

Page

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)..............................................................................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................26, 31

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................19, 20

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................................................32, 34

*Wallace v. Intralinks*,
    2013 U.S. Dist. LEXIS 65958
    (S.D.N.Y. May 8, 2013)...........................................................................29

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j ......................................................................................................10
    §78t(a) ..................................................................................................35
    §78u-5 ..................................................................................................23

Federal Rules of Civil Procedure
    Rule 12(b)(6) .......................................................................................34

17 C.F.R.
    §240.10b-5 ...........................................................................................10
    §229.303 ..............................................................................................24
    §229.503................................................................................................24, 26
    §240.10b5-1 .........................................................................................32

Private Securities Litigation Reform Act of 1995
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..............................................23, 24

**SECONDARY AUTHORITIES**

No. 33-6835, 1989 SEC LEXIS 1011 (May 18, 1989)...................................29

Lead Plaintiffs New England Carpenters Guaranteed Annuity and Pension Funds ("Lead Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Complaint (the "SAC").[1]

## I.    INTRODUCTION

This securities class action concerns Defendants' failure to disclose several fundamental, adverse changes that Foot Locker, a conventional retailer of athletically-inspired footwear and apparel, was experiencing during the August 19, 2016 through August 17, 2017 Class Period.

Specifically, the vendors that supplied Foot Locker with the merchandise sold in its stores were increasingly eliminating Foot Locker as an intermediary, instead selling their products directly to consumers through their own websites and apps.  This change was highly significant because it meant that the Company's vendors were now acting as their own retailers and competing with Foot Locker.  Vendors were also slashing the amount of premier products allocated to Foot Locker, instead keeping the trendiest products – including the limited-release sneakers that Foot Locker relied upon to drive customers into its stores – for their own direct-to-consumer initiatives.

Since vendors were no longer reliant on Foot Locker's stores as a platform for selling their best merchandise, they were utilizing their newfound leverage to require Foot Locker to purchase large amounts of second-tier merchandise in order to obtain the trendy merchandise that Foot Locker wanted.  Foot Locker inevitably had difficulty selling this second-tier merchandise at full price, and was only able to return a fraction to its vendors for a refund.  This resulted in a surplus of inventory that needed to be marked down in order to be sold, straining Foot Locker's margins and undermining its business model of selling premium products at full price.

---

[1]  "Defendants" refers to Foot Locker, Inc. ("Foot Locker" or the "Company"); Richard A. Johnson, Foot Locker's CEO and Chairman (¶22); and Lauren B. Peters, Foot Locker's CFO and Executive Vice President (¶23). "¶__" and "¶¶__" refer to paragraphs of the SAC. ECF No. 36. "MTD" refers to Defendants' memorandum of law in support of their motion to dismiss. ECF No. 43. "Ex. __" refers to exhibits to the Declaration of Susan L. Saltzstein, dated January 7, 2019. ECF No. 44. Unless otherwise noted, emphasis in quotations is added and citations and alterations are omitted.

Instead of accurately informing investors about these adverse trends, Defendants repeatedly highlighted Foot Locker's strong vendor partnerships (when its vendors had in fact become competitors), its ability to obtain favorable product allocations from vendors (when in fact, Foot Locker was no longer receiving sufficient quantities of trendy and limited-release products), and its careful inventory management and controlled inventory growth (although Foot Locker was faced with a glut of second-tier inventory). *See, e.g.*, ¶¶75-76, 82, 86, 93.

When Foot Locker announced disappointing results on May 19, 2017, an analyst asked whether vendors' direct-to-consumer sales were to blame, eliciting an outright denial from Johnson, who stated that those initiatives were not impacting Foot Locker "any more right now . . . than [they had] been" in the past. ¶107. Defendants also insisted that Foot Locker's "position in the industry [was] stronger than ever," "the consumer ha[d]n't gone elsewhere," and the Company was merely experiencing "a little bit of a lag." ¶¶9, 106-08. But Defendants' denials lost credibility when Foot Locker announced a second consecutive quarter of disappointing results on August 18, 2017, revealing that the Company was facing a sustained downturn, rather than a "little bit of a lag" – and leading analysts to uniformly conclude that Foot Locker was in fact being adversely impacted as its vendors increasingly sold their best merchandise directly to consumers. ¶117.

In response to these well-pled allegations, Defendants have filed a kitchen-sink motion to dismiss, asserting a panoply of defenses to liability. Their motion primarily focuses on two contentions: *first*, that Plaintiffs have failed to adequately plead the existence of the omitted facts, and *second*, that the omitted facts did not render any of Defendants' statements false or misleading.

Defendants' first argument improperly discounts the information provided by eight confidential witnesses ("CWs"), which must be accepted as true at the pleading stage. And, their second argument is simply wrong. Although Defendants' statements need only to have "'create[d] a

- 2 -

materially *misleading* impression . . .[to] support [a] claim[] for securities fraud[,]'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016), the SAC adequately alleges falsity because Defendants' "statements were 'just that: false; in error; wrong.'" *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 172 (E.D.N.Y. 2016) (Donnelly, J.). Foot Locker's vendor relationships were *not* "strong" "partnerships" (¶¶82, 93) because its vendors were bypassing and competing with Foot Locker; the Company was *not* receiving "exclusive and strong" product allocations (¶76) because its allocations of hot products were diminishing; and Foot Locker's inventory was *not* "fresh and well-positioned" (¶86) because the Company had a surplus of second-tier inventory.

As a result, and for all the reasons below, Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

Foot Locker primarily sells its products in brick-and-mortar stores, which it operates under various "banners," including Foot Locker, Kids Foot Locker, Lady Foot Locker, Champs Sports, Footaction, Runners Point, Sidestep, and SIX:02. ¶¶2, 39-40. As a retailer, Foot Locker purchases the merchandise sold in its stores from vendors, which provide a defined product or brand. ¶¶3, 41. Foot Locker's business is heavily dependent on a small number of vendors, with the Company's top five vendors supplying 90% of its merchandise and its top vendor, Nike, supplying 68%. *Id.*

The Company's business model consists of selling premium, full-priced merchandise to its core constituency of young male sneaker aficionados. ¶¶3, 42-44. Therefore, the willingness of Foot Locker's vendors to supply the Company with high-demand merchandise, including limited-release sneakers, is critical to Foot Locker's success. ¶¶3, 44.

By 2016, many conventional retailers were experiencing declining sales, as vendors increasingly sold their merchandise online through their own websites and third-party websites such as Amazon. ¶¶4, 45. Defendants led investors to believe that Foot Locker had insulated itself from these market forces by way of its competitive advantages and business strategies. ¶¶4, 46. For

example, they represented that the Company's customers preferred to shop in-store, and highlighted Foot Locker's strong vendor relationships, which purportedly enabled it to secure favorable product allocations. ¶¶4, 46-47. At the start of the Class Period, it appeared that Foot Locker's strategy was working, as the Company had reported 26 consecutive quarters of year-over-year sales and profit growth, and had consistently achieved Defendants' standard guidance of mid-single-digit increases in comparable-store sales and double-digit earnings-per-share ("EPS") growth. ¶48.

### A.    Defendants Mislead Investors About Foot Locker's Vendor Relationships

Unbeknownst to investors, during the Class Period, Foot Locker was experiencing several adverse changes to its vendor relationships, as described by CWs who were each former employees of Foot Locker. ¶¶1, 49. First, Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers via online channels – essentially becoming their own retailers and competing with Foot Locker. ¶¶5, 50, 68, 71, 75. Second, Foot Locker was no longer receiving sufficient quantities of the premier products that it relied upon to drive sales growth, since the Company's vendors were keeping more of those products for themselves, to be sold directly to consumers, rather than selling them through Foot Locker. ¶¶6, 68, 71, 75.

Around April 2016, many of Foot Locker's vendors began allocating their premier products to their own direct-to-consumer initiatives, instead of allocating those products to Foot Locker. ¶51 (CW1).[2] Vendors also began to allocate their premier products to boutique stores, with Foot Locker receiving those products later on, only after they had been successful in boutiques. *Id*. (CW1).

During 2017, major vendors, including Nike and Adidas, resorted to selling special-release footwear directly to consumers through their own websites and apps. ¶52 (CW2).[3] For example,

---

[2] CW1 was a replenishment analyst for women's footwear at Foot Locker's corporate headquarters through April 2016. ¶31. CW1 was responsible for analyzing sales trends in women's footwear, advising buyers on the amount of inventory to purchase, and preparing daily and weekly reports for buyers that reflected sales trends in women's footwear. *Id*.

[3] CW2 was a treasury analyst through November 2016, and a capital planning financial analyst until January 2017. ¶32. As a treasury analyst, CW2 prepared Foot Locker's global cash forecast for its North American operations. *Id*. As a

Nike re-launched its "SNKRS" app as a means of targeting coveted sneaker aficionados.  ¶55.  In contrast to Foot Locker's business model of requiring customers to camp out in long lines at its stores to obtain special-release sneakers, consumers using Nike's SNKRS app could unlock particular shoe models for purchase by following the app's prompts to visit and photograph specific locations.  *Id*.  For certain special releases from Nike and Adidas, it was necessary to purchase the sneakers through the vendors' apps.  *Id*. (CW2).  At the same time, Nike and Adidas restricted the amount of special-release inventory that Foot Locker could procure.  *Id*. (CW2).

By the Fall of 2016, it was apparent that Foot Locker was receiving less special-release inventory, as it became difficult even for Foot Locker employees to obtain special-release sneakers. ¶53 (CW2).  Nike, in particular, allocated only limited quantities of its especially popular products to Foot Locker during the Class Period.  *Id*. (CW3).[4]  Foot Locker's inability to obtain special-release footwear had an outsized impact on the Company's business, since Foot Locker relied upon special releases to drive other sales after it attracted customers to its stores.  ¶54 (CW2).

Notwithstanding these adverse changes to Foot Locker's vendor relationships, Defendants highlighted Foot Locker's "strong vendor relationships" (¶93) and stated that Foot Locker was a "lead[ing] partner for [its] world-class vendors" (¶76), was "partner[ing]" with its "key vendors . . . to deliver [] trend-right, premium footwear" (¶73), and had "great partnerships" with its vendors "that continue[d] to fuel sneaker culture" (¶82) and "bring heat . . . to [the Company's] stores" (¶98).[5]  In truth, Foot Locker's vendors had essentially become competitors, rather than partners.  ¶5.

---

financial analyst, CW2 forecasted the return on investment for planned store openings and remodelings.  *Id*.

[4]  CW3 was the director of store optimization for Foot Locker's SIX:02 banner through September 2017.  ¶33.  CW3 prepared reports containing performance results, marketing review and product analysis for SIX:02 for use in monthly steering meetings for Foot Locker's women's business, which were attended by Johnson and Peters.  *Id*.

[5]  Defendants similarly stated that Foot Locker's "vendors kn[e]w that [its] banners provide[d] the perfect battleground to fight it out to win market share" (¶76), that Foot Locker's vendors had "certainly come to recognize and support the critical position [the Company] ha[d] built within the industry" (¶88), and that Foot Locker's "vendor partnerships" were "all working" and Defendants had cause to feel "very positive about the vendor partnerships" (¶82).

And, despite the less favorable product allocations that Foot Locker was receiving from its vendors, Defendants represented that:

- "the leading brands continue[d] to be highly motivated to collaborate with [Foot Locker] on . . . exclusive and strong allocations" (¶76);

- Foot Locker was doing "a great job of working with [its] vendor partners to bring in assortments that resonate[d] with [its] consumers" (¶80);

- Foot Locker was "on a nice run with" securing allocations from Adidas, which "relate[d] to the great relationship that" the Company had "with all of [its] vendor partners" (¶81);

- Foot Locker's vendors were "all committed to bringing fresh, new, exclusive product into" the Company's stores (¶82);

- Foot Locker was "work[ing] close[ly] with [its] vendors on allocations" (¶90);

- the Company was doing "really good work . . . on improving [its] allocation[s] to get the right product to the right place, [at the] right time" (¶80);

- Foot Locker was "continu[ing] to work with all of [its] vendor partners to increase [its] allocations" (¶81); and

- "consumers [were] driven by" the allocations Foot Locker received "because they kn[e]w they ha[d] to get into the stores" to purchase trendy products "or they might not have the chance" (¶90).

Third, Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products. ¶¶7, 56-59, 68, 71, 75 (CWs 3, 4, 5, 6 and 7).[6] During semi-annual product acquisition meetings between Nike and Foot Locker, Nike would condition Foot Locker's ability to obtain the Nike products that Foot Locker wanted on the Company purchasing large quantities of inventory that it did not want. ¶56 (CW3). Under Nike's "70/30" rule, Foot Locker could only obtain 70% of the sneakers that the Company wanted to purchase, and had to fill the other 30% of the order with subpar sneaker models that the Company knew would be difficult to sell. ¶57 (CW4). Likewise, Puma frequently would

---

[6] CW4 was a retail planner through March 2018, and worked in the Footaction banner during the Class Period. ¶34. CW4 was responsible for managing sales, evaluating inventory levels, and forecasting margins and inventory levels. *Id.* CW5 was a replenishment analyst for men's footwear until September 2017. ¶35. CW5 was responsible for allocating footwear among Foot Locker's stores. *Id.* CW6 was a marketing brand coordinator for SIX:02 through September 2017. ¶36. CW6 served as a liaison between the marketing team and other SIX:02 teams, and interacted with vendors including Nike and Adidas. *Id.* CW7 was an associate buyer for SIX:02 footwear until September 2017. ¶37. CW7 was responsible for negotiating the purchase of inventory from vendors including Nike and Adidas. *Id.*

only allow Foot Locker to purchase certain "hot" sneakers if it also purchased other types of sneakers that were likely to sell poorly. ¶59 (CW7). During the Class Period, Foot Locker routinely agreed to purchase thousands of pairs of undesirable sneakers in order to obtain trendy sneaker models, and inevitably had difficulty selling the undesirable merchandise. ¶60 (CWs 3 and 7).

The second-tier merchandise that Foot Locker purchased was more likely to compete with non-premium merchandise that was available on Amazon and other third-party websites, making it even more difficult to sell. ¶¶7, 62. Moreover, vendors such as Nike only permitted Foot Locker to return a single-digit percentage of unsold inventory for a refund. ¶¶7, 61 (CWs 3, 4, and 7). As a result, Foot Locker was forced to mark down the inventory that it could not sell or return to vendors – a practice that undermined the Company's business model of selling premium, full-priced merchandise and strained its profit margins. ¶¶7, 62 (CW4). Nonetheless, Defendants represented that Foot Locker had "careful inventory . . . management" (¶74), that Foot Locker's "inventory [was] fresh and well-positioned" (¶86), and that Foot Locker was "keeping control of [] inventory growth" (¶80). Defendants also stated that Foot Locker was "do[ing] a great job of managing" its average selling prices and was "focus[ed] . . . on the premium area of sneaker culture[.]" *Id.*

### B.    The Truth Gradually Emerges

On April 20, 2017, nine days before the end of the first quarter of fiscal 2017 ("1Q17"), Foot Locker issued a press release lowering its 1Q17 and full-year guidance "in light of the . . . slow start to the fiscal year in February." ¶¶8, 102. For fiscal 2017, Foot Locker now expected an EPS "percentage increase in the mid-single digits," compared to previous guidance of a double-digit EPS increase. ¶102. However, Defendants falsely attributed the revision to "the delay in the issuance of the vast majority of income tax refund checks until after the NBA All-Star Game," and assured investors that "the customer's appetite for [Foot Locker's] exciting product assortments ha[d] not changed" and the Company's "banners remain[ed] at the center of sneaker culture[.]" ¶¶8, 102.

- 7 -

Then, on May 19, 2017, Foot Locker announced disappointing results for 1Q17, including year-over-year declines in total sales growth, net income and EPS, as well as a year-over-year increase in comparable-store sales of just 0.5% – below Foot Locker's recently-revised guidance of a low single-digit percentage increase.  ¶¶9, 104.  Defendants also disclosed that if "recent sales trends continue[d]," the Company would be forced to cut costs and inventory in order to achieve its full-year guidance of a mid-single-digit EPS increase.  ¶105.

Defendants continued to blame delayed tax refunds for the disappointing results, however, and assured investors that Foot Locker's "position in the industry [was] stronger than ever."  ¶¶9, 106.  During a conference call that day, when an analyst asked whether vendors' direct-to-consumer initiatives had been negatively affecting Foot Locker's business, Johnson replied: "At all?  Sure. . . . But [Foot Locker was] push[ing] back against" those initiatives and they were not impacting Foot Locker "*any more right now* . . . *than [they had] been*" in the past.  ¶¶9, 107.  Johnson further stated that the Company's "vendors continue[d] to support [its] initiatives," which "[spoke] to the strength of the [Company's] relationship[s] with [its] key vendor partners."  *Id*.  Also during the call, an analyst remarked that "you've said that when the consumer has the cash, they shop at Foot Locker . . . So [it's] hard to understand why this time is different," prompting Johnson to insist that "[t]here's just a little bit of a lag," and "the consumer hasn't gone elsewhere."  ¶¶9, 108.

In response to these announcements, Foot Locker stock declined 16.65%, from a closing price of $70.45 per share on May 18, 2017, to close at $58.72 per share on May 19, 2017.  ¶110.  However, Defendants' false and misleading reassurances prevented a more substantial decline.

Finally, on August 18, 2017, Foot Locker announced its financial results for the second quarter of fiscal 2017 ("2Q17") and reported negative comparable metrics for the first time in *29 quarters* – including a 6% decline in comparable-store sales and a 4.4% decline in total sales.

¶¶10, 112.  As a result, Foot Locker's 2Q17 net income had fallen to just $51 million, compared to net income of $127 million in the second quarter of fiscal 2016 ("2Q16"), and EPS had fallen to $0.39 per share, drastically below both the $0.90 per share that analysts were expecting, and the $0.94 per share that the Company had reported for 2Q16.  ¶112.  In addition, Defendants revealed that they now "expect[ed] comparable[-store] sales to be down three to four percent over the remainder of the year" and "expect[ed] . . . EPS to decrease between 20% to 30% in the second half of 2017."  ¶¶10, 114.  Defendants further stated that Foot Locker was "accelerating" the "process of reviewing [its] store portfolio" and "currently expect[ed] to close at least 135 stores," an increase from the 100 stores Defendants had previously announced they would close.  ¶¶113-14.

These announcements apprised investors of the fact that – notwithstanding Defendants' previous denials – Foot Locker's business was facing a sustained downturn as its top vendors increasingly sold their products directly to consumers via online channels, and simultaneously allocated less premier inventory to Foot Locker.  ¶¶11, 116.  Analysts issued reports the same day reflecting this understanding.  ¶117.  For example: (i) Credit Suisse noted that "the pace of retailer disintermediation by core vendors looks to be outpacing Foot Locker's digital offset"; (ii) Evercore ISI concluded that it was "clear that" Foot Locker was "now on the growing list of retailers caught in the crossfire of digital disintermediation"; (iii) Wells Fargo stated that the Company's announcements "likely heighten[ed]" investors' "significant[] concern[s] about . . . the disruption that e-commerce is causing to sellers of third-party goods"; (iv) Morgan Stanley opined that Foot Locker was "being negatively impacted by Adidas.com and Nike.com" and questioned whether the "lack of availability of products [was] a sign that [Foot Locker] ha[d] fallen off brands' 'most favored retailer' lists"; (v) Piper Jaffray noted the "intensifying consumer shift to vendor [direct-to-consumer] platforms"; and (vi) UBS predicted that Foot Locker would "struggle to return to positive

growth amid . . . key brands pushing . . . [direct-to-consumer] growth." ¶¶11, 117.

Defendants also disclosed that Foot Locker's gross margins had deteriorated 340 basis points, which was "driven by [] higher markdown[s]," and admitted that a "very high level of promotional activity" had "affected [Foot Locker] more this quarter than in the past," thereby revealing that the Company was saddled with undesirable inventory it could not sell at full price. ¶¶12, 63, 112, 114.

Following these disclosures, Foot Locker stock declined nearly 28%, from a closing price of $47.70 per share on August 17, 2017, to close at $34.38 per share on August 18, 2017. ¶115. Before investors learned the full truth, insiders including Johnson and Peters collectively sold 192,162 shares of their Foot Locker stock for proceeds of more than $13.38 million. ¶¶14, 127.

## III.    ARGUMENT

### A.    Applicable Legal Standards

"In evaluating a motion to dismiss, a court must accept as true the facts alleged in the complaint, and draw all reasonable inferences in the plaintiff's favor." *Crypto Research, LLC v. Assa Abloy, Inc*., 236 F. Supp. 3d 671, 684 (E.D.N.Y. 2017). The question is whether a claim is *plausible* and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 185 (2d Cir. 2012).

Under Section 10(b) and Rule 10b-5, "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

### B.    The SAC Pleads Actionable Misstatements and Omissions

#### 1.    The SAC Adequately Alleges Falsity

Defendants primarily argue that the adverse changes to Foot Locker's vendor relationships

alleged in the SAC did not directly contradict – and thus did not render false – any of their public statements.  MTD at 9-14.  However, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  "'The law is well settled . . . that so-called half-truths – literally true statements that create a materially misleading impression – will support claims for securities fraud.'"  *Vivendi*, 838 F.3d at 240; *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("[t]he literal truth of an isolated statement is insufficient").  The inquiry is whether undisclosed "'information renders . . . public statements materially misleading, not . . . [whether] that information completely negates the public statements.'"  *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010).

Throughout the Class Period, Defendants made unequivocally positive statements about the status of Foot Locker's vendor relationships.  *See, e.g.*, ¶93 (Foot Locker had "strong vendor relationships"); ¶76 (Foot Locker was a "lead[ing] partner for [its] world-class vendors"); ¶73 (Foot Locker was "partner[ing]" with its "key vendors . . . to deliver [] trend-right, premium footwear and apparel"); ¶82 (the "great partnerships" with its vendors "continue[d] to fuel sneaker culture"); *id.* (the "vendor partnerships" were "all working" and Defendants had cause to feel "very positive about the vendor partnerships"); ¶98 ("vendors continue[d] to bring heat . . . to [Foot Locker's] stores").  No reasonable investor would have understood from these statements that in truth, Foot Locker's top vendors were increasingly bypassing the Company and selling their products directly to consumers, becoming their own retailers and competing – rather than partnering – with Foot Locker.  ¶¶5, 75.[7]

Defendants also provided consistent assurances that Foot Locker's vendors "continue[d] to be highly motivated to collaborate" on "exclusive and strong allocations" (¶76) and were "all

---

[7]  Defendants complain that the SAC "takes liberties with" their statements by disregarding context, but appear to take issue only with the summary of the statements in the SAC's introduction, as they acknowledge that the full quotations are set forth elsewhere.  MTD at 10 n.4.

committed to bringing fresh, new, exclusive product into" the Company's stores (¶82), and that Foot Locker was doing "a great job of working with [its] vendor partners to bring in assortments that resonate[d] with [its] consumers" ¶80. Defendants' argument that these statements did not represent that "Foot Locker was receiving any specific allocation or specific products," "received an unlimited supply of . . . premier products," or "engaged in specific inventory management practices" misses the point. MTD at 12. "Even assuming these statements were not literally false," they failed to "'accurately inform'" investors of the fact that Foot Locker was no longer receiving enough of the premier products that it relied upon to drive sales growth, as the Company's vendors increasingly allocated those products to their own direct-to-consumer initiatives. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015); ¶¶6, 75. Likewise, the statements that Foot Locker was "work[ing] close[ly] with [its] vendors on allocations" (¶90), doing "really good work . . . on improving [its] allocation[s] to get the right product to the right place, [at the] right time" (¶80), and "continu[ing] to work with all of [its] vendor partners to increase [its] allocations" (¶81) were materially misleading because "'a reasonable investor would have received [the] false impression from the[se] statement[s]'" that Foot Locker's product allocations were improving, when its allocations of premier products were actually diminishing. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017); ¶¶6, 75.

And, the statements that Foot Locker was engaged in "careful inventory . . . management" (¶74), "keeping control of [] inventory growth" (¶80) and "focus[ed] . . . on the premium area of sneaker culture" (¶80), and that its "inventory [was] fresh and well-positioned" (¶86) were undermined and rendered misleading by the fact that the Company's vendors were requiring Foot Locker to purchase large quantities of undesirable inventory in order to obtain the premium inventory that was critical to its business model. ¶¶7, 75. Although Foot Locker's difficulty selling

- 12 -

or returning this undesirable merchandise resulted in a surplus of inventory that needed to be marked down in order to be sold (¶¶7, 61-62), Defendants misrepresented that Foot Locker was "do[ing] a great job of managing" its average selling prices[.]"  ¶80.[8]

Accordingly, the undisclosed changes to Foot Locker's vendor relationships "'render[ed] [Defendants'] . . . public statements materially misleading,'" *MBIA*, 700 F. Supp. 2d at 578, and Plaintiffs need not show that those undisclosed changes "'completely negate[d] [Defendants'] public statements'" (*id.*) by alleging that vendors "did not sell to Foot Locker" at all, did not "engage in initiatives with Foot Locker," and did not "view Foot Locker as a desirable partner,"[9] or that "Foot Locker's inventory management was careless or out of control."  MTD at 11, 13.[10]

Even after Defendants disclosed a downturn in Foot Locker's business, they falsely attributed the downturn to delayed tax refunds, when – as investors would discover the following quarter – it was actually the result of a fundamental shift in Foot Locker's vendor relationships.  ¶¶102, 106.  At the same time, Defendants insisted that "the customer's appetite for [Foot Locker's] exciting product assortments ha[d] not changed" (¶102), its "banners remain[ed] at the center of sneaker culture" (*id.*) and its "position in the industry [was] stronger than ever" (¶106), and stated that the business was merely experiencing "a little bit of a lag," and "the consumer [had not] gone elsewhere."  ¶108.[11]

---

[8]  Defendants' assertion that the inventory allegations "actually support the veracity of Defendants' statements" by showing that Foot Locker's "inventory management was indeed 'careful'" does not withstand scrutiny.  MTD at 13. Reasonable investors would not have understood Defendants' statements highlighting Foot Locker's focus on selling premium merchandise at full price (*e.g.*, ¶80) as consistent with the fact that Foot Locker was purchasing large quantities of non-premium inventory that was unlikely to be sold at full price.  ¶¶56-62.

[9]  While Defendants point out that Nike's CEO referred to Foot Locker as a "key account" and "strategic partner," the very next sentence of the cited transcript refers to other "partners" – presumably besides Foot Locker – "who align with [Nike's] more direct approach to the consumer[.]"  Ex. 25 at 6.

[10]  This case is fundamentally different from *Etsy*, 242 F. Supp. 3d at 178, in which the allegedly-omitted fact that some sellers "were not compliant with Etsy's policy guidelines" did not render any statements false or misleading because the company "did not guarantee that all sellers would fit Etsy's ideal mold," but rather merely stated that the company "'ask[ed]' its sellers to comply" with its policy guidelines.  MTD at 13. Here, the misstatements at issue essentially *were* guarantees about the status of Foot Locker's "strong vendor relationships" (¶93), "exclusive and strong allocations" (¶76), and "careful inventory . . . management[.]"  ¶74.

[11]  The SAC does not "rely on Foot Locker's projections' miss" to allege that Defendants' statements regarding

Although analysts were highly concerned about whether vendors' direct-to-consumer initiatives were responsible for the disappointing results that Foot Locker announced on May 19, 2017, when directly questioned on that topic, Johnson replied that Foot Locker was "push[ing] back against" direct-to-consumer initiatives, such that they were not impacting Foot Locker "any more right now . . . than [they had] been" in the past, and had the "continu[ed] [] support" of its "key vendor partners."  ¶¶9, 107.  In fact, the precise opposite was true: vendors' direct-to-consumer initiatives were impacting the Company significantly more than in the past, such that Foot Locker was beginning to experience a sustained downturn in its business.  *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (statement that company had adopted "a formal and effective process for preventing and combatting corruption and bribery" was materially misleading where it was made during a "time of concern" over widespread bribery).

Defendants also argue that the information provided by the CWs is too vague to render any of their statements false or misleading.  MTD at 9-14.  However, Plaintiffs are "not require[d] . . . [to] plead[]" the type of "detailed evidentiary matter" that Defendants demand, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  The information provided by the CWs (*see* §II.A., *supra*) adequately particularizes the basis for Defendants' omissions by showing that Foot Locker was experiencing a fundamental shift in its vendor relationships, product allocations and inventory, as its vendors increasingly bypassed the Company and sold their products directly to consumers.  *See, e.g.*, ¶51 (CW1 stating that around April 2016, many of Foot Lockers vendors began allocating their premier products to their own direct-to-consumer initiatives, instead of to Foot Locker); ¶55 (CW2 stating

---

consumers' willingness to shop in its stores were false or misleading (MTD at 14), but rather relies on CWs to allege that consumers were increasingly purchasing products directly from vendors.  ¶¶50-55.

that top vendors Nike and Adidas were only making certain special-release sneakers available through their own apps, while at the same time restricting the amount of special-release inventory that Foot Locker could procure); ¶53 (CW2 stating that it was apparent by Fall 2016 that Foot Locker was receiving less special-release inventory); *id.* (CW3 stating that Nike allocated only limited quantities of its especially popular products to Foot Locker during the Class Period); ¶¶56-62 (CWs 3, 4, 5, 6 and 7 describing how vendors were requiring Foot Locker to purchase large quantities of undesirable products that were expected to sell poorly in order to obtain desirable products, resulting in a glut of inventory that needed to be marked down in order to be sold).[12]

Judge Marrero recently rejected a similar argument in *Galestan v. OneMain Holdings, Inc*., 348 F. Supp. 3d 282 (S.D.N.Y. 2018). There, the defendants argued that the plaintiff's CW allegations amounted to "conclusory assertions" that a bank's integration process following an acquisition "negatively impacted productivity and delinquency rates" because plaintiffs did not "plead specific facts describing the timing, magnitude, and scope of the negative impact." *Id.* at 298. The court rejected this argument and found that such "quantification" was not "necessary to illustrate the alleged fraud" because the plaintiff did "not allege that [d]efendants understated the magnitude of the negative impact" from the acquisition, but instead, "failed to disclose the existence . . . of the negative impact[.]" *Id.* at 299. The court concluded that the CWs' descriptions of various integration problems were "sufficient to illustrate the existence of a negative impact stemming from the integration activities." *Id.* at 298. Likewise, here, the level of detail Defendants demand is not "necessary to illustrate the alleged fraud" because the SAC does "not allege that Defendants understated the magnitude of" the adverse changes to Foot Locker's vendor relationships (*id.* at

---

[12] Plaintiffs do not merely "refer to generic reports tracking inventory" and "assume that those reports reflected the alleged inventory allocation issues." MTD at 12. Rather, the SAC describes periodic reports and meetings to demonstrate that Johnson and Peters were aware of the allocation issues detailed by the CWs. ¶¶124-25. And, the CWs do not express their opinions about the appropriateness of Foot Locker's allocation practices (MTD at 12 n.6), but rather describe how Foot Locker's vendors were requiring the Company to purchase large quantities of undesirable inventory, which contradicted Foot Locker's business model of selling desirable, limited-release inventory at full price. ¶¶56-63.

299), but rather, failed to disclose those changes and their increasing impact on Foot Locker. The CW allegations are thus "sufficient to illustrate" that Foot Locker was experiencing adverse changes to its vendor relationships and was being negatively impacted by those changes. *Id*. at 298.[13]

### 2. The Alleged Misstatements Are Not Puffery

Defendants mischaracterize "nearly all" of the alleged misstatements as puffery (MTD at 14), which is "'an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law.'" *Galestan*, 348 F. Supp. 3d at 297-98. A statement is immaterial as a matter of law only when it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Ganino*, 228 F.3d at 162. Courts "must exercise great caution" when considering a puffery defense at the "motion to dismiss stage" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012).

Reasonable investors simply would not have viewed Defendants' statements describing Foot Locker's vendor relationships in categorically positive terms such as "strong," "great" and "key . . . partner[ships]" (¶¶81-82, 93, 107), characterizing the product allocations it was receiving from vendors as "exclusive," "strong," "fresh," "new" and "improving" (¶¶76, 80, 82), and describing its inventory as "fresh," "well-positioned," and "focus[ed] . . . on the premium area of sneaker culture"

---

[13] By contrast, in *In re NBTY, Inc. Sec. Litig.*, 224 F. Supp. 2d 482, 492 (E.D.N.Y. 2002), the plaintiffs merely made "conclusory allegations" of adverse trends that were "not grounded in any supportive facts." MTD at 13-14. In *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016), the information provided by CWs did not support the allegation that a company failed to disclose that its growth rate was falling due to competitive pressure from free apps, because one CW (who had not worked at the company) "was not in a position to know whether the growth rate . . . was [in fact] in decline" and could only "speculate as to the reason for any such drop," and the other CW merely expressed his "personal view that the company was not sufficiently competitive," which was "not enough to support a claim that the company made any false or misleading statements." MTD at 13. Here, the CWs do more than speculate and express their personal views regarding Foot Locker's vendor relationships, and instead describe changes to those relationships and how the changes were impacting the Company. ¶¶51-62. Moreover, Defendants do not dispute that each of the CWs is "described in the [SAC] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," as required by *Novak*, 216 F.3d at 314.

(¶¶80, 86) and its inventory management as "careful" and "controll[ed]" (¶¶74, 80) as "obviously unimportant," *Ganino*, 228 F.3d at 162, when the success of Foot Locker's business was dependent upon its vendor relationships, and in turn, its ability to secure favorable product allocations and inventory from vendors.  "[S]tatements about a company's business practices may invoke reasonable reliance by investors" where, as here, they relate to topics that are "touted as sources of its success." *Inv. Tech. Grp.*, 251 F. Supp. at 611 (statements about company's "'independent agency status'" were not puffery because they "described a significant aspect of [the] business model").

Moreover, "statements are not puffery when they constitute 'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true.'" *Galestan*, 348 F. Supp. 3d at 298.  As if to underscore the importance of Foot Locker's vendor relationships, Defendants repeatedly described the Company's vendors as "partners" (¶¶73, 76, 80-82, 90, 97, 99, 107), although the SAC alleges they knew that the contrary was true – those vendors were increasingly becoming competitors by selling their products directly to consumers.  *See Novak*, 216 F.3d at 315 (rejecting puffery defense where "defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").[14]

Additionally, when statements are "'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (collecting cases).  Many of the statements at issue were made in response to analysts' questions, in an effort to reassure investors about the status of Foot Locker's vendor and customer relationships (¶¶78, 80, 82, 97, 107), allocations (¶¶80-82, 90, 89-99) and inventory (¶80), which removes them from the realm of puffery.  *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 U.S. Dist.

---

[14]  Because Defendants misrepresented existing facts about the status of Foot Locker's vendor relationships, allocations and inventory – matters that were sufficiently concrete and verifiable – these are not the sort of aspirational and vague statements found to be puffery in the cases cited by Defendants.  MTD at 14-15.

LEXIS 199809, at \*34-\*35 (S.D.N.Y. Nov. 26, 2018) (statements that credit portfolio was "strong," "robust," and "highly disciplined" were not puffery because they "were made in response to direct questions about [the company's] credit portfolio . . . in an effort to reassure the investing public about the portfolio's health").  In this context, Defendants' statements "were not puffery at all; they were purported descriptions of the health of the business."  *Id.* at \*36.

### 3.    Any Statements of Opinion Are Actionable

Defendants also argue that "numerous" statements were subjective opinions, requiring Plaintiffs to plead one of the bases for opinion liability in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).  MTD at 17-20.  However, Defendants' statements attributing the "challenging retail sales environment" and Foot Locker's revised guidance for 1Q17 to delayed tax refunds (¶¶93, 95, 98, 106) were not opinions at all because they "were neither forward-looking nor estimative."  *Signet Jewelers*, 2018 U.S. Dist. LEXIS 199809, at \*38.  "They spoke to a present state of affairs, not a belief about future events." *Id.*  Indeed, the reason for a slowdown in Foot Locker's business is precisely the kind of information investors would understand to be factual.  "[I]nserting the word 'belie[ve]' before" statements explaining the cause of the downturn "does not change the assertive nature of the statements."  *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999).  Likewise, Defendants' positive characterizations of Foot Locker's vendor relationships, product allocations and inventory management – which did not even contain qualifiers such as "believe" or "think" (*see Omnicare*, 135 S. Ct. at 1326) – are statements of fact, not opinion.  *See Signet Jewelers*, 2018 U.S. Dist. LEXIS 199809, at \*34, \*38 (statements describing company's credit portfolio as "'strong,'" "'very healthy'" and "'robust,'" and its underwriting as "'effective'" and "'consistent'" were not opinions).

But even if these statements are analyzed as opinions, they are actionable.  In *Omnicare*, the Supreme Court held that a statement of opinion may be actionable *either* because: (1) "'the speaker

did not hold the belief she professed'"; (2) "'the supporting fact[s] she supplied were untrue'"; *or* (3) the opinion, "though sincerely held and otherwise true as a matter of fact, . . . omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Thus, a sincerely held and factually true statement of opinion is actionable if it omits "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicar*e, 135 S. Ct. at 1332.

The SAC's allegations satisfy the first and third bases for liability under *Omnicare*. As discussed in the scienter section below, the SAC alleges that Defendants did not honestly believe their representations about Foot Locker's "strong" vendor "partnerships" (¶¶73, 93), favorable product allocations (¶80) and inventory (¶86) because they were aware that Foot Locker's top vendors were increasingly bypassing the Company and selling their products directly to consumers, keeping more of their premier products for direct-to-consumer initiatives, and requiring the Company to purchase undesirable merchandise in order to obtain desirable merchandise. ¶75; *see* §III.C., *infra*.[15] Defendants likewise could not have honestly believed their statements attributing the slowdown in Foot Locker's business primarily to delayed tax refunds (¶¶93, 95, 98, 102, 106) because they knew that the primary cause was actually the adverse changes to vendor relationships.

Even if Defendants' purported "opinions" were both sincerely held and factually true – which they were not – they are still actionable under *Omnicare* because they omitted "particular (and material) facts going to the basis for the . . . opinion[s]" (135 S. Ct. at 1332) – that Foot Locker's vendor partnerships were weakening as its vendors instead became competitors, and that its

---

[15] For this reason, Defendants' reliance on *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *8 (E.D.N.Y. July 22, 2016), in which the plaintiffs failed to allege any "facts suggesting that [d]efendants knew" the company's intangible assets were inflated, is misplaced. MTD at 18.

allocation of premier products was declining along with the quality of its inventory. ¶¶50-63.[16] The omission of these facts directly contradicted Defendants' repeated, positive statements – often made with the express purpose of reassuring investors about the health of Foot Locker's business model (*e.g.*, ¶¶102, 106) – and rendered those statements misleading to a reasonable investor "reading the statement[s] fairly and in context." *Omnicare*, 135 S. Ct. at 1332.[17]

### 4.    Defendants' Purported Disclosures Were Inadequate

The generic risk disclosures cited by Defendants (MTD at 20-22) do not shield them from liability for the omissions alleged in the SAC because a company's disclosure of a potential risk is misleading where that risk has already materialized, or even where it is likely to materialize.  *See Meyer*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

The purported warning that "*[s]hould*" direct-to-consumer sales initiatives by Foot Locker's vendors "continue to occur, and *if* our customers decide to purchase directly from our suppliers, it *could* have a material adverse effect on our business, financial condition, and results of operations" (Ex. 2 at 3) did not adequately warn investors that the Company's customers *were presently* purchasing directly from its vendors to such an extent that direct-to-consumer sales were beginning to adversely impact Foot Locker's business.  ¶¶50-55.  *See, e.g.*, *In re Facebook, Inc., IPO Sec. &*

---

[16]  The SAC alleges that a fundamental shift was occurring in Foot Locker's vendor relationships, as vendors changed from partners to competitors – not that "one discrete aspect of some" vendor relationships was evolving.  MTD at 18-19.

[17]  In contrast to the cases cited by Defendants, the statements here were not "fairly align[ed] with the information in [Foot Locker's] possession at the time." *Omnicare*, 135 S. Ct. at 1329.  *See Fogel v. Vega*, 2018 U.S. App. LEXIS 36441, at *13 (2d Cir. Dec. 26, 2018) (opinions about controls presently in place "[did] not conflict with" the fact that bribery occurred years earlier); *Tongue*, 816 F.3d at 212 (FDA feedback did not conflict with optimistic projections about drug approval); *Barrett v. PJT Partners, Inc.*, 2017 U.S. Dist. LEXIS 145781, at *14-*15 (S.D.N.Y. Sept. 8, 2017) (fact that one employee embezzled funds from clients did "not render [the company's] statements that its long-term relationships and strong reputation were keys to its success false or misleading").

*Deriv. Litig.*, 986 F. Supp. 2d 487, 510-12 (S.D.N.Y. 2013) (risk warnings were inadequate where they noted that "potential issues" with increasing mobile usage "'may' negatively affect the Company's revenues" but did not disclose "the extent [that] increased mobile usage . . . was already affecting Facebook's revenues"). And, Johnson's statement on May 19, 2017 – the date investors began to discover the truth about Foot Locker's business – that Foot Locker was "push[ing] back against" vendors' direct-to-consumer initiatives, such that those initiatives were not impacting Foot Locker "any more right now . . . than [they had] been" in the past (¶¶9, 107; Ex. 14 at 12) was a denial, rather than a disclosure, of the fact that direct-to-consumer initiatives were increasingly impacting the Company and were the cause of its disappointing 1Q17 financial results.[18]

Likewise, neither the generic warning that Foot Locker had "generally been able to purchase sufficient quantities of [high-demand] merchandise *in the past*," but could "[not] be certain that [its] suppliers [would] continue to allocate sufficient amounts of such merchandise to [it] *in the future*" (Ex. 2 at 3), nor the assurances that Foot Locker was doing "really good work . . . on *improving* [its] allocation[s]" (¶80), "continu[ing] to work with all of [its] vendor partners to *increase* [its] allocations" (¶81) and "fighting for consumers" (Ex. 14 at 12) said anything about the fact that Foot Locker was *presently* receiving *insufficient* allocations of premier products, or that its vendors were conditioning allocations of premier products on Foot Locker purchasing undesirable products. ¶75. *See BioScrip*, 95 F. Supp. 3d at 727-28 (statements that there could be "'no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations . . . from time to time'" were misleading "because . . . a reasonable investor could have read them to mean that BioScrip was not already in receipt of just such a request for information," when in fact it was).

---

[18]  In contrast to Johnson's denial here, the defendants in *Etsy*, 242 F. Supp. 3d at 180, "openly acknowledged" that the company's website listed counterfeit goods.  MTD at 21.

### 5. Defendants Fail to Establish a "Truth-on-the-Market" Defense

Defendants' argument that the adverse changes to Foot Locker's vendor relationships were publicly known (MTD at 22-23) prematurely raises a truth-on-the-market defense, which requires Defendants to show that the "corrective information [was] conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d at 167. Whether the relevant information was adequately disclosed is generally "a fact-intensive query that cannot be disposed of on a motion to dismiss." *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008).

Defendants' reference to vendors' unspecified "ongoing public marketing campaigns and sales practices" (MTD at 23) falls short of this demanding test. "[S]cattered disclosures" by outside parties are insufficient "as a matter of law to disclose the material facts to reasonable investors." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009).

Moreover, any publicly-available information about vendors' direct-to-consumer initiatives was undercut by Defendants' assurances that those initiatives were not presently adversely impacting Foot Locker. *See* ¶102 ("the customer's appetite for [Foot Locker's] exciting product assortments ha[d] not changed" and its "banners remain[ed] at the center of sneaker culture"); ¶106 (Foot Locker's "position in the industry [was] stronger than ever"); ¶107 (Foot Locker was "push[ing] back against" direct-to-consumer initiatives such that they were not impacting Foot Locker "any more right now . . . than [they had] been" in the past, and the Company's "vendors continue[d] to support [its] initiatives"); ¶108 ("the consumer ha[d]n't gone elsewhere"). *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 486 (S.D.N.Y. 2010) ("a reasonable jury could find that the defendants' emphatic statements vouching for the PPM overshadowed the concerns raised by outside parties"); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008) (disclosures "may not have been intense

- 22 -

or credible enough to 'counter-balance effectively' Converse's previous misstatements").[19]

### 6.      The Safe Harbor Is Inapplicable

Defendants contend that a handful of the misstatements alleged in the SAC are protected by the PSLRA's safe harbor for forward-looking statements. MTD at 15-16.[20] None of the statements Defendants identify, however, are protected by the safe harbor because they incorporate forward-looking aspects within existing facts. *See* ¶78 ("[O]ur consumer *is still driven to the malls* . . . . So *we're confident that* . . . we should continue to drive traffic into the malls."); ¶80 ("*[O]ur focus is really on the premium area of sneaker culture*, and the consumer *is definitely responding to that*. So *I don't* . . . *see* any changes in the back half."); ¶93 ("*[W]e believe the strategic initiatives we have in place, coupled with our strong vendor relationships*, will enable us to deliver another year of record performance."); ¶97 ("*I have a huge amount of faith* in our vendor partners and our merchant teams, to move the dollars *where the customer is*, and is going to be."); ¶98 ("*So we're confident that* the sales will start to flow when the tax checks start to flow."); ¶102 ("*[W]e are confident our banners remain at the center of sneaker culture and we believe in our ability* to produce the strong performance over the remainder of 2017 that we previously outlined."). "It is well recognized that . . . when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 87991, at *26-*27 (S.D.N.Y. May 24, 2018); *see also Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 481

---

[19]  The cases cited by Defendants do not support a contrary result. MTD at 22-23.  In *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010), unlike here, the company itself had already disclosed the alleged omission in a previous SEC filing, and the plaintiffs did not "explain why [that] disclosure was deficient." In *Shemian v. Research in Motion Ltd.*, 2013 U.S. Dist. LEXIS 49699, at *63 (S.D.N.Y. Mar. 28, 2013), the publicly-available facts were widely known because they concerned the age of the company's own products.

[20]  To qualify for the safe harbor, a forward-looking statement must be: (1) identified as such; and (2) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i). Forward-looking statements that are known to be false and misleading at the time they are made are not protected by the safe harbor. 15 U.S.C. §78u-5(c)(1)(B).

(E.D.N.Y. 2001) (defendants were "not immunized by the safe harbor provision" where they were alleged to have "knowingly misrepresented present material facts as part of forward-looking statements pertaining to [the company's] current and future business health").

Defendants also ignore that "[t]he safe harbor . . . does not protect material omissions." *In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *29 (S.D.N.Y. Apr. 22, 2016). Defendants' omissions concerning the adverse changes that Foot Locker was experiencing in its vendor relationships thus preclude safe harbor protection. *See id.* at *34 (statements were "not subject to the PSLRA safe harbor" because they "were made misleading by material omissions"). Finally, even assuming that certain statements are forward-looking, the cautionary language upon which Defendants rely is insufficient to invoke the safe harbor's protection, as discussed above in §III.B.4., and the SAC alleges that the statements were made with actual knowledge of falsity, as discussed in the scienter section below. *See* §III.C., *infra*.

### 7.    Items 303 and 503 Created an Independent Duty to Disclose

Even in the absence of their affirmative misstatements, Defendants had a duty to disclose the adverse trends in Foot Locker's vendor relationships pursuant to Items 303 and 503 of Regulation S-K.  ¶¶64-72.  Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" (17 C.F.R. §229.303(a)(3)(ii)), while Item 503 requires a company to "provide . . . a discussion of the most significant factors that make the [securities] speculative or risky."  17 C.F.R. §229.503(c).[21]

Defendants argue that there is no liability under Items 303 and 503 because: (i) the alleged omissions were adequately disclosed; and (ii) Plaintiffs fail to allege that the alleged omissions were

---

[21] Item 303 "imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011).

"sufficiently material."  MTD at 23-25.  *First*, as discussed above, none of the purported risk warnings Defendants point to adequately disclosed that Foot Locker's vendors were *presently* ramping up their direct-to-consumer sales, allocating smaller quantities of premier products to Foot Locker, and requiring the Company to purchase undesirable merchandise in order to obtain desirable merchandise.  *See* §III.B.4., *supra*.[22]  Nor can Defendants point to any disclosure of the *expected future impact* of these adverse trends on Foot Locker's financial condition, as required by Item 303.  *See Litwin*, 634 F.3d at 719 (Item 303 required disclosure of the "*potential future impact*" that publicly disclosed trends would have on the company); *Facebook*, 986 F. Supp. 2d at 511-12 (same).

*Second*, the SAC adequately alleges the materiality of the adverse changes to Foot Locker's vendor relationships.  The SEC's release governing Item 303 provides that "[d]isclosure" of a known trend or uncertainty "is . . . required *unless* management determines that a material effect on the registrant's financial condition or results of operations is *not* reasonably likely to occur."  *Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations*, SEC Release No. 33-6835, 1989 SEC LEXIS 1011, at *19 (May 18, 1989).  The fact that Foot Locker's top vendors, which supplied 90% of its merchandise – including Nike, which supplied 68% (¶¶41, 53) – were increasingly competing with Foot Locker by selling their products directly to consumers, were no longer allocating sufficient quantities of premier products to Foot Locker, and were requiring Foot Locker to purchase non-premium merchandise that would need to be marked down in order to be sold simply cannot be described as "obviously unimportant," and thus "immaterial as a matter of law[.]"  *Ganino*, 228 F.3d at 162.  Nor could Defendants have concluded that a material effect on Foot Locker's financial condition was *not* reasonably likely to occur, since each of these adverse trends

---

[22]  For this reason, Defendants' cited authorities, in which companies adequately disclosed the relevant trend, uncertainty or risk, provide no assistance.  MTD at 23-24.

undermined Foot Locker's business model of selling premium, full-priced merchandise.  ¶¶42-44.[23]

Finally, Item 503 claims are governed by "the familiar materiality standard."  *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011). Even if Item 503 did impose a higher threshold for materiality, a reasonable investor would certainly consider the increasing inability of a retailer such as Foot Locker to obtain sufficient amounts of desirable products to sell in its stores to be among "the most significant factors that make [its] [securities] speculative or risky."  17 C.F.R. §229.503(c).[24]

## C.    The SAC's Allegations Give Rise to a Strong Inference of Scienter

To plead scienter, a plaintiff must allege "facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).  The key question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but merely "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  Where "competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.'"  *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

### 1.    Plaintiffs Adequately Allege Defendants' Recklessness

A plaintiff may establish recklessness by alleging "[c]ircumstantial evidence [to] support an

---

[23]  Defendants' contention that the CW allegations do not adequately establish the existence of the adverse trends amounts to an improper refusal to accept the SAC's allegations as true, and demands a level of detail such as "specific inventory data" and "internal discussions" about "the competitive threat" (MTD at 24) that would improperly "require[] [Plaintiffs] to plead evidence."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).

[24]  While Forms 20-F were at issue in *BHP Billiton*, 276 F. Supp. 3d at 89, there is no question that Item 503 is applicable here because Item 1A of the instructions to Forms 10-K and 10-Q requires companies to "[s]et forth . . . the risk factors described in Item 503(c) of Regulation S K" in their annual and quarterly filings.  MTD at 23 n.17.

inference of scienter in a variety of ways, including where defendants '. . . knew facts or had access to information suggesting that their public statements were not accurate[.]'" *Gauquie v. Albany Molecular Research, Inc.*, 2016 U.S. Dist. LEXIS 97295, at *5 (E.D.N.Y. July 26, 2016). Information provided by confidential sources "may be probative of scienter where" the sources are "'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* at *6.

Here, the CWs provided corroborating information which establishes that: (i) by April 2016, Foot Locker's vendors were increasingly bypassing the Company and selling their products directly to consumers (¶51; CW1) – a trend which escalated during 2017 (¶52; CW2); (ii) by the Fall of 2016, it was apparent that Foot Locker was no longer receiving sufficient quantities of premier products as its top vendors, including Nike, kept more of those products for their own direct-to-consumer initiatives (¶53; CW3); and (iii) in order to obtain desirable merchandise, Foot Locker's top vendors were requiring it to purchase large quantities of undesirable merchandise that would be difficult to either sell at full price or return (¶¶56-62; CWs 3, 4, 5, 6 and 7).[25] *See Freudenberg*, 712 F. Supp. 2d at 197 ("[c]orroboration from multiple sources . . . supports an inference of scienter").

Contrary to Defendants' argument that the SAC fails to allege *how* the Company's internal systems, periodic reports and meetings would have put them on notice of these adverse trends (MTD at 29-30), the SAC alleges that: (i) Quantum, Foot Locker's internal network, tracked sales figures, products and inventory on a daily basis (CW1); (ii) MicroStrategy software showed the Company's sales on a daily, weekly and monthly basis by division, as well as Company-wide (CW4); and (iii) printouts distributed to buying groups contained metrics including sales, actual and projected inventory, cost, turnover and margins (CW7). ¶124. Moreover, Johnson and Peters attended weekly

---

[25] Because the CWs pinpoint the adverse changes to Foot Locker's vendor relationships to time periods prior to and during the Class Period, the SAC's allegations do not amount to fraud-by-hindsight. MTD at 1, 8, 31.

meetings every Monday with other top executives.  ¶125 (CW6).  And, Johnson attended weekly meetings during which the Company's leadership team discussed sales, earnings and cost trends, while Peters attended weekly meetings during which discussions were held regarding revenues, markdowns, and financial forecasts for each area of Foot Locker's business.  *Id*. (CW8).[26]

These metrics and discussions alerted Defendants to the adverse changes in Foot Locker's vendor relationships, product allocations and inventory and the financial impact that those changes were having – or at minimum, provided Defendants with access to information suggesting that their positive statements were not accurate.  *See, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171688, at *36 (E.D.N.Y. Dec. 5, 2013) (scienter adequately pled by alleging defendants had access to and reviewed reports that would have shown inflated sales projections); *Akerman*, 608 F. Supp. 2d at 387 (allegations that defendants "received . . . monthly sales projection and monthly inventory reports" and "had access to . . . accounting software" sufficiently pled recklessness).[27]

Notwithstanding the adverse trends described by the CWs, Defendants repeatedly emphasized the strength of Foot Locker's vendor relationships (*e.g.*, ¶93), highlighted its favorable product allocations (*e.g.*, ¶82), and made positive statements about inventory (*e.g.*, ¶86).  Under these circumstances, Defendants plainly "knew or, more importantly, should have known that they were misrepresenting" the condition of Foot Locker's business.  *Novak*, 216 F.3d at 308.[28]

---

[26]  CW8 was a vice president at Foot Locker until January 2016.  ¶38.  CW8's responsibilities included budgeting, procurement, financial planning, accounting and project management.  *Id*.  CW8 attended weekly meetings with Johnson and Peters.  ¶125.  There is nothing contradictory about CW8's account of weekly meetings attended by Johnson, and CW6's account of weekly meetings attended by both Johnson and Peters (MTD at 30 n.24), because they were not necessarily the same weekly meetings.  ¶125.  Even if they were, CW8's statement that the weekly meetings were attended by members of Foot Locker's leadership team *including* Johnson does not rule out Peters' attendance.  *Id*.

[27]  The fact that seven of the eight CWs were "non-management employees" (MTD at 30 n.24) is entirely appropriate because those CWs provided corroborating information from various levels and divisions of Foot Locker's business, including its SIX:02 banner (*see generally* ¶¶30-38), and Defendants do not dispute that each CW was in a position to "'possess the information alleged.'"  *Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *6.  Similarly, while some of the CWs did not have direct contact with Johnson and Peters, "there is no baseline requirement of such contact[.]"  *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015).

[28]  Relying on a repackaged version of their falsity argument, Defendants argue that the undisclosed facts did not contradict any of their statements.  MTD at 29.  But as explained, this argument is without merit.  *See* §III.B.1., *supra*.

Defendants' choice to "[a]ctively communicat[e] with the public about" Foot Locker's vendor relationships and product assortments "demonstrates [their] sensitivity to" those issues, and supports an inference of scienter, *Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *6, as does the fact that analysts inquired about the impact that direct-to-consumer initiatives were having on Foot Locker. ¶107; *see New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (fact that inventory levels "was a subject about which investors and analysts often inquired" "reinforce[d] the inference of scienter" by "explain[ing] why [defendants] would have been alert to information concerning" that subject). Indeed, Johnson's "attempt[] to 'placate the market in reaction to the inquiries by analysts'" – by insisting that direct-to-consumer sales were not impacting Foot Locker "any more right now . . . than [they had] been" in the past (¶107) – "'provides cogent support for an inference of scienter.'" *Signet Jewelers*, 2018 U.S. Dist. LEXIS 199809, at *48.

"[T]he fact that [the alleged fraud] involved the core operations of [Foot Locker's] business also support[s] a strong inference of scienter." *Salix Pharms.*, 2016 U.S. Dist. LEXIS 54202, at *50. As courts in this Circuit have repeatedly recognized, "[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110, at *72 (S.D.N.Y. Dec. 2, 2013).[29] The importance of Foot Locker's vendor relationships, the product allocations it received from its top vendors, and the status of its inventory cannot be overstated. Foot Locker purchased

---

[29] While Defendants assert that "the core operations doctrine has been heavily questioned" (MTD at 31 n.25), the view that the core operations doctrine "can provide supplemental support for allegations of scienter" "finds support in decisions by [the Second Circuit] and district courts within this circuit." *Celestica*, 455 F. App'x at 14 n.3. *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 5999, at *39 (S.D.N.Y. Jan. 20, 2015) (finding scienter where "defendants' misstatements concerned a core operation of their company," *i.e.*, its "ability to support growth"); *Wallace v. Intralinks*, 2013 U.S. Dist. LEXIS 65958, at *24-*25 (S.D.N.Y. May 8, 2013) (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the company's] business" provided "additional evidence" of scienter); *In re Pall Corp.*, 2009 U.S. Dist. LEXIS 88240, at *21 (E.D.N.Y. Sept. 21, 2009) (core operations doctrine supported a finding of scienter).

90% of its inventory from its top five vendors, including 68% from Nike.  ¶¶41, 121.  The viability of Foot Locker's business model of selling premium merchandise at full price and attracting customers to its stores with limited-release sneakers was dependent upon the willingness of those top vendors to supply the Company with sufficient amounts of premium merchandise.  ¶¶42-44.

Under these circumstances, it is reasonable to infer that Defendants closely monitored the direct-to-consumer sales of Nike and other top vendors, as well as Foot Locker's inventory purchases, and knew or recklessly disregarded that vendors were increasingly bypassing Foot Locker and selling their products directly to consumers via online channels, allocating more of their premier products to their own direct-to-consumer initiatives, and requiring the Company to purchase undesirable products in order to obtain desirable products.  ¶¶121-22.  *See, e.g.*, *Christine Asia Co. Ltd. v. Yun Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (finding scienter for executives where it was "virtually inconceivable" that information about key business segments was not communicated to them); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("In employing a holistic analysis, surely an inference of knowledge may be appropriate . . . where it would be 'absurd to suggest that management was without knowledge of the matter.'").[30]

### 2. Suspicious Insider Sales Contribute to an Inference of Scienter

Since Plaintiffs have established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege motive and opportunity.  *See Ganino*, 228 F.3d at 170.[31]  Nonetheless, the fact that Johnson and Peters, along with six other Foot

---

[30]  Accordingly, the SAC does not rely solely on Defendants' corporate positions, as in *Jackson v. Halyard Health, Inc.*, 2018 U.S. Dist. LEXIS 54738, at *28 (S.D.N.Y. Mar. 30, 2018), where the plaintiffs provided no support for their "conclusory allegation that the 'core executives' who had knowledge of the problems included the Individual Defendants."  None of the other cases cited by Defendants compel a contrary result.  For example, in *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), the plaintiff alleged that the company's software was unreliable, but failed to plead any facts showing defendants had access to information indicating the software's unreliability.  *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013), is inapposite because the allegations here do not involve Defendants' subjective view about their present intentions.  MTD at 30-31.

[31]  In the Second Circuit, the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."  *Scholastic*, 252 F.3d at 74.

Locker insiders, acted to benefit from material, non-public information by engaging in suspicious insider trading further supports a strong inference of scienter. *See Tellabs*, 551 U.S. at 325.

During the Class Period, Foot Locker insiders collectively sold 192,162 shares of their stock for proceeds of more than *$13.38 million*. ¶127.  In particular, Johnson sold 5.4% of his holdings for proceeds of $3,402,000, and Peters sold 10.9% of her holdings for proceeds of $3,297,750, while six other insiders sold between 7.3% and 38.9% of their holdings for proceeds totaling $6,680,317. *Id*. The proceeds reaped during the twelve-month Class Period were more than six times the proceeds reaped during the twelve months prior to the Class Period, when insiders sold just 31,628 shares for proceeds of $2.1 million, and more than three times the proceeds reaped during the twelve months following the Class Period, when insiders sold 73,442 shares for proceeds of $3.6 million. ¶¶128-29.

The timing of the insider trading was unusual, as the majority of the sales – including all of Johnson and Peters' sales – were made within days of the Company's positive announcements. *See* ¶127 (reflecting insider sales made the same day, or shortly after misstatements on August 19, 2016 (¶¶73-83), September 7, 2016 (¶84), November 18, 2016 (¶¶85-91), February 24, 2017 (¶¶93-100), and April 20, 2017 (¶¶102-03)); *Blanford*, 794 F.3d at 308 (finding motive adequately alleged where "stock sales occurred shortly after the quarterly investor calls during which [defendants] reassured investors of the strength and continued growth of [the] business").

Contrary to Defendants' assertion that sales by non-defendant insiders cannot be used to support scienter (MTD at 27), "[t]he number of corporate insiders who sold shares is . . . relevant" in assessing motive.  *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010).[32]

Defendants' argument distinguishing gross proceeds and net profits fails as well.  MTD at 28. Because net profits are nearly impossible to calculate pre-discovery (without information such as tax

---

[32]    *See, e.g., Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (motive adequately alleged where defendant sold stock along with "several other insiders"); *Hutchins v. NBTY, Inc.*, 2012 U.S. Dist. LEXIS 45678, at *6, *18 (E.D.N.Y. Mar. 30, 2012) (considering sales by non-party insiders).

liabilities), courts routinely use gross proceeds to determine whether insider sales were unusual.[33]

It is of little significance at this juncture that some of the insider sales occurred pursuant to 10b5-1 trading plans. MTD at 26-27. As Defendants admit, half of the insiders who sold stock during the Class Period (Ms. Turpin, Mr. Gilbert, Mr. McKenna and Mr. DiPaolo) did *not* trade pursuant to 10b5-1 plans. MTD at 26 n.21. Moreover, one of Peters' two sales, and all of Ms. Alviti's sales, were made pursuant to trading plans that were adopted *during* the Class Period, and which therefore "provide[] no defense to scienter allegations." *Blanford*, 794 F.3d at 309; *Freudenberg*, 712 F. Supp. 2d at 201 (collecting cases).[34] In any event, "[t]he existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg*, 712 F. Supp. 2d at 200-01. Defendants fail to carry the burden of proving this affirmative defense – instead of submitting the trading plans so that the Court can evaluate their terms, Defendants rely on a compilation of Forms 4, creating a selective factual record. MTD at 26 n.21 (citing Exs. 17-20).[35]

Finally, Foot Locker's share repurchase program does not "undermine[] . . . scienter" (MTD at 28) because if that were so, executives could cause their companies to enact such programs to disguise the suspicious nature of insider sales. In fact, share repurchases support scienter because they inflate the price of a company's stock – leading to a larger payoff for insiders who sell stock.[36]

---

[33]   *See, e.g.*, *Scholastic*, 252 F.3d at 74 (considering gross proceeds in scienter analysis); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (same); *Hutchins*, 2012 U.S. Dist. LEXIS 45678, at *6-*7, *18 (same).

[34]   *See also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("While a small portion of the sales were pursuant to trading plans entered into outside the Class Period, the vast bulk of the sales were not made pursuant to any Rule 10b5-1 trading plan or pursuant to trading plans that were entered into at times that were plausibly designed to take advantage of comScore's allegedly inflated share price.").

[35]   Rather than negate scienter, a "Rule 10b5-l trading plan may *give rise* to an inference of scienter," because "'a clever insider might "maximize" their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.'" *Freudenberg*, 712 F. Supp. 2d at 200.

[36]   *See In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014) ("There are many inferences that a Court could draw from a stock repurchase."); *In re Guilford Mills, Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 21690, at *14 (S.D.N.Y. July 21, 1999) ("A company buys back its stock for any number of reasons."). *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *14 (S.D.N.Y. Jan. 2, 2013), cited by Defendants, did not even involve insider trading.

### 3.    Defendants Have Not Set Forth a More Compelling Inference

Taken collectively, the SAC's allegations give rise to a strong inference that Defendants knew or recklessly disregarded the adverse changes brought about by vendors' direct-to-consumer initiatives, and sought to conceal and downplay those changes while selling their stock before it became apparent that the changes would cause a sustained downturn in Foot Locker's profitability. The competing inference urged by Defendants – that they "acted in good faith" – is simply not more compelling.  MTD at 31.  In particular, the fact that Foot Locker "continued to report record growth throughout the end of 2016" does not undermine scienter. *Id*. at 32.  Vendors' direct-to-consumer initiatives inevitably took time to impact the Company's financial results – since there is a delay from the time that Foot Locker purchases its inventory from vendors, to the time that the inventory is sold in its stores, and the time that the sales are reported in its financial results.  And, Defendants' "early, voluntary disclosure" that the business was facing a slowdown (*id*.) is consistent with their efforts to gradually lower investor expectations while disguising the true cause of the downturn, instead blaming it on delayed tax refunds and industry disruption.  ¶¶93, 95, 102, 106; Ex. 16 at 3.

### D.    The SAC Adequately Alleges Loss Causation

To plead loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  This burden "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  The allegations must support an inference that the "misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 175 (2d Cir. 2005).  "[T]here is no 'requirement that the disclosure take a particular form or be of a particular quality.'" *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  Loss causation is generally "'a matter of

- 33 -

proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" *Loreley*, 797 F.3d at 187.

The SAC satisfies these standards by alleging that investors began to discover the truth about Foot Locker's business on May 19, 2017, when Defendants announced disappointing results for 1Q17 – sending the Company's stock down 16.65% – but continued to conceal the true causes of the downturn, instead blaming delayed tax refunds, assuring investors that vendors' direct-to-consumer initiatives were not increasingly impacting Foot Locker, and extolling the continued "strength" of Foot Locker's vendor partnerships and industry position. ¶¶106-07, 110. Defendants' explanations and denials were discredited on August 18, 2017, however, when Foot Locker announced another quarter of disappointing results, including its first negative comparable metrics in *29 quarters*, along with lowered full-year expectations. ¶¶112-14. In response, Foot Locker's share price fell nearly 28%. This slowdown in Foot Locker's business was "within the zone of risk concealed by [Defendants'] misrepresentations and omissions" about Foot Locker's vendor relationships and product allocations, and thus suffices to plead loss causation. *Lentell*, 396 F.3d at 173.[37]

While Defendants argue that these announcements did not explicitly reveal that Foot Locker was being adversely impacted by vendors' direct-to-consumer initiatives (MTD at 33-34), "corporate wrongdoers rarely admit that they committed fraud[.]" *Freudenberg*, 712 F. Supp. 2d at 202. Therefore, "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure [to] be a 'mirror image' tantamount to a confession of fraud." *Id.*; *see also Van Dongen*, 951 F. Supp. 2d at 477 (finding loss causation adequately alleged although company's disappointing results did not "explicitly disclose" the fraud).

Defendants cannot be expected to have admitted that their previous explanations and denials

---

[37]   Defendants do not challenge the SAC's allegations that their August 18 admissions that Foot Locker's gross margins had deteriorated due to "higher markdown[s]," and that a "very high level of promotional activity" had "affected [Foot Locker] more this quarter than in the past" revealed that the Company was saddled with undesirable inventory which needed to be marked down in order to be sold. ¶¶12, 112, 114.

- 34 -

were false, and that Foot Locker was in fact facing a sustained downturn as its top vendors increasingly sold their products directly to consumers and simultaneously allocated less premier inventory to Foot Locker.  ¶116.[38]  Yet the market widely understood this reality, as reflected by analyst reports issued the same day.  *See* ¶117 (quoting analyst reports by Credit Suisse, Evercore ISI, J.P. Morgan, Wells Fargo, Morgan Stanley, Piper Jaffray and UBS, and industry publication *Sneaker News*, concluding that Foot Locker was being impacted by vendors' direct-to-consumer initiatives and opining that it was receiving less favorable product allocations); *supra* at §II.B.  It is well-settled that "corrective disclosures [need not] emanate from the company itself," *Initial Pub. Offering*, 544 F. Supp. 2d at 289, and courts routinely find loss causation adequately alleged where analyst reports disclosed the relevant truth.  *See, e.g.*, *Signet Jewelers*, 2018 U.S. Dist. LEXIS 199809, at *50-*51 ("disclosures from third-party analysts who questioned the company's aggressive lending and underwriting practices" sufficiently pled loss causation).[39]

## IV.    CONCLUSION[40]

Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety.[41]

---

[38]  For the same reason, the continued hedges and denials cited by Defendants do not alter the analysis.  MTD at 33.  Indeed, Defendants' purported "unrelated explanation for the downturn" – "'shifts in consumer behavior and spending patterns'" driven by "'mobile technology'" (*id*. at 34) is consistent with the SAC's allegation that Foot Locker's vendors were successfully using apps to target the Company's customers as part of their direct-to-consumer efforts.  ¶55.

[39]  In *In re Francesca's Holdings Corp. Sec. Litig*., 2015 U.S. Dist. LEXIS 50726, at *54 (S.D.N.Y. Mar. 31, 2015), the plaintiffs failed to plead loss causation because the alleged corrective disclosure merely "reaffirmed" previously disclosed information – a situation not at issue here.  MTD at 34.

[40]  Because the SAC states a Section 10(b) claim against Defendants, and scienter has been pled with particularity, Plaintiffs have also stated a control-person claim under Section 20(a) with culpable participation.

[41]  If the Court grants Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend, which is typically freely given.  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also Loreley*, 797 F.3d at 190 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

DATED:  March 8, 2019

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
LINDSAY LA MARCA

*/s/ Erin W. Boardman*
ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
llamarca@rgrdlaw.com

*Lead Counsel for Plaintiff*

KRAKOW & SOURIS, LLC
AARON D. KRAKOW
225 Friend Street
Boston, MA  02114
Telephone:  617/723-8440
617/723-8443 (fax)

O'REILLY GROSSO & GROSS, P.C.
JAMES F. GROSSO
1671 Worcester Road, Suite 205
Framingham, MA  01701-5400
Telephone:  508/620-0055
508/620-7655 (fax)

*Additional Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Erin W. Boardman, hereby certify that on March 8, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


_____
            */s/ Erin W. Boardman*
            ERIN W. BOARDMAN