

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 30 2019 ★



BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

**CITY OF WARREN POLICE AND FIRE
RETIREMENT SYSTEM**, Individually and on
Behalf of All Others Similarly Situated,

                         Plaintiffs,

          – against –

**FOOT LOCKER, INC.**, **RICHARD A.
JOHNSON**, and **LAUREN B. PETERS**,

                       Defendants.

----------------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**
18-CV-1492 (AMD) (SJB)

**ANN M. DONNELLY**, United States District Judge:

On March 9, 2018, the City of Warren Police and Fire Retirement System brought this class action on behalf of itself and all others similarly situated against Foot Locker, Inc., Chief Executive Officer, President, and Board of Directors Chairman Richard A. Johnson, and Chief Financial Officer and Executive Vice President Lauren B. Peters. (*See* ECF No. 1.) On June 25, 2018, Magistrate Judge Sanket J. Bulsara appointed New England Carpenters Guaranteed Annuity and Pension Funds as the lead plaintiff and Robbins Geller Rudman & Dowd LLP as lead class counsel. (ECF No. 35.) Subsequently, on August 24, 2018, the lead plaintiff filed the operative Second Amended Complaint ("SAC"). (*See* ECF No. 36.)

The SAC alleges that beginning in August 2016, the defendants misled investors by claiming that Foot Locker had "strong" partnerships with its top vendors and continued to obtain "premier products" from them, when in reality, its vendors had become competitors through online sales and forced Foot Locker to purchase "large quantities of undesirable products" as a condition of acquiring premium merchandise. (ECF No. 36 ¶¶ 4-7.) According to the SAC, the defendants' misstatements and omissions artificially inflated Foot Locker's stock price, causing

the plaintiffs to suffer a loss when the truth was revealed in 2017. (*Id.* ¶¶ 8-11.) The plaintiffs claim that the defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and that defendants Johnson and Peters violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (*Id.* ¶¶ 145-152.)

On January 7, 2019, the defendants moved to dismiss, arguing that the plaintiffs had not alleged any actionable misstatements or omissions, and did not sufficiently plead scienter or loss causation. (*See* ECF No. 43.) I held oral argument on September 9, 2019. For the reasons stated below, I grant the defendants' motion and dismiss the complaint without prejudice.

## BACKGROUND[1]

Foot Locker is a New York City-based retailer that sells athletic footwear and apparel under several different "banners," including Foot Locker, Kids Foot Locker, Lady Foot Locker, Champs Sports, Footaction, Runners Point, Sidestep, and SIX:02. (ECF No. 36 ¶¶ 2, 39.) Structurally, the company is divided into two segments: (1) "Athletic Stores," which includes its more than 3,000 brick-and-mortar locations, and (2) "Direct-to-Customers," which includes online and catalogue sales. (*Id.* ¶¶ 2, 40.) Its Athletic Stores segment is significantly more profitable than its Direct-to-Customers segment. For example, in the 2016 fiscal year, Athletic Stores made $1.576 billion in sales, while the Director-to-Customers earned $204 million. (*Id.* ¶ 40.)

Foot Locker does not create any products; it derives its income by buying product from its vendors and reselling it for a profit. (*Id.* ¶¶ 3, 41.) According to the plaintiffs, "Foot Locker's business is heavily dependent on a small number of vendors, with its largest vendor Nike Inc. . . . supplying 68% of the Company's merchandise in fiscal 2016." (*Id.* ¶¶ 3, 41.) The ability to

---

[1] The facts are taken from the complaint, assumed to be true for purposes of this motion, and are read in the light most favorable to the plaintiffs. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

obtain "high-demand merchandise, including limited release sneaker models," is vital to its

business model. (*Id.* ¶ 3.) Limited release sneakers are particularly important to Foot Locker's

business, because its target consumers are "young males aged 12 to 25" – many of whom are

"sneaker aficionados" and Foot Locker's "most loyal customers" – purchase limited release

sneakers. (*Id.* ¶ 42-43.) Limited release sneakers make up only five percent of Foot Locker's

total sneaker sales, but keeping "sneaker aficionados" as customers helps "drive[] store traffic to

retailers such as Foot Locker." (*Id.* ¶ 43.)

The plaintiffs purchased Foot Locker common stock, which is listed and traded on the

New York Stock Exchange, between August 19, 2016 and August 17, 2017 (the "Class Period"),

and bring this action complaining that the defendants committed fraud when they led investors to

believe that Foot Locker had "strong vendor relationships." (*Id.* ¶¶ 1, 4.) The plaintiffs further

allege that Foot Locker did not have the "great partnerships" it touted; many of its vendors had

become competitors by selling directly to customers through online marketplaces and were

forcing Foot Locker to accept more difficult to sell "non-premium merchandise" in order to

receive premium products. (*Id.* ¶¶ 5-7.)

## I.    Confidential Witnesses

The plaintiff's fraud allegations are based on information from eight confidential

witnesses ("CWs") each of whom worked at Foot Locker in varying roles. (*Id.* ¶¶ 50-63.) CW1,

a replenishment analyst until April 2016,[2] analyzed sales trends in women's footwear and

advised buyers on how much inventory to buy. (*Id.* ¶ 31.) CW2 was a treasury analyst through

November 2016 and a financial analyst until January 2017; he forecasted the company's cash

flow for North American operations and return on investment for store openings and

---

[2] CW1 left the company before the beginning of the Class Period in August of 2016.

remodelings. (*Id.* ¶ 32.) CW3 was a director of store optimization for SIX:02 – which features footwear and apparel for the "modern woman" – from "before the Class Period through September 2017;" she prepared "reports containing performance results, marketing review, and product analysis for the SIX:02 banner." (*Id.* ¶ 33.) CW4 was a retail planner in Footaction, responsible for "forecasting margins and inventory levels on a daily, monthly, yearly and three-year basis." (*Id.* ¶ 34.) CW5 was a replenishment analyst until September 2017, and determined how to distribute footwear among Foot Locker's stores. (*Id.* ¶ 35.) CW6 was a marketing brand coordinator for SIX:02 until September 2017; she worked with Foot Locker vendors including Nike and Adidas "to increase recognition of the SIX:02 banner." (*Id.* ¶ 36.) CW7, an associate buyer for SIX:02 until September 2017, "negotiate[ed] the purchase of inventory from vendors including Nike and Adidas." (Id. ¶ 37.) CW8 was a Foot Locker vice president until January 2016.[3] (*Id.* ¶ 38.)

According to CW1, beginning in around April 2016, "many of Foot Locker's vendors began to keep much of their premier products for themselves" and for boutique stores, "rather than selling those products through Foot Locker." (*Id.* ¶ 51.) CW2 and CW3 confirmed that Nike sold only limited quantities of its "especially popular products" to Foot Locker during the Class Period. (*Id.* ¶¶ 52-53.) CW2 saw that vendors like Nike and Adidas began selling special release products through their own websites and sometimes only through custom apps. (*Id.* ¶¶ 51-52.)

The plaintiffs also allege that "during the Class Period, . . . vendors would require Foot Locker to purchase large quantities of undesirable merchandise in order to obtain desirable merchandise." (*Id.* ¶ 56.) CW3 attended product meetings at Nike every six months and reported that Nike allowed Foot Locker to obtain premium Nike products only if it also agreed to

---

[3] CW8 also left the company before the start of the Class Period.

purchase significant less desirable inventory. (*Id.*) According to CW5, CW6, and CW7, some of Foot Locker's other vendors had similar policies. (*Id.* ¶ 58.) CW4 explained that "Nike had a '70/30' rule, whereby Foot Locker could obtain only 70% of the sneakers that the Company wanted to purchase [and] had to fill the other 30% of the order amount with sneaker models that the Company knew would be difficult to sell." (*Id.* ¶ 57-58.) According to CW3, Foot Locker had difficulty selling the "undesirable merchandise," a problem that was compounded because Nike would only refund a small percentage of the price if Foot Locker returned inventory it could not sell. (*Id.* ¶ 61.) Likewise, CW7 and CW4 said that other vendors would allow Foot Locker to return only a small amount of inventory – about five to six percent, and not more than ten percent of the unsold products. (*Id.*) CW4 confirmed that this limitation on Foot Locker's ability to return unsold inventory "resulted in a glut of inventory that needed to be marked down in order to be sold." (*Id.* ¶ 62.)

## II.    **Public Statements**[4]

According to the plaintiffs, the defendants made false statements during the Class Period that led investors to believe it was not affected by its vendors' growing online sales and that it continued to obtain premium merchandise from its vendors.

The plaintiffs claim that the defendants' fraudulent scheme began on August 19, 2016, when Foot Locker announced its financial results for the second quarter of 2016.[5] It reported increased earnings; earnings per share increased 12% to $0.94 per share, net income totaled $127 million, and total sales increased 5% to $1.78 billion. (*Id.* ¶ 73.) In connection with its earnings

---

[4] At the oral argument on September 9, 2019, the parties agreed that the Court should consider the transcripts of the defendants' various public statements during the Class Period.

[5] At oral argument, counsel for Foot Locker represented that the second quarter of 2016 was the company's "best quarter" financially.

announcement, defendants Johnson and Peters boasted of Foot Locker's "strong leadership positions in the athletic industry," its "current strong financial position," and its "deep understanding of the core customer." (*Id.* ¶¶ 73-74; *see id.* ¶¶ 76, 78.) They also made clear that Foot Locker's understanding of customer preferences and choices helped build strong partnerships with vendors. For example, defendant Johnson said that Foot Locker was "leading in understanding what [its] customers want, and how and when they want it. . . . This work in turn make[s] us a leading partner for our world-class vendors . . . ." (*Id.* ¶ 76.) He said that Foot Locker's banners were "the perfect battleground to fight it out to win market share, especially with the young male customers who buy the most sneakers . . . And that's why the leading brands continue to be highly motivated to collaborate with [the company] on these exclusive and strong allocations." (*Id.*)

Defendants Johnson and Peters discussed product allocation and assortment: "Our buyers and our merchants do a great job of working with our vendor partners to bring in assortments that resonate with our consumers" and Foot Locker was "getting the allocations [due to] the great relationship that [it] ha[s] with all of [its] vendor partners." (*Id.* ¶¶ 80-81.) Moreover, Foot Locker "continue[d] to work with all of [its] vendor partners to increase [] allocations," and trusted that "the vendor partners do a good job of controlling the flow into the marketplace, and keeping that ever-present demand out there." (*Id.* ¶ 81.) When asked specifically about exclusive non-basketball products from Nike, Adidas, Under Armour, and Puma, defendant Johnson replied, "They're all committed to bringing fresh, new, exclusive product into those spaces . . . [T]hey deliver great product, some of it exclusive, some of it with time leads." (*Id.* ¶ 82.) These "great partnerships . . . [are] all working and we're very positive about the vendor partnerships." (*Id.*)

On November 18, 2016, the company announced is third quarter results: Earnings per share increased 13% to $1.13 per share, net income reached $157 million, and total sales increased by 5.1% to $1.886 billion. The defendants continued to discuss the company's vendor relationships and prominent position in the sneaker and athletic industry in the accompanying filings and earnings call:

- Defendant Johnson stated that the strong quarterly earnings were a "testament to Foot Locker, Inc.'s solid position at the center of sneaker culture," and that "[o]ur vendors have certainly come to recognize and support the critical position we have built within the industry in terms of providing that feeling of authenticity to our customer." (*Id.* ¶¶ 85, 88.)

- In the same vein, he said, "We work continuously with our vendors to share the insights we gathered . . . . Ultimately, it is having available the most innovative products from our outstanding suppliers that keeps our banners top of mind with our most influential customers. (*Id.* ¶ 88.)

- When questioned whether Foot Locker would "be in a better position in terms of allocations with some of that hottest product" moving forward, Johnson responded that what "fuels our business with our consumers is a scarcity model. . . . [We] try to get what we think is the appropriate amount for our stores. But it's an ongoing conversation. And as significant partners with our suppliers, I think we end up with . . . a model that the consumers are driven by because they know they have to get into the stores and get it or they might not have the chance. So the scarcity piece of the allocation models is important to our success." (*Id.* ¶ 90.)

- Defendant Peters confirmed that Foot Locker's "inventory [was] fresh and well-positioned . . . ." (*Id.* ¶ 86.)

On February 24, 2017, Foot Locker continued to report strong financial results for the fiscal year 2016. Earnings per share had increased 18% to $1.37 per share, and its year-end net income was $189 million. (*Id.* ¶ 93.) The defendants commented that Foot Locker remained "at the center of sneaker culture," but that a "delay in the release of tax refunds by the IRS" would likely result in "a challenging first quarter." (*Id.* ¶¶ 93, 95.) According to Johnson, the delay in tax refunds resulted in "buying opportunities that have passed when our consumer didn't have cash in their hands," but that Foot Locker "ha[d] a huge belief that [its] vendors continue to bring

heat in our category to our stores and websites," and that "the consumer still has a huge desire for the product that we have in our store." (*Id.* ¶ 98; *see id.* ¶ 97.)

On April 20, 2017, Foot Locker issued a press release updating its guidance for the first quarter 2017 "in light of the previously noted slow start to the fiscal year in February." (*Id.* ¶ 102.) Among other things, it adjusted its first quarter earnings per share from $1.39 to $1.36 and projected that first quarter store sales "were expected to increase at a low-single digit percentage rate." (*Id.*) Defendant Johnson attributed this "slow start" to "the delay in the issuance of the vast majority of income tax refund checks until after the NBA All-Star Game[, which] significantly affected our February comparable store sales, which were down low-double digits." (*Id.*) But he reaffirmed that "the customer's appetite for our existing product assortments has not changed," and that "[Foot Locker] is confident [that its] banners remain at the center of sneaker culture." (*Id.*)

The plaintiffs allege that the truth about Foot Locker's vendor partnerships and competitors began to leak to the market on May 19, 2017, when the defendants announced the financial results for the first quarter of 2017. (*Id.* ¶ 104.) The company reported that store sales did not meet its guidance and "had risen only 0.5% year-over-year," that its quarterly net income had fallen to $180 million from $191 million, and that its quarterly earnings per share had fallen from $1.39 to $1.36. (*Id.*) The defendants projected that earnings would be in the low-single digits, and would stay "relatively flat" year-over-year. (*Id.* ¶ 105.) They also said that if "recent sales trends continue[d]," Foot Locker would execute a "Plan B" to cut costs and inventory to achieve its 2017 year-end earnings guidance. (*Id.*) As a result, Foot Locker's share price declined 16.65% from $70.45 to $58.72 that same day. (*Id.* ¶ 110.)

According to the plaintiffs, these subpar results did not stop the defendants from perpetuating the alleged fraud. Instead of disclosing the truth about vendor partnerships and the competitive market, the plaintiffs say, the defendants again attributed the disappointing results to delayed tax refunds: "The slow start we experienced in February, which we believed was largely due to the delay in income tax refunds, was unfortunately not fully offset by much stronger sales in March and April." (*Id.* ¶ 106.) The defendants continued to tout the strength of Foot Locker's vendor relationships and competitiveness in the market while downplaying the negative effects of its vendors' direct-to-consumer sales:

- Defendant Johnson stated that Foot Locker's "banner remain[ed] at the center of a vibrant sneaker culture," that the defendants were "confident that [Foot Locker's customers ha[d] not lost their tremendous appetite for athletic footwear and apparel," and that Foot Locker's "position in the industry [was] stronger than ever." (*Id.*)

- On an earnings call, defendant Johnson was asked whether he thought that "direct-to-consumer efforts of some of the brands are impacting the business at all today?" He replied, "At all? Sure. But, I mean, I think that there's some pressure from everybody that sells sneakers. We're all fighting for consumers. I think that our understanding of our consumer base and our connectivity, trying to create consistent, authentic, memorable experience for our consumer, whether they're in-store or online with us, allow us to push back against that. But certainly, people have a lot of shopping choices, whether it's online or places in malls or on the street. So I don't know that it's any more right now, Bob, than it's been, but we'll continue to be diligent across all of the channels and leverage our inventory and our experiences with our consumers across all those channels." (*Id.* ¶107.)

- Johnson went on to say that "[t]he vendors continue to support our initiative, right? We're building House of Hoops. We're looking at Kicks Lounges, the Fly Zones in Kids Foot Locker, opening the Jordan store in Paris. All of those things just speak to the strength of the relationship with our key vendor partners." (*Id.*)

- When asked about "how the second quarter is just a blip," Johnson replied that, "[t]here's just a little bit of a lag," and that "the consumer hasn't gone elsewhere." (*Id.* ¶ 108.)

- On the same call, defendant Peters said, "We know these customers well, and we know the differences in those customers across our different brands. We understand what motivates them, what they get excited about, and that's what we focus on

bringing to them. So with that focus, they know they've got to come to us to check out what we've got before they make their purchase decision." (*Id.* ¶ 107.)

On August 18, 2017, when Foot Locker announced its second quarter earnings, investors learned of Foot Locker's alleged deteriorating vendor relationships. Foot Locker announced that its second quarter total sales declined 4.4% compared to 2016, from $1.78 billion to $1.701 billion, that its net income had dropped to $51 million compared with $127 million in 2016, and that its earnings per share had fallen to $0.39 from its 2016 comparable $0.94. (*Id.* ¶ 112.) The company revised its guidance, explaining that it expected comparable store sales to drop 3% to 4% for the remainder of 2017, and that earnings per share would likely decrease "between 20% to 30% in the second half of 2017." (*Id.* ¶¶ 112, 114.) The defendants explained that the disappointing results were due to "higher markdown[s]" and a "very high level of promotional activity." (*Id.* ¶ 114.) As a result, Foot Locker anticipated closing 35 additional stores, and "shifting [its] emphasis from real estate to digital and supply chain." (*Id.* ¶¶ 113-14.) On August 18, Foot Locker's stock price dropped about 28%, from $47.70 to $34.38; the next day, the price dropped again to $31.82. (*Id.* ¶ 115.)

Some time "[f]ollowing the August 18, 2017 announcements," analysts reported, among other things, that "retailer disintermediation by core vendors looks to be outpacing Foot Locker's digital offset," that "investors have been significantly concerned about the disruption that e-commerce is causing to sellers of third-party goods," and that the second quarter results "lent more credence to the idea that Foot Locker was being negatively impacted by Adidas.com and Nike.com." (*Id.* ¶ 117 (internal alterations omitted).)

## III.    Material Omissions

In addition to alleging that the defendants defrauded investors by making misleading statements, the plaintiffs also claim that the defendants, in their Forms 10-Q and 10-K, failed to

disclose their vendors' increasing direct-to-consumer sales, their inability to obtain premium products, and the increased inventory of undesirable products, in violation of Securities and Exchange Commission reporting rules and regulations. (*See id.* ¶¶ 64-72.) Specifically, the plaintiffs argue that Foot Locker's September 7, 2016, December 7, 2016, and June 6, 2017 Forms 10-Q and March 23, 2017 Form 10-K did not include disclosures mandated by Items 303 and 503 of Regulation S-K. (*See id.* ¶¶ 84, 92, 101, 111.)

The plaintiffs allege that the defendants failed to meet Item 303's requirement that Forms 10-Q and 10-K include "Management's Discussion and Analysis of Financial Condition and Results of Operations;" in particular, they claim that Foot Locker's filings did not disclose: "(i) material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition; (ii) known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income form continuing operations; and (iii) unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." (*Id.* ¶ 69 (internal quotation marks omitted).) Similarly, the plaintiffs claim that the defendants did not meet disclosure requirements under Item 503, 17 C.F.R. § 229.503(c), which says that a company must provide a "Risk Factors" section that "discuss[es] . . . the most significant factors that make the [securities] speculative or risky," "[s]et forth each risk factor," and "explain how the risk affects the [company]." (*Id.* ¶ 70.)[6] According to the plaintiffs, the defendants should have included discussions about the increasing number of direct sales from vendors to customers, Foot Locker's inability to obtain enough premier product, and vendors'

---

[6] Form 10-K requires a "Risk Factors" discussion, while Forms 10-Q requires that the company "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K." (*Id.*)

conditions that Foot Locker purchase large amounts of unpopular products to obtain premium ones. (*Id.* ¶¶ 68, 71.)

## IV.     Scienter Allegations

The plaintiffs make factual allegations to support their claim that the defendants knowingly or recklessly defrauded investors. First, they say that because vendor supply "relates to the core business of Foot Locker," the defendants "would have closely monitored the direct-to-consumer sales of Nike and the Company's other top vendors throughout the Class Period," and would have known that "vendors were increasingly bypassing Foot Locker" to sell their products to online consumers and thus were keeping more of their premier products. (ECF No. 36 ¶ 121.) The defendants also would have known from monitoring Foot Locker's "inventory purchase" that its vendors were forcing the company to purchase "large quantities of undesirable products." (*Id.* ¶ 122.)

In addition, the plaintiffs claim that "at the end of the Class Period," defendant Peters said that the defendants knew that during the second quarter of 2017 that "sales were declining 'more than expected,'" which is why Foot Locker had "decided to 'temporarily halt[]' the Company's share 'repurchase activity;'" given the defendants' alleged knowledge of declining sales, the plaintiffs allege the defendants should have "pre-announce[d] that they expected disappointing financial results for 2Q17, as they had done on April 20, 2017 with respect to 1Q17." (ECF No. 36 ¶ 123.)

The plaintiffs also charge that the defendants knew of or recklessly disregarded the deterioration in vendor relationships because of Foot Locker's systems, periodic reports, and regular meetings. An internal network, Quantum, was updated daily and kept track of "sell through data, sales numbers, products and inventory." (*Id.* ¶ 124.) The company also used

12

"MicroStrategy software, which showed the Company's sales on a daily, weekly, and monthly basis." (*Id.*) According to CW6 and CW8, defendants Johnson and Peters attended weekly meetings at which the leadership team "discussed sales, earnings and cost trends." (*Id.* ¶ 125.) At a separate weekly meeting, defendant Peters reviewed financial forecasts, revenues, and mark-downs. (*Id.*) Last, the plaintiffs argue that defendants Johnson and Peters, as well as other insiders, engaged in suspicious trading activity that raises an inference of fraudulent intent (*id.* ¶ 127):

| Insider | Date | Price | Shares Sold | Proceeds | Percentage Sold |
|---------|------|-------|-------------|----------|-----------------|
| Defendant Johnson (CEO, President, Chairman) | 8/19/16 8/19/16 | $68.00 $68.10 | 30,000 20,000 | $2,040,000 $1,362,000 | 5.4% |
| Defendant Peters (CFO) | 8/22/16 3/8/17 | $68.00 $77.51 | 20,000 25,000 | $1,360,000 $1,937,750 | 10.9% |
| Lewis P. Kimble (Executive VP, CEO International) | 9/7/16 9/7/16 | $65.38 $65.46 | 30,667 12,812 | $2,005,008 $838,674 | 32.5% |
| Paulette Alviti (Senior Vice President, Chief Human Resources Officer) | 12/5/16 12/5/16 4/20/17 | $75.23 $75.37 $74.50 | 3,000 7,000 8,000 | $225,690 $527,590 $596,000 | 21.4% |
| Jarobin Gilbert (Director) | 12/9/16 5/24/17 | $76.23 $59.40 | 1,000 5,600 | $76,230 $332,640 | 38.9% |
| Nicholas P. Dipaolo (Director) | 10/13/16 | $68.75 | 5,424 | $372,900 | 7.3% |
| Cheryl N. Turpin (Director) | 10/12/16 3/2/17 | $69.16 $76.17 | 10,000 2,000 | $691,600 $152,340 | 21.8% |
| Matthew M. McKenna (Director) | 11/29/16 3/1/17 | $72.39 $75.92 | 6,659 5,000 | $482,045 $379,600 | 19.9% |
| | **Total:** | | 192,162 | $13,380,067 | |

According to the plaintiffs, these sales were unusual because in the year prior to the Class Period, "Foot Locker insiders sold just 31,628 shares for proceeds of approximately $2.1 million," and

for the year after the Class Period, "Foot Locker insiders sold just 73,442 shares for proceeds of approximately $3.6 million." (*Id.* ¶¶ 128-29.)

Based on these allegations, the plaintiffs, on behalf of a putative class, claim that Foot Locker and defendants Johnson and Peters engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and its implementing regulation, Rule 10b-5 (Count I) and that the individual defendants are liable under Section 20(a) of the Exchange Act (Count II). (ECF No. 36 ¶¶ 145-52.) On January 7, 2019, the defendants moved to dismiss the SAC in its entirety. (ECF No. 43.) For the reasons discussed below, that motion is granted.

## DISCUSSION

Generally, in order to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In a securities fraud case, the court may consider "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the [SEC], and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Stratte-McClure v. Morgan Stanley,* 776 F.3d 94, 100 (2d Cir. 2015) (internal alterations omitted).

A plaintiff alleging securities fraud must comply with the heightened pleading requirements detailed in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities

fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud."

Fed. R. Civ. P. 9(b). "[T]o satisfy this requirement the plaintiff must '(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v.

Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang,* 355 F.3d

164, 170 (2d Cir. 2004)). Under the PSLRA, a securities fraud plaintiff must "specify each

misleading statement," explain why the statement is misleading, and "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Id.* (citing *Dura Pharms., Inc v. Broudo*, 544 U.S. 336, 345 (2005) (internal quotation marks and

alterations omitted)); *see also* 15 U.S.C. § 78u–4(b)(1), (2)).

## I.    Section 10(b) Claim

"Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to 'use or

employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of [the] rules and regulations' that the SEC

prescribes." *Stratte-McClure*, 776 F.3d at 100 (citing 15 U.S.C. § 78j); *see also* 17 C.F.R. §

240.10b–5. To sustain claims under Section 10(b) or Rule 10b-5, a complaint must plausibly

allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of

mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic

loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quoting

*Kleinman*, 706 F.3d at 152 (internal quotation marks and brackets omitted)).

A.    Material Misrepresentations or Omissions

The plaintiffs' allegations of misleading statements can be grouped into three categories: (1) statements in which the defendants misled the public about its competitive strength without disclosing growing adverse market trends, (2) statements in which the defendants falsely touted Foot Locker's "great partnerships" with its vendors, and (3) statements in which the defendants discussed the company's product allocation and inventory without mentioning that vendors forced it to take on difficult to-sell "non-premium merchandise" as a condition to obtaining premium products. The defendants argue that the plaintiffs have not established 10(b) liability. They say that the alleged misstatements are not actionable because: they are not false or misleading; they are are puffery; they were accompanied by meaningful cautionary language; and because they are opinions. (*See* ECF No. 43.) Further, they assert that the plaintiffs have not identified any violation of a duty to disclose. (*Id.*) For the reasons discussed below, I find that the plaintiffs have not pled an actionable statement or omission warranting 10(b) liability.

*1.    Alleged Misstatements Concealing Adverse Market Trends*

The plaintiffs allege that during the Class Period, the defendants led investors to believe that Foot Locker continued to hold a strong position in the market, when it was in reality suffering from the increasing direct-to-consumer online sales of its vendors. (ECF No. 36 ¶¶73-77, 85-89, 93-97.) The plaintiffs claim that the defendants' statements that Foot Locker continued to "understand[] what our consumers want" and that its "core consumers want[ed] to be in our stores" masked the truth that customers were, in larger numbers, defecting and buying directly from vendors online. (*Id.* ¶¶ 76-79, 98-100.) The plaintiffs also claim that the defendants tried to conceal the adverse direct-to-consumer market trend by blaming the company's poor

performance on "the delay in income tax refunds." (ECF No. 36 ¶ 106; *see, e.g., id.* ¶¶ 93-96, 98-100, 102-03, 106-09.) None of the defendants' statements is actionable.

The defendants characterize their statements – that Foot Locker had a "strong leadership position" (*id.* ¶ 73),[7] was a "leading retailer of premium sneakers" (*id.* ¶ 76), and was a "preferred destination for the best footwear and apparel" (*id.* ¶ 85) – as mere puffery, and thus not actionable. (ECF No. 43 at 14.) As for statements that Foot Locker "understand[s] what [its] customers want" (ECF No. 36 ¶ 76) and has a "connectivity with [its] consumer" (*id.* ¶ 78), the defendants say that they are broad and generalized and that no reasonable investor would rely on them. (ECF No. 43 at 15.)

Puffery encompasses "vague and optimistic 'statements [that] are too general to cause a reasonable investor to rely upon them,' and thus cannot serve as the basis for a securities fraud claim." *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 497 (2d Cir. 2019) (summary order) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)); *see Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). The statements at issue here are plainly puffery; they are unverifiable claims upon which no reasonable investor could rely. Accordingly, the statements do not give rise to liability. *See Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Employees Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (Statements that a new platform helped "differentiate [the company] from [its] competitors around the world" could not "reasonably be found to be misleading."); *Gregory v. ProNAi Therapeutics Inc.*, 297 F.

---

[7] *See id.* ¶¶ 93, 102, 106 (discussing the company's "solid position" at the "center of sneaker culture"), ¶ 88 (Foot Locker has a "critical position we have built within the industry").

Supp. 3d 372, 399 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (Pronouncement that the

defendant pharmaceutical company was "a leader in developing and commercializing a broad

and diverse portfolio of cancer therapies" was nonactionable puffery.) (collecting cases);

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) (Statements that expressed

the company's "belief in its competitive advantage" were not actionable.)

The defendants argue that the plaintiffs have not pled with particularity that the

defendants' statements were false or misleading by omission. To establish falsity, plaintiffs must

do more than simply assert that a statement is false; "they must demonstrate with specificity why

that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphasis added) "A violation

of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged

material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F.

Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *San Leandro*

*Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d

Cir. 1996)).

"Similar to the falsity of statements, omissions are only actionable if a defendant is under

a duty to disclose information and fails to do so." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at

571–72 (citing *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013)). However,

when a company decides to disclose certain information, "[d]isclosure is required . . . to make . .

. the statements made, in the light of the circumstances under which they were made, not

misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotation

marks omitted) (quoting Rule 10b–5, 17 C.F.R. § 240.10b–5(b); *see In re Vivendi, S.A. Sec.*

*Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). In other words, "once a company speaks on an issue or

topic, there is a duty to tell the whole truth, even where there is no existing independent duty to

disclose information on the issue or topic." *Vivendi*, 838 F.3d at 258 (internal quotation marks

omitted); *see Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) (when a party

chooses to speak on a subject, it has a "duty to be both accurate and complete"). A statement or

omission is material when there is "a substantial likelihood that the disclosure of the omitted fact

would have been viewed by the reasonable investor as having significantly altered the total mix

of information made available" to the market. *IBEW Local Union No. 58 Pension Tr. Fund &*

*Annuity Fund v. Royal Bank of Scot. Grp., P.L.C.*, 783 F.3d 383, 390 (2d Cir. 2015) (internal

quotation marks and citations omitted).

The defendants argue that the "[p]laintiffs offer no particularized facts . . . that

contradict" Foot Locker's optimistic statements about its market performance and consumer

understanding. (ECF No. 43 at 14.) In addition, the defendants argue that none of the CW

allegations suggest that the issue of vendors turning into competitors was in fact having a

negative impact on Foot Locker. (ECF No. 47 at 13.) I agree. The only allegations in the SAC

that imply falsity are general CW observations that vendors "began to keep much of their

premier products for themselves" and that CW2 saw Nike and Adidas selling special release

products through their own websites and apps. (ECF No. 36 ¶¶ 51, 52.) These claims are not

sufficiently particularized, and in any event, do not render the defendants' statements about Foot

Locker's consumer insight and general market standing false or misleading.[8] *See Rombach*, 355

F.3d at 174 (plaintiff "must demonstrate with specificity why and how" a statement was false or

misleading). Because the plaintiffs do not allege that vendors' direct sales to customers had a

---

[8] The plaintiffs' assertion that the defendants' explanation that sales had decreased due to delayed tax refunds was a façade to hide the truth about increased vendor competition is simply that: an assertion without any factual basis. Nowhere in the SAC do the plaintiffs claim that there was no delay in tax refunds nor that any such delay did not cause sales to decrease.

negative effect on the company's sales, they cannot meet the specific falsity pleading requirements.[9] In short, the statements are not actionable.[10]

### 2. Alleged Misstatements About Foot Locker's Vendor Relationships

The plaintiff's allegations that Foot Locker misrepresented its vendor relationships and thus misled investors do not withstand a motion to dismiss. According to the plaintiffs, the defendants misstated the strength of its vendor relationships, because vendors like Nike and Adidas had become competitors by selling directly to customers. For example, on the 2016 second quarter earnings call, defendant Johnson stated that Foot Locker had "great partnerships that continue to fuel sneaker culture. So they're all working and we're very positive about the vendor partnerships." (ECF No. 36 ¶ 82.) He also said that Foot Locker was a "lead[ing] partner for [its] world-class vendors" (*Id.* ¶ 76), and "getting the allocations relates to the great relationship that [the company] ha[s] with all [its] vendor partners," (*Id.* ¶ 81). The defendants said that Foot Locker worked closely with its vendors to "to bring in assortments that resonate with . . . consumers" (*Id.* ¶ 80), and that they "share[d] this understanding [of Foot Locker's consumers] with . . . key vendors, which enables [the company] to partner with them to deliver . . . premium footwear and apparel," (*Id.* ¶ 73).

Again, the plaintiffs cite broad characterizations of Foot Locker's vendor relationships as "strong," "positive," and "great:" statements that amount to puffery, and are insufficient to

---

[9] The plaintiffs rely on *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) for the proposition that "quantification was not necessary to illustrate the alleged fraud." But the plaintiff in that case alleged significantly more detail to "illustrate the existence of a negative impact" from the alleged undisclosed integration activities. *Id.* at 298. For example, the plaintiff in *Galestan* "identifie[d] specific metrics and reports on the Symphony platform that allegedly measured productivity and delinquency rate." *Id.* at 299. The plaintiffs here do not make similarly detailed allegations.

[10] Likewise, the plaintiffs' claims that the defendants did not comply with Items 303 and 503 are not actionable since they have not established that there was in fact a market trend that harmed Foot Locker's sales and earnings.

sustain a 10(b) action. *See Rudman v. CHC Group LTD.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) (The defendant's "statements regarding its 'strong' relationships with [one of its top customers] was no more than 'puffery' which does not give rise to securities violations." (internal quotations omitted)).

Nor have the plaintiffs alleged that the statements were false or misleading. The plaintiffs do not explain why the statements about working closely with vendors and having "strong" vendor relationships are false, or allege facts to support their claim. Instead, the plaintiffs rely on CW statements that vendors were not selling "especially popular products" to Foot Locker, and were keeping those products to sell themselves. (*See* ECF No. 45 ("No reasonable investor would have understood from these statements that in truth, Foot Locker's top vendors were increasingly bypassing the Company and selling their products directly to consumers, becoming their own retailers and competing – rather than partnering – with Foot Locker.").) The CWs did not say that the vendor relationships were not "strong" or that vendors were refusing to work with Foot Locker on product assortment and allocations. For that reason, the CW statements do not support the plaintiff's claims. Without more, the plaintiffs have not put forth factual allegations that render the defendants' statements false or misleading. The statements touting the strength of Foot Locker's vendor relationships are thus not actionable.[11]

### 3. *Alleged Misstatements About Foot Locker's Inventory and Product Allocation*

The plaintiffs claim that they have alleged an actionable misstatement or omission with regard to the defendants' statements about Foot Locker's inventory and product allocation.

---

[11] The defendants argue that certain of the alleged misstatements are forward-looking statements accompanied by meaningful cautionary language and inactionable opinion statements. (ECF No. 43 at 15-20.) I do not reach these arguments, as I find that they are not actionable on other grounds.

During the Class Period, the defendants touted Foot Locker's "careful inventory . . .

management" and "fresh and well-positioned inventory." (ECF No. 36 ¶¶ 76, 80.) They claimed

that "leading brands continue to be highly motivated to collaborate with [Foot Locker] on these

exclusive and strong allocations" and are "committed to bringing fresh, new, exclusive product."

(*Id.* ¶¶ 80, 82.) However, the defendants also said that allocations were "an ongoing

conversation" and that Foot Locker was continuing to "try to get what [it] th[ought was] the

appropriate amount for [its] stores." (*Id.* ¶ 90.) One defendant explained that Foot Locker was

doing "really good work . . . on improving [] allocation to get the right product to the right place,

right time, and keeping control of the inventory," and that "[t]hat too ha[d] fueled lower mark

downs." (*Id.* ¶ 80.) Still, Foot Locker was "do[ing] a great job managing its average selling

prices." (*Id.* ¶ 80.)

According to the plaintiffs, these statements are false and misleading because Foot

Locker was not receiving sufficient quantities of premier products due to vendors' growing

online direct-to-consumer sales; instead, it was saddled with difficult-to-sell merchandise.

Specifically, CW4 asserted that during the Class Period, "Nike had a "70/30" rule, whereby Foot

Locker could only obtain 70% of the sneakers that the Company wanted to purchase . . . Foot

Locker had to fill the other 30% of the order amount with sneaker models that the Company

knew would be difficult to sell." (*Id.* ¶ 57.) According to the CWs, the "70/30" rule, combined

with the condition that less than ten percent of unsold product could be returned to the vendor,

"resulted in a glut of inventory that needed to be marked down in order to be sold." (*Id.* ¶¶ 61-

62.)

The plaintiff's theory of falsity is not supported by the CW allegations. For example, the

plaintiffs claim that statements that Foot Locker was managing its inventory "carefully" were

misleading, but the CWs did not claim that Foot Locker was not being diligent with its inventory. Instead, they reported only that Foot Locker did not obtain exclusively premium merchandise through the "70/30" rule or otherwise. (*Id.* ¶ 56.) Likewise, CW statements that Foot Locker bought "large quantities of undesirable merchandise in order to obtain desirable merchandise" do not undercut Foot Locker's statements that it was attempting to "try to get what [it] th[ought was] the appropriate amount for [its] stores" or working to "improv[e] allocation to get the right product to the right place, right time . . . ." (*Id.* ¶¶ 56, 80, 90).

Drawing all reasonable inferences from the allegations, I find that the plaintiffs have not pled enough particularized facts to demonstrate that the defendants' claims were false or misleading.

B.   Scienter

Although I conclude that the allegations do not make out an actionable statement or omission, I nevertheless consider whether the plaintiffs have sufficiently pled scienter. To sustain a Section 10(b) or Rule 10b-5 action, the plaintiffs must allege that each defendant acted with scienter, or "a mental state embracing intent to deceive, manipulate, or defraud" investors. *Boca Raton*, 506 F. App'x at 38 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011)). Plaintiffs must "allege facts that give rise to a *strong inference* of fraudulent intent," *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (emphasis added); a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In addition, "[p]laintiffs must allege those facts that give rise to an inference of scienter 'with particularity.'" *Singh*, 918 F.3d at 62 (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99).

Plaintiffs may plead scienter in two ways: by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015) (citation omitted); *see also Boca Raton*, 506 F. App'x at 38 (citing *In re Carter–Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). When the defendant is a corporation, a plaintiff must plead scienter with respect to "someone whose intent could be imputed to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The plaintiffs have not satisfied the scienter pleading requirement.

### 1. Motive and Opportunity

The plaintiffs argue that the defendants had a motive to lie because they profited from selling Foot Locker shares while the stock price was artificially inflated. (ECF No. 36 ¶¶ 127-129.) Motive may be "shown by pointing to 'the concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures." *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009). This test is "generally met when corporate insiders are alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Id.* (citation omitted).

"While motive may be 'sufficiently pleaded where [a] plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares,' the defendant's stock sales must be 'unusual' to support such an allegation." *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (summary order) (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) and *Acito*, 47 F.3d at 54). A court determining whether

sales are unusual or suspicious must consider: "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772–73 (S.D.N.Y. 2019) (citing *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018)).[12]

Here, the plaintiffs claim that during the Class Period, defendants Johnson and Peters, along with non-defendant Foot Locker officers and directors, sold 192,162 shares for over $13.38 million. (ECF No. 36 ¶ 127.) They claim that these sales, compared with the 31,628 shares sold the year before the Class Period, and the 73,442 shares sold the year after the Class Period, sufficiently raise a strong inference of scienter. (*Id.* ¶¶ 128-29.) Upon a closer examination of the specific sales, I find that the plaintiffs did not make a showing.

I first discuss the stock sales that defendants Johnson and Peters made. On August 19, 2016, defendant Johnson sold 50,000 shares for about $3.4 million. (*Id.* ¶ 127.) Defendant Peters sold 20,000 shares on August 22, 2016 for about $1.3 million and 25,000 shares on March 8, 2017 for about $1.9 million. (*Id.*) According to the SAC, defendants Johnson and Peters' sales were 5.4% and 10.9%, respectively, of their total stock holdings; thus, the sales at issue represented only a small fraction of their total beneficial ownership. *See Koplyay v. Cirrus Logic*,

---

[12] Officers and directors are presumed to have the opportunity to commit fraud. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006).

*Inc.*, No. 13-CV-790, 2013 WL 6233908, at \*5 (S.D.N.Y. Dec. 2, 2013) (Sales of 10%, 11%, 14% of corporate insiders total holdings do not amount to suspicious trades inferring scienter.)

Moreover, defendant Johnson's August 19, 2016 sales and defendant Peters' August 22, 2016 sales – both of which were made shortly after the August 19, 2016 alleged misstatements – were made pursuant to 10b5-1 trading plans that were adopted before the fraud allegedly began,[13] which undermines any inference of fraudulent intent. *See Dempsey v. Vieau*, 130 F. Supp. 3d 809, 816 (S.D.N.Y. 2015) ("[T]he mere fact that stock shares were traded pursuant to a Rule 10b5–1 trading 'do[es] not give rise to a strong inference of scienter.'" (quoting *In re Lululemon.*, 14 F. Supp. 3d at 585)).[14] Defendant Peters' remaining sale was made pursuant to a trading plan adopted during the Class Period. While it is true that trading plans entered into during the class period may raise an inference of scienter, *see Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015), the plaintiffs have not alleged any facts that suggest there was strategic trading and manipulative intent involved in the trading plan, *see In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 585 (finding that sales made pursuant to insider sales did not raise an inference of scienter where the complaint "pleads no facts that even remotely suggest that Wilson entered into the Plan 'strategically' so as to capitalize on insider knowledge of the company's allegedly undisclosed quality control issues.")

---

[13] *See* ECF No. 44-17 at 5, n.1 (defendant Johnson's August 19, 2016 sales were made pursuant to a 10b5-1 trading plan adopted on March 24, 2016); ECF No. 44-18 at 6, n.1 (defendant Peters' August 22, 2016 were pursuant to a 10b5-1 trading plan adopted on January 13, 2016).

[14] The plaintiffs cite *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) to suggest that a Rule 10b5-1 trading plan "give[s] rise to an inference of scienter," not negate it. (ECF No. 45 at 40 n.35 (quoting *Freudenberg*, 712 F. Supp. 2d at 200).) But the court in this case limited its discussion of trading plans to the individual defendants' "Rule 10b5-1 trading plans – *adopted during the Class Period*" – not plans adopted before the class period. *Freudenberg*, 712 F. Supp. 2d at 200 (emphasis added).

Nor do the stock sales of non-defendants raise an inference of intent to defraud. As an initial matter, the plaintiffs do not allege why defendants Johnson and Peters would have been motivated to engage in fraud for the benefit of other officers and directors. *See Russo v. Bruce*, 777 F. Supp. 2d 505, 518-19 (S.D.N.Y. 2011) (Allegations that non-defendant directors and officers "sold shares during the Class Period . . . do not support plaintiffs' theory of motive . . . [because] the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves." (citation omitted)); *see also Geiger v. Solomon–Page Grp., Ltd.*, 933 F. Supp. 1180, 1190 (S.D.N.Y. 1996).

Moreover, the plaintiffs have not established that the non-defendants' sales were suspicious or unusual; for the most part, they do not coincide with the dates the alleged misstatements were made. (*See* ECF No. 36 ¶ 127.)[15] *Cf. Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (Scienter was sufficiently pled where the defendants sold their shares "at peak stock prices" during the class period, and the "stock sales occurred shortly after the quarterly investor calls," on which the individual defendants made the alleged misstatements."). In fact, one of these sales occurred after the May 19, 2017 corrective disclosures, in which the plaintiffs claim *revealed* – not concealed – the alleged fraud. (*See* ECF No. 36 ¶ 127 (Mr. Gilbert sold 5,600 shares on May 24, 2017).) And, more than 80% of the sales made close to the pronouncement of an alleged misstatement – Mr.

---

[15] The plaintiff's assertion that the majority of the sales were made "within days of the Company's positive announcements" is not accurate. (ECF No. 45 at 31.) For example, the plaintiffs claim that there were insider sales made on "the same day, or shortly after" the November 18, 2016 statements – the sale most closely following those statements was on November 29, eleven days later – and the February 14, 2017 statements – the next sale after those were made over two weeks later on March 1, 2017.

Kimble's September 7, 2016 sales and Ms. Alvitti's April 20, 2017 sales – were made pursuant to a 10b5-1 trading plan adopted before the Class Period. (*See* ECF No. 44-19 at 4, n.1.)

The plaintiffs have not shown that insider stock sales during the Class Period raise a "strong inference" that the defendants acted with the requisite scienter.

       2.    *Recklessness*

Alternatively, the plaintiffs argue that the defendants acted with conscious recklessness because they had access to periodic reports of "sell through data, sales numbers, products and inventory" and held weekly meetings to discuss "sales earnings and cost trends" (ECF No. 36 ¶¶ 124-25); thus, the argument goes when they made the statements, they must have known that vendor relationships were deteriorating, and that vendors' direct online sales to consumers had increased. "Conscious misbehavior or recklessness" is a "state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citation omitted); *see South Cherry*, 573 F.3d at 109 (To establish "conscious recklessness," the plaintiff must establish that the defendants had "a state of mind approximating actual intent, and not merely a heightened form of negligence.") (citing *Novak*, 216 F.3d at 312 (internal quotation marks omitted)). Put simply, "'an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness.'" *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation omitted). Where a plaintiff cannot make a showing of "motive," the "strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 198-99.

The plaintiffs may establish "conscious recklessness" by establishing that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306 (quotation mark and citations omitted); *see also Novak*, 216 F.3d at 308 (the plaintiff must have "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."). Here, the plaintiffs have made no such allegations. Instead, they make vague assertions that the defendants had access to software that that showed Foot Locker's daily, weekly, and monthly sales numbers, as well as a network that kept "sell through data, sales numbers, products and inventory," and that they met weekly to discuss "sales, earnings, and cost trends." (ECF No. 36 ¶¶ 124-25.) The plaintiffs do not claim that the defendants discussed the alleged deteriorating vendor relationships and competing online sales at any meeting, that these issued were discussed in the defendants' presence, or that these trends were reflected in the financial reports to which the defendants had access. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 547 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (the plaintiffs did not adequately allege conscious recklessness because they did not allege that the defendants "had access to information *specifically informing them* of the [alleged undisclosed facts]." (emphasis added)).

Nor can the plaintiffs rely only on the "core operations" doctrine to meet the PSLRA's demanding scienter pleading requirement. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (The "core operations" doctrine is "not an independently sufficient means to plead scienter."); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (summary order) (Core operations doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently."). Accordingly, the plaintiffs have not established conscious recklessness.

C.     Loss Causation

Because I hold that the complaint fails to plead that the defendants had the requisite

scienter, I do not reach the defendants' alternative argument that the plaintiffs have not

adequately alleged loss causation. *See, e.g., Xerox Corp.*, 300 F. Supp. 3d at 581.

## II.     Section 20(a) Claim

The plaintiffs also allege "controlling person liability" against defendants Johnson and

Peters pursuant to Section 20(a), 15 U.S.C. § 78t(a). *See Levy v. Maggiore*, 48 F. Supp. 3d 428,

439–40 (E.D.N.Y. 2014) (citations omitted). Under Section 20(a), "every person who, directly or

indirectly, controls any person directly liable under the Securities Exchange Act" is also liable.

*Levy*, 48 F. Supp. 3d, at 439–40 (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir.

2014) (internal quotation marks and alterations omitted) (quoting 15 U.S.C. § 78t)). A party

cannot be held both primarily and secondarily liable for Exchange Act violations, but a plaintiff

may allege both as alternative theories of liability at the pleading stage. *Id.* at 440 (citing *Szulik v.

Tagliaferri*, 966 F.Supp.2d 339, 368–69 (S.D.N.Y. 2013); *In re Scholastic Corp. Sec. Litig.*, 252

F.3d 63, 77 (2d Cir. 2001); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87,

101 (2d Cir. 2001)).

Since the plaintiffs have not identified any actionable misstatements or adequately

alleged scienter or loss causation, they have not adequately pled a Section 10(b) claim.

Therefore, their Section 20(a) control person claim fails as well, as control person liability under

Section 20(a) depends on a primary violation of Section 10(b).

## CONCLUSION

The defendants' motion to dismiss the complaint is granted. The case is dismissed with

leave to amend. The plaintiffs must file an amended complaint, if any, by October 28, 2019.

**SO ORDERED.**

s/Ann M. Donnelly

_____
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
     September 30, 2019